ELECTRONICALLY
FILED
Oct 19 2018
U.S. DISTRICT COURT
Northern District of WV

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
## WHEELING DIVISION

REDSTONE INTERNATIONAL, INC.,

      Plaintiff,

v.

     Civil Action No.  5:18-cv-175

     Judge  Bailey

     JURY TRIAL DEMANDED

LIBERTY MUTUAL FIRE INSURANCE
COMPANY; and THE INSURANCE
MARKET, INC.,

      Defendants.

## COMPLAINT

NOW COMES Plaintiff, Redstone International, Inc., ("Plaintiff") by and through its undersigned counsel, and state as follows for its Complaint in this action:

## INTRODUCTION

1. Plaintiff brings this action to:

    a. Request that the Court enter a judgment declaring that Defendant Liberty Mutual Fire Insurance Company is required to provide insurance coverage to Plaintiff for the allegations in *Civil Action No. 5:15:cv-113,* pending before this Court (the "Federal Court Underlying Action"), and *Civil Action 16-C-82,* pending before the Business Court Division of the Wetzel County Circuit Court (the "State Court Underlying Action").  (hereinafter, the "Underlying Actions") under the West Virginia Uniform Declaratory Judgment Act, § 55-13-1 et seq., and Rule of Civil Procedure 57; and,

> b. Award the Plaintiff with damages, punitive damages, expenses and costs, and attorney's fees as further detailed herein for breach of contract and unjust enrichment as to Liberty Mutual Fire Insurance Company, and negligence, breach of contract, and unjust enrichment, as to The Insurance Market, Inc., (hereinafter, "The Insurance Market").

## PARTIES

2.     Plaintiff is a Pennsylvania corporation with a principal office at 1200 East National Pike, Scenery Hill, Pennsylvania, 15360, Washington County, Pennsylvania.  Plaintiff, for purposes of diversity jurisdiction, is a citizen of Pennsylvania.

3.     Defendant Liberty Mutual Fire Insurance Company ("Liberty Mutual") has a principal business address of 175 Berkeley Street, Boston, Massachusetts, Zip Code 02116 and is a wholly owned subsidiary of Liberty Mutual Group. Liberty Mutual is licensed to sell insurance in West Virginia under NAIC 23035.  Liberty Mutual Group had annual consolidated revenue of approximately 38.3 billion dollars in 2016.  Liberty Mutual has a West Virginia notice of process address of Corporation Service Company, 209 W. Washington Street, Charleston, West Virginia, 25302.  Liberty Mutual Group is incorporated in Massachusetts.  Liberty Mutual, for purposes of diversity jurisdiction, is a citizen of Massachusetts.

4.     The Insurance Market, Inc., is a Delaware corporation with a current principal business address of 109 Poplar Hill Avenue, Salisbury, Maryland, Zip Code 21801, and a registered agent or process in Delaware of Matthew Parker, 450, N. Central Avenue, P.O. Box 637, Laurel, Delaware, Zip Code 19956.  The Insurance Market, Inc., is both a citizen of Maryland and Delaware under *Hertz* for purposes of diversity jurisdiction.  *Hertz Corp. v. Friend*, 559 U.S. 77 (2010).

## VENUE AND JURISDICTION

5.      Venue and jurisdiction are proper before this Court under diversity jurisdiction, 28 U.S.C. 1332, because Plaintiff is a citizen of Pennsylvania, Defendant Liberty Mutual is a citizen of Massachusetts, both via headquarters/ nexus of operations and via incorporation, and Defendant Insurance Market is a citizen of Maryland and Delaware.  As such, there is complete diversity of the parties.

6.      The incidents and underlying actions that form the basis of the dispute giving rise to this Complaint all occurred and are continuing to occur in Wetzel County, West Virginia.

7.      The amount in controversy exceeds seventy-five thousand dollars ($75,000).

8.      This Court has jurisdiction pursuant to the diversity of citizenship of the parties, and the substantive law to be applied is the law of West Virginia based on the location of the Underlying Actions and the project site and alleged damages which give rise to the Underlying Actions.

9.      Additionally, "A federal court exercising diversity jurisdiction is obliged to apply the substantive law of the state in which it sits." *Volvo Constr. Equip. N. Am. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 599-600 (4th Cir. 2004).

## FACTS COMMON TO ALL COUNTS

10.      Plaintiff operates and conducts business primarily as a contractor in geotechnical projects such as foundations and retaining walls.

11.      In September of 2014, Plaintiff was awarded a portion of a contract, as a subcontractor, to perform work on a large retaining wall project at Mobley, Wetzel County, by the general contractor, J.F. Allen Company, with an approximate base value of $6.5 million for Plaintiff's portion of the work.

12.     Plaintiff was hired to build a Beam and Lagging Wall made of steel and concrete, secured by tieback anchor bars, at the base of the main retaining wall.  J.F. Allen Company was to perform the remaining work on the wall, including backfilling the soldier wall, and the project was designed by engineers at AMEC Foster Wheeler.  The backfill for the wall was cut and prepared by Lane Construction Corporation.  Inspection services were provided by Civil Environmental Consultants, Inc., and additional work was performed by Coastal Drilling.  The project's site was owned by MarkWest Liberty Midstream and Resources, LLC, which is now owned by Marathon Oil, and the project's purpose was to provide approximately seven acres of ground to build the fifth natural gas processing plant at the site.

13.     On September 8, 2014, Plaintiff's CEO, Rich Walton, sent an email to his insurance agent, Roger Waters, who is employed by the Insurance Market, requesting insurance under the terms of the contract.  (Exh. A.)

14.     The September 8, 2014, email correspondence included contractual documents for Mr. Waters to review, and specifically referred to the "pertinent language" of "section 5 of the general conditions agreement" (the "Building Contract") which defined the insurance and indemnification necessary under the contract between J.F. Allen Company and Plaintiff.  (Building Contract attached as Exh. B)

15.     Roger Waters and the Insurance Market promptly issued Certificates of Insurance and assured Plaintiff that appropriate coverage was in place for the contract and work to be performed. (Exh. C)

16.     Section 5.02 of the Standard General Conditions of the Subcontract in the Building Contract (Exh. B, P. 24) states that "All Bonds and insurance required by the Subcontract Documents to be purchased and maintained by Design/Builder or Subcontractor **shall be obtained**

**from surety or insurance companies that are duly licensed or authorized in the jurisdiction in which the Project is located** to issue Bonds or insurance policies for the limits and coverages so required.  Such surety and insurance companies shall also meet such additional requirements and qualifications as may be provided in the Supplementary Conditions." (Emphasis supplied).

17.    Section 5.04.A. states that "Subcontractor shall purchase and maintain **such insurance as is appropriate for the Work being performed and as will provide protection from claims set forth below which may arise out of or result from Subcontractor's performance of the Work** and Subcontractor's other obligations under the Subcontract Documents, whether it is to be performed by Subcontractor, any Subsubcontractor or Supplier, or by anyone directly or indirectly employed by any of them to perform any of the Work, or by anyone for whose acts any of them may be liable." (Exh. C, P. 25)

18.    Section 5.04.B. states that "**the polices of insurance… shall…include contractual liability insurance covering Subcontractor's (Plaintiff's) indemnity obligations under Paragraphs 6.10.A.3 and 6.19**." *Id*. (Emphasis supplied).

19.    Section 6.10.A.3 states that "To the fullest extent permitted by Laws and Regulations, Subcontractor shall indemnify and hold harmless Owner, (MarkWest) Owner's Consultants, (CEC) Design/Builder, (J.F. Allen & AMEC Foster Wheeler) Design/Builder's Consultants and the officers, directors, partners, employees, agents, and other consultants of each and any of them **from and against all claims, costs, losses, and damages (including, but not limited to, fees and charges of engineers, architects, attorneys, and other professionals and all court or arbitration or other dispute resolution costs) arising out of or relating to any claim brought by any such owner or occupant against Design/Builder or any other party**

**indemnified hereunder to the extent caused by or based upon Subcontractor's performance of the Work**." (Exh. C, P. 32-22, emphasis supplied).

20.     Section 6.19.A, Indemnification, states that "To the fullest extent permitted by Laws and Regulations, Subcontractor shall indemnify and hold harmless Owner, Owner's Consultants, Design/Builder, Design/Builder's Consultants and the officers, directors, members, partners, employees, agents, and other consultants and subcontractors of each and any of them from and against all claims, costs, losses and damages (including but not limited to all fees and charges of engineers, architects, attorneys, and other professionals and all court or arbitration or other dispute resolution costs**) to the extent caused by Subcontractor's performance of the Work**, provided that any such claim, cost, loss or damage is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself), **including the loss of use resulting therefrom, but only to the extent caused by any negligent act or omission of Subcontractor, or any Subsubcontractor, Supplier, or any individual or entity directly or indirectly employed by any of them to perform any of the Work."** (Exh C, P. 37-38, emphasis Supplied).

21.     The Building Contract's insurance provisions required Plaintiff to procure insurance that would:

a.     Be "appropriate for the Work being performed and as will provide protection from claims set forth below which may arise out of or result from [Plaintiff's] performance of the Work." Section 5.04.A

b.     "[I]nclude contractual liability insurance covering [Plaintiff's] indemnity obligations under Paragraphs 6.10.A.3 and 6.19." Section 5.04.B

    i.   Including indemnification "from and against all claims, costs, losses, and damages … arising out of or relating to any claim brought by any such owner or occupant against Design/Builder or any other party indemnified hereunder **to the extent caused by or based upon Subcontractor's performance of the Work.**" Section 6.10.A.3 (Emphasis supplied); and

    ii.   Also including "all claims, costs, losses and damages … to the extent caused by Subcontractor's performance of the Work, provided that any such claim, cost, loss or damage is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself), including the **loss of use** resulting therefrom, but only **to the extent caused by any negligent act or omission of Subcontractor, or any Subsubcontractor, Supplier, or any individual or entity directly or indirectly employed by any of them to perform any of the Work.**" Section 6.19 (Emphasis Supplied).

22.    The Insurance Market, by and through its employee, insurance agent Roger Waters, provided certificates of insurance for this Building Contract and the parties to the Contract on multiple occasions, including during September 2014, and also during the renewal period that occurred in April 2015, when the Liberty Mutual policy was purchased by Plaintiff.

23.    The Insurance Market repeatedly assured Plaintiff that it had appropriate insurance coverage in place for both its normal business operations and the Building Contract, and the Building Contract was against specifically discussed with Mr. Waters prior to the renewal policy being purchased from Liberty Mutual in April 2015, via email correspondence during February,

2015, and specifically discussing coverage for "construction/foundation work," "subsidence and underground damage," and closing all coverage gaps.  (Exh. D)

24.     The Insurance Market assured Plaintiff that it had appropriate coverage in place and that the Liberty Mutual policy was appropriate for its business operations and obligations under the Building Contract.

25.     In April 2015, after the Liberty Mutual policy took effect, there began to be problems with the retaining wall at Mobley.

26.     Specifically, prior to April 2015, Plaintiff performed work on the wall, which work was inspected and approved by Civil & Environmental Consultants, Inc., ("CEC") AMEC Foster Wheeler Environment and Infrastructure, Inc., ("AMEC") and/or MarkWest Liberty Midstream & Resources, LLC ("MarkWest").

27.     Thereafter, backfill ("Rock Fill") was installed on top of the Plaintiff's work which was not adequately screened and sized (did not fit through a 4 inch +/- screen) and was frozen due to winter weather.  This work was done by other entities, namely MarkWest, J.F. Allen, and Lane Construction.

28.     Due to the larger particle size and the freeze/thaw cycle, the Rock Fill ended up settling and being much more dense and heavy than what was designed, (the design called for a density of 125 pounds per cubic foot, and the installed material had a density of 145 pounds per cubic foot) Plaintiff's previously installed anchor tiebacks, in some places, began to sheer and snap. (Exh. E, J.F. Allen Counterclaim against MarkWest, State Court Underlying Action, P. 22).

29.     As such, Plaintiff properly installed work which was inspected and approved by multiple entities, and the work was later damaged by other parties installing the Rock Fill.

30.     Due to instability in the Project, MarkWest has refused to accept ownership/responsibility of the retaining wall because it does not meet the contract global factor of safety of 1.5.

31.     Accordingly, Plaintiff's property, namely concrete lagging panels, steel H-beams, and steel tie-back anchors, have been damaged by the conduct of others, and MarkWest has refused to accept ownership/responsibility for the damaged property.

32.     The damaged property, in addition to all of the allegations in the pleadings in both Underlying Actions, operates to trigger coverage and the duty to defend.

33.     The resulting repairs and damage to the retaining wall led to hostility and multiple lawsuits amongst many different entities, two of which described below.

34.     The "Underlying actions" consist of a Federal Court Action and a State Court Action.

a.     Federal Court Action.  Plaintiff sued J.F. Allen Company and AMEC Foster Wheeler PLC in this Court on August 24, 2015, which case bears *Civil Action No. 5:15:cv-113*.  J.F. Allen Company sued Plaintiff in the Circuit Court of Wetzel County on August 28, 2015, which action was subsequently removed to this Court, assigned *Civil Action No. 5:15-CV-124* and joined with *5:15:cv-113*.. Said actions proceeded with multiple amended pleadings, cross-claims, and counterclaims, including the addition of parties MarkWest Liberty Midstream and Resources, LLC, ("MarkWest") Civil & Environmental Consultants, Inc., ("CEC") and the Lane Construction Corporation ("Lane Construction"), until the "Order Granting MarkWest Liberty Midstream & Resources, LLC's Motion For Stay of This Action," was entered on April 6, 2017. [Doc. 158].  This action remains stayed.

b. State Court Action. MarkWest filed suit against J.F. Allen Company, AMEC Foster Wheeler Environment & Infrastructure, Inc., Redstone International, Inc., Civil & Environmental Consultants, Inc., and Coastal Drilling, LLC, in Wetzel County Circuit Court in August, 2016; styled *Civil Action 16-C-82*. Lane Construction was subsequently added as an additional defendant. The Circuit Court, more than a year thereafter, *sua sponte*, referred the matter to the Business Court Division, and it is now proceeding before the Hon. H. Charles, Carl, III.

35. There have been a plethora of pleadings, amended pleadings, and cross-claims and counterclaims filed in both the Federal Court action and the State Court Action, all of which have been provided to Liberty Mutual, and Liberty Mutual has denied coverage and refused to tender a defense.

36. Liberty Mutual, by and through The Insurance Market, issued Policy Number TB2-641-444555-025 (the "Policy") to Redstone International Inc., with an effective date of April 12, 2015, which Policy was in effect on the date(s) of the allegations of anchor failures and other problems, which are continuing to the present time, as, via correspondence dated October 11, 2018, Counsel for MarkWest has alerted all of the Parties of additional property damages, including corrosion of metal components, cracking of concrete panels, and new anchor failures. Policy attached as Exh. F; Oct. 11, 2018, Correspondence attached as Exh. G.

37. The Policy included $2,000,000 in general limits.

38. Plaintiff promptly notified Defendants of the Underlying Actions and filed a claim for coverage at least as early as December 23, 2015, (Exh. H) when amended pleadings were filed in the Federal Action, and continued via email and written correspondence to Liberty Mutual's employee, Sr. Technical Claims Specialist Julian Savoie, which led to an extensive chain of

correspondence until November 21, 2016, when Liberty Mutual fully and finally denied Plaintiff's claim for coverage and request for a tender of defense. (Exh. I)

39.     Liberty Mutual has issued a full and final denial of coverage of the claim and has never tendered a defense.

40.     Because MarkWest alleges in excess of $20 million in damages, including property damage and economic loss of use, the absence of coverage has put the future of Plaintiff's business at risk. Additionally, the failure to tender a defense has caused Plaintiff to incur hundreds of thousands of dollars of attorney and expert witness fees which should have been provided by Liberty Mutual based upon its duties under the policy and West Virginia law.

41.     During the Underlying Actions and the present time, Plaintiff has fully cooperated with Defendants and provided any and all relevant information to Liberty Mutual to allow evaluation of the claim.

42.     As will be discussed in detail in the individual counts below, Liberty fails to understand black letter West Virginia law on construction claims and property damages, wrongfully denied coverage to Plaintiff, and unjustly failed to tender a defense.

43.     Liberty Mutual has failed to fully and properly investigate the claim and the underlying action, and has failed to identify portions of the claim, if not the entire claim, which are eligible for coverage under the Policy, including but not limited to: failing to determine what portion of the damages claimed in the Underlying Actions are property damage and by failing to investigate the defenses of the Plaintiff to claims, cross claims, and counter-claims and instead assumed that the allegations against Plaintiff are true, and failed to defend Plaintiff.

44.     Accordingly, Liberty Mutual failed to tender a defense as of the filing of the original J. F. Allen Complaint, in August of 2015, failed to tender a defense to all of the cross claims and

counter-claims in the Federal Court Action, and failed to tender a defense to the negligence count and cross claims and counter claims in the State Court action filed in August 2016, which also included many cross-claims and counterclaims, and has wrongfully denied coverage.

45.     Plaintiff purchased insurance products, by and through the Insurance Market, from Liberty Mutual, at a significant cost for commercial liability insurance premiums.

46.     In 2014, Plaintiff approached the Insurance Market for insurance for construction and geotechnical services that Plaintiff provides, and relied upon the expertise of Insurance Market employees and members to advise and direct Plaintiff to purchase the Policy at issue.

47.     Plaintiff relied upon the Insurance Market to determine appropriate coverages and which policies of insurance to purchase.

48.     During each policy year, Plaintiff relied upon the Insurance Market's expertise in the insurance business generally, and in commercial insurance business particularly, and followed the Insurance Market's guidance in determining the appropriate insurance policies to purchase for all aspects of Plaintiff's business.

49.     The Insurance Market, by and through its agents, servants, and employees, knew the details of Plaintiff's business and services, knew that Plaintiff regularly performed geotechnical work and construction, and specifically knew of the contractual insurance requirements of the Mobley Building Contract, having received it in writing on at least two occasions prior to the purchase of the Liberty Mutual policy and the allegations of damages on the project.

50.     As will be further discussed below, Liberty Mutual has asserted in its denials of coverage that all of the allegations in the Federal and State Court Actions did not constitute "property damage" or "occurrences" under the Policy, both of which assertions are plainly wrong.

51.     Additionally, Liberty Mutual failed to properly asses the use of subcontractors by Plaintiff, and other key factors in wrongfully determining that exclusions in the Policy operated to deny coverage.

52.     Plaintiff purchased insurance policies from the Insurance Market and Liberty Mutual which have, according to Liberty Mutual, provided no protection for a staple and significant portion of their business, namely any activities constituting construction or geotechnical activities or work, and failed to provide the contractual liability insurance required under the Building Contract.

53.     Upon information and belief, all of the other parties in the State and Federal Court Underlying Actions, with the possible exception of project site owner MarkWest, are being defended by their insurers for similar, and in some cases, identical, claims, while Liberty Mutual is denying coverage.

54.     Plaintiff's litigation expenses are ongoing and increasing, and the lack of coverage and of a defense are causing a continuing and ongoing financial harm which increases by the day.

## COUNT I – DECLARATORY JUDGMENT AGAINST LIBERTY MUTUAL AS TO 2015 FEDERAL COURT ACTION

55.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

56.     This is an action for Declaratory Judgment brought pursuant to under the West Virginia Uniform Declaratory Judgment Act, § 55-13-1 *et seq*.

57.     As an overview, Plaintiff prays for the Court to review and construe the Pleadings in the Underlying Federal Court Action and Policy pursuant to the West Virginia Uniform Declaratory Judgment Act, § 55-13-1 *et seq*., and issue a final judgment that Plaintiff is entitled to coverage and a tender of defense for the allegations described in the Underlying Action, as well as

any and all associated damages, remedies, costs, and attorney's fees associated with bringing this action.

58.     An actual, substantial, and justiciable controversy has arisen between Plaintiff and Liberty Mutual regarding their respective rights, obligations, and duties under the Policy.

59.     Liberty Mutual denied issuing coverage under the Policy, via February 3, 2016, correspondence, and via November 21, 2016 correspondence.  Exh. I & J.

60.     The applicable statute of limitations for a declaratory judgment action based upon a written contract, such as the Policy, is ten (10) years.  W. Va. Code § 55-2-6; *Maynard v. Bd. Of Ed. Of Wayne County*, 357 S.E.2d 246 (1987).

61.     Plaintiff requests that the Court declare that Liberty Mutual has an obligation to provide coverage for the claim(s) identified in the Federal Court Underlying Action.

62.     Timely notice of the Underlying Action, and of all alleged property damages and losses were provided to Liberty Mutual. (Exh. K)

63.     Policy premiums were timely paid, and the Policy was in full force and effect on the date of the loss.

64.     The Policy provides coverage for property damage, and a variety of other losses and claims, subject to exclusions, definitions, and endorsements.

65.     Liberty Mutual has denied coverage stating that there was no "property damage" and no "occurrence," as follows, "[c]overage exists under the policy only for damages because of 'property damage' as defined by the policy. … Since the claims does not involve 'property damage' caused by an 'occurrence' there is no insurance coverage." (Exh. J, P. 7)

66.     On page 36 of the Policy (Exh. F) said terms are defined as follows:

a. *"Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.*

b. *"Property damage" means: (a) Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be determined to occur at the time of the physical injury that caused it; or (b) Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it.*

67.     For insurance purposes in a construction setting, the West Virginia Supreme Court, in *Cherrington*, examined a very similar construction company commercial general liability policy issued by Eire Insurance, and determined that alleged construction defects claims count as accidents and are "property damage" and "occurrences" to trigger coverage and the duty to defend. *Cherrington v. Erie Insurance*, 231 W.Va. 470, 745 S.E.2d 508 (2013).

68.     "In order for a claim to be covered by the subject CGL policy it must evidence 'bodily injury' or 'property damage' that has been caused by an 'occurrence.' An 'occurrence,' in turn, is defined as 'an accident, including continuous or repeated exposure to substantially the same general harmful conditions.'" *Cherrington* 745 S.E.2d at 520.

69.     "In determining whether under a liability insurance policy an **occurrence was or was not an 'accident' — or was or was not deliberate, intentional, expected, desired, or foreseen** — **primary consideration, relevance, and weight should ordinarily be given to the perspective or standpoint of the insured whose coverage under the policy is at issue**." *Id.* (Emphasis supplied).

70.     Under *Cherrington*, construction defect claims are "occurrences" and "property damage," as follows:

"**[I]t is apparent that the circumstances giving rise to the claimed damages or injuries must not have been "deliberate, intentional, expected, desired, or foreseen"** by the insured. … It goes without saying that the damages incurred …. during the construction … or the actions giving rise thereto, were **not within the contemplation of [the Insured] when it hired the subcontractors alleged to have performed most of the defective work**. Common sense dictates that had [the Insured] expected or foreseen the allegedly shoddy workmanship its subcontractors were destined to perform, [the Insured] would not have hired them in the first place." *Id*. (Emphasis supplied, internal citations omitted). *Cherrington* at 520.  (emphasis supplied).

71.    Plaintiff is the insured, and additionally, the general contractor, J.F. Allen Company, is contractually an insured under the Policy and the Building Contract. (Exh. B, P. 24-29)

72.    Under the Policy, at Page 72 of Exhibit F,  the "Blanket Additional Insured Endorsement" states that  "who is an insured is amended to include any person or organization for whom you have agreed in writing to provided liability insurance…[including] 'property damage' arising out of (a) 'your work.'"

73.    Accordingly, because Plaintiff contractually agreed to provide insurance to J.F. Allen Company in the Building Contract, J.F. Allen Company is an "additional insured" under the Policy, and all of the claims for coverage must be reviewed and construed as such.

74.    Liberty Mutual has failed to consider the Policy and the allegations under the pleadings in light of J.F. Allen Company being an additional insured, and should be required by the Court to tender a defense and provide coverage.

75.    Further, under West Virginia law, (1) ambiguity is construed in favor of the insured; (2) the duty to defend is broader than the duty to pay; (3) the allegations in the complaint normally control the coverage analysis; (4) the insurer must defend all allegations whether covered or not; and (5) the insured's right to a defense will not be foreclosed unless such a result is inescapably necessary. *Horace Mann Ins. Co. v. Leeber*, 180 W. Va. 375, 376 S.E.2d 581 (1988).

76.     Here, there are allegations in multiple pleadings which should have triggered coverage and the duty to defend, such as

a.     The original J.F. Allen Complaint, dated August 28, 2015, alleged that Plaintiff herein, Redstone International, was a subcontractor of J.F. Allen, that Redstone was negligent and had breached its contractual obligations. Said Complaint, while threadbare, still contains sufficient allegations to trigger the duty to defend and investigate. (Exh. L)

b.     J.F. Allen's Amended Answer, Affirmative Defenses, Cross-Claim, and Counterclaim to Plaintiff's Amended Complaint, [5:15-cv-00113, Doc. 49] alleges that Plaintiff herein, Redstone, breached its contract, breached a warranty, and is contractually required to indemnify and insure J.F. Allen. Said pleadings are of record in this Court in Civil Action 5:15-cv-00113 and are therefore incorporated by reference herein.

c.     The Fourth party complaint by MarkWest, March 3, 2017, against Redstone et al. [5:15-cv-00113; Doc 134] alleges that ( attached as Exh. M):

*i.     J.F. Allen, Redstone, and Redstone's replacement contractor, Coastal, failed to properly construct the Retaining Wall in a timely and workmanlike manner, and*

*ii.     MarkWest now seeks to recover over $20 million in damages it has incurred and will incur as a result of J.F. Allen's, Amec's, Redstone's, and CEC's numerous failures on the Project, including damages that resulted from the Project delays attributable to the late construction of the Retaining Wall, correction of the defective design and construction work associated with the Retaining Wall, cost of MarkWest installing monitoring instrumentation on the Retaining Wall for safety*

*purposes and legal fees incurred and payments made by MarkWest to resolve the liens filed on its property.*  Exh M. at P. 17.

iii.      *Further, the Fourth Party complaint alleged as follows: that 22. J.F. Allen contracted with Redstone to construct the Retaining Wall.  Redstone, in turn,* __*hired a number of subcontractors and suppliers to provide services necessary to build the Retaining Wall*__*. 24. Redstone knew by nature of the design build contract that MarkWest would own the Retaining Wall and any construction deficiencies or delay would significantly harm MarkWest. 25. Nonetheless, Redstone not only failed to properly construct the Retaining Wall in a timely and workman like manner, it abandoned the Project before its scope of work was even complete, all of which resulted in direct harm to MarkWest. 26. Some time after Redstone's abandonment, J.F. Allen terminated Redstone from the Project.*  Exh M. at P. 19-20.

i.      *In the allegations against J.F. Allen Company, MarkWest stated that: 52. To date, numerous anchors (i.e. steel rods that go through the Retaining Wall to lock it into the mountainside) have failed and repairs to all of the failed anchors have not been completed.  The most recent anchor failures occurred over the weekend of February 13, 2016. During this time, two anchors (# A-60 and # A-65) failed suddenly by shearing at the connection at the face of the vertical retaining wall. These failures are an example of inadequate and defective design and construction of the anchor system to provide the long term support of loads resulting from the earth fill behind the wall. The long term stability (75 to 100 years) of the entire project rests on the long term adequacy of the anchor system to*

*provide support for the loads resulting from the earth fill behind the Retaining Wall.* (Exh. M., p. 24-25).

ii.      Next, MarkWest alleged Negligence against Redstone, stating as follows:  *Fourth-Party Complaint - Count VI (Negligence) MarkWest v. Redstone-106. MarkWest restates and incorporates by reference all of the foregoing paragraphs as if fully set forth herein. 107. Redstone knew by nature of the design-build contract between MarkWest and J.F. Allen that MarkWest would own the Retaining Wall and any construction deficiencies would significantly harm MarkWest. Therefore, a special relationship exists between Redstone and MarkWest with regard to Redstone's work on the Retaining Wall. 108. As a result of the special relationship between Redstone and MarkWest, at all times relevant herein, Redstone had a duty to complete all work timely and consistent with generally accepted construction practices and standards of its industry. 109. At all times relevant herein Redstone negligently performed such duties with resulting breaches thereof. 110. As a direct and proximate result of Redstone's negligence, MarkWest suffered significant damages and is entitled to all such damages as a result of the negligent construction of the Retaining Wall.* Exh. M.

77.      There are a multitude of allegations of in the Pleadings of the Underlying Federal Court Action that trigger both coverage and the duty to defend.

78.      Further, Liberty Mutual has not conducted a thorough analysis and investigation of the claims against Plaintiff. The Supreme Court of Appeals of West Virginia has stated that, "[w]hen a complaint is filed against an insured, an insurer must look beyond the bare allegations contained in the third party's pleadings and **conduct a reasonable inquiry into the facts in order**

**to ascertain whether the claims asserted may come within the scope of the coverage that the insurer is obligated to provide**." *F & M Mut. Fire Ins. Co. of W. Va. v. Hutzler*, 191 W. Va. 559, 447 S.E.2d 22 (1994). (Emphasis supplied).

79.     Here, the usage of subcontractors by Plaintiff included, at a minimum, the following: Three-D Drilling, $52,446.00, Drilling Contractor; Anthony Crane USA, $49,312.65, Crane Rental - Equipment & Operator; KATKO LTD, $20,022.50, Welding Contractor; Global Shaft Drilling Services, LLC., $14,580.03, Drilling Contractor; Mike Broglie, $10,087.50, Welding Contractor; White's Welding, LLC, $5,890.00, Welding Contractor; Grand Total = $152,338.68.

80.     The usage of subcontractors by Plaintiff is critical, because exclusions in the Policy relied upon by Liberty Mutual in denying the claim do not apply to work performed by subcontractors.  Specifically, Exclusion L relied upon by Liberty Mutual to deny the claim, "does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor." (Exh. J)

81.     This exclusion is identical to language analyzed by the West Virginia Supreme Court in the Eire Insurance policy in *Cherrington*, and work performed by subcontractors defeats the exclusion. *Cherrington* at 520, 524.

82.     Plaintiff hired welding subcontractors, and there are allegations from the pleadings about defective welding related problems with whalers, anchors, and lagging panels.

83.     Further, Plaintiff hired drilling subcontractors, and there are allegations from the pleadings about defective drilling related problems for pillars and anchors.

84.     A fair interpretation of the Policy, and all of the pleadings in the Federal Court Underlying Action, as a whole, cannot involve a reading that completely excludes coverage for all of the claims alleged against Plaintiff, and certainly cannot be read to eliminate the duty to defend.

85.     There are clearly portions of the pleadings and allegations which serve to trigger the duty to defend and Liberty Mutual must defend all allegations, whether covered or not; and Plaintiff's right to a defense will not be foreclosed unless such a result is inescapably necessary. *Horace Mann Ins. Co. v. Leeber*, 180 W. Va. 375, 376 S.E.2d 581 (1988).  Even if some portions of the claim ultimately result in no coverage, there are other portions of the claims and pleadings which should have already entitled Plaintiff to a defense, at a minimum, and coverage once all of the facts are determined.

86.     If the Court determines that Liberty Mutual's contentions of the Policy's coverage, or lack of coverage, for the core concerns of Plaintiff's' business operations is accurate, then the counts below for breach of contract and unjust enrichment, against the Insurance Market, necessarily flow from such a determination.

87.     A declaratory judgment is necessary and appropriate at this time in order that Plaintiff may ascertain the parties' rights, duties, and obligations as related to the Federal Court Underlying Action, under the Policy.

88.     Plaintiff requests that the Court declare the parties' rights and obligations and issue a judgment providing:

a)  Declaratory relief that the events alleged in the Federal Court Underlying Action are covered by the Policy, and that Liberty Mutual is required to cover the loss and tender a meaningful defense, including by refunding all of Plaintiff's attorney and expert witness defense costs incurred to date;

b) Costs of suit incurred herein, as well as pre and post judgment interest and all monetary damage allowed by law;

c) Resolution of any other disputes between the parties that become known or arise during the course of this litigation; and,

d) Any further relief that the Court may deem just and proper.

Wherefore, Plaintiff demands judgment against Liberty Mutual, for compensatory damages, consequential damages, special damages, punitive damages, cost of suit, attorney's fees and expenses, and any and all such other relief available under the law or that the Court may determine to award.

## COUNT II – DECLARATORY JUDGMENT AGAINST LIBERTY MUTUAL AS TO 2016 STATE COURT ACTION

89.   Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

90.   This is an action for Declaratory Judgment brought pursuant to under the West Virginia Uniform Declaratory Judgment Act, § 55-13-1 et seq.

91.   As an overview, Plaintiff prays for the Court to review and construe the Pleadings in the Underlying State Court Action, Civil Action no. 16-C-82, in the Circuit Court of Wetzel County, Business Court Division, and Policy pursuant to the West Virginia Uniform Declaratory Judgment Act, § 55-13-1 et seq., and issue a final judgment that Plaintiff is entitled to coverage and a tender of defense for the allegations described in the Underlying State Court Action, as well as any and all associated damages, remedies, costs, and attorney's fees associated with bringing this action.

92.    An actual, substantial, and justiciable controversy has arisen between Plaintiff and Liberty Mutual regarding their respective rights, obligations, and duties under the Policy.

93.    Liberty Mutual has denied issuing coverage under the Policy.  Exh. N, October 20, 2016, letter.

94.    Plaintiff requests that the Court declare that Liberty Mutual has an obligation to provide coverage for the claim(s) identified in the Underlying State Court Action.

95.    Timely notice of the Underlying State Court Action, and of all alleged property damages and losses were provided to Liberty Mutual. (Exh. K.)

96.    Policy premiums were timely paid, and the Policy was in full force and effect on the date of the loss.

97.    The Policy provides coverage for property damage, and a variety of other losses and claims, subject to exclusions, definitions, and endorsements.

98.    Liberty Mutual has denied coverage stating that there was no "property damage" and no "occurrence." (Exh. N. P. 6-7)

99.    The allegations and averments of Count I as to the meanings of "property damage" and "occurrence" under West Virginia law are incorporated by reference as if fully restated herein, and Plaintiff alleges that Liberty Mutual is required under the Policy to tender a defense and provide coverage.

100.    Here, there are clear allegations in multiple pleadings which should have triggered coverage and the duty to defend, such as the MarkWest Complaint. (Exh. O)

101.    The allegations in MarkWest's Complaint closely mirror the allegations in the Federal Court Fourth Party Complaint, including that Redstone was a subcontractor of J.F. Allen,

and that "Redstone, in turn, hired a number of subcontractors and suppliers to provide services necessary to build the retaining wall." (Exh. O, P. 6)

102.    The allegations in the State Court Complaint essentially restate the allegations already identified in Paragraph 70, *supra*, and are incorporated by reference herein.

103.    In addition to the MarkWest Complaint which initiated the State Court Action, there are at least fifteen additional pleadings between and amongst the parties, which are too voluminous to fully restate herein and are incorporated by reference.  (Exh. P, Attachments to Judicial Motion to Refer to Business Court)

104.    J.F. Allen Company filed a Cross-Claim against Redstone, alleging generally that there were defects with design and construction of the retaining wall, including with soldier pile webbing, lagging, installation of tie-back anchors, pull testing of anchors, modification of waler designs, and breach of contractual notice requirements related to differing site conditions. (Exh. E)

105.    J.F. Allen Company additionally alleged that Redstone "negligently performed work on the project…" such as failures to follow "specific weld details" and other issues related to installation of the wall, as well as extensive allegations of breach of contract and breach of warranty, and breach of the duty to indemnify. (Exh. E at PP 78-164).

106.    The Building Project contract required that Plaintiff have coverage for contractual liability and indemnity, and Liberty Mutual has denied coverage by relying upon an exclusion, even though material work was performed by subcontractors which defeats the exclusion.  (Exh. B; Exhs. I, J, & N)

107.    Civil & Environmental Consultants also filed a Cross-Claim against Redstone, alleging that Redstone was negligent and/or jointly and severally liable for CEC's potential liability.

108.    Plaintiff is the insured, and additionally, the general contractor, J.F. Allen Company, is contractually an insured under the Policy and the Building Contract. Building Contract & General Conditions (Exh. B, P. 24-29; Exh. F, P. 72)

109.    Under the Policy, at Page 72 of Exh. F, the "Blanket Additional Insured Endorsement" states that "who is an insured is amended to include any person or organization for whom you have agreed in writing to provided liability insurance…[including] 'property damage' arising out of (a) 'your work.'"

110.    Accordingly, because Plaintiff contractually agreed to provide insurance to J.F. Allen Company in the Building Contract, J.F. Allen Company is an "additional insured" under the Policy, and all of the claims for coverage must be reviewed and construed as such.

111.    Liberty Mutual has not conducted a thorough analysis and investigation of the claims against Plaintiff. The Supreme Court of Appeals of West Virginia has stated that, "[w]hen a complaint is filed against an insured, an insurer must look beyond the bare allegations contained in the third party's pleadings and **conduct a reasonable inquiry into the facts in order to ascertain whether the claims asserted may come within the scope of the coverage that the insurer is obligated to provide**." *F & M Mut. Fire Ins. Co. of W. Va. v. Hutzler*, 191 W. Va. 559, 447 S.E.2d 22 (1994). (emphasis supplied).

112.    Here, the usage of subcontractors by Plaintiff included, at a minimum, the following: Three-D Drilling, $52,446.00, Drilling Contractor; Anthony Crane USA, $49,312.65, Crane Rental - Equipment & Operator; KATKO LTD, $20,022.50, Welding Contractor; Global

Shaft Drilling Services, LLC., $14,580.03, Drilling Contractor; Mike Broglie, $10,087.50, Welding Contractor; White's Welding, LLC, $5,890.00, Welding Contractor; Grand Total = $152,338.68.

113.    This is critical, because exclusions in the Policy relied upon by Liberty Mutual in denying the claim do not apply to work performed by subcontractors.  Specifically, Exclusion L relied upon by Liberty Mutual to deny the claim, "does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor." (Exh. N, P. 6-7)

114.    This exclusion is identical to language analyzed by the West Virginia Supreme Court in *Cherrington*, and work performed by subcontractors is enough to defeat the exclusion. *Cherrington* at 520, 524.

115.    Plaintiff hired welding subcontractors, and there are allegations from the pleadings about defective welding related problems with whalers, anchors, and lagging panels.

116.    Further, Plaintiff hired drilling subcontractors, and there are allegations from the pleadings about defective drilling related problems for pillars and anchors.

117.    An insurer's duty to defend its insured is broader than its duty to indemnify. *Camden-Clark Memorial Hosp. Ass'n v. St. Paul Fire and Marine Ins. Co*., 224 W.Va. 228, 237, 682 S.E.2d 566, 575 (2009).

118.    According to *Bruceton Bank v. U.S. Fid. & Guar. Ins. Co*., 199 W. Va. 548, 486 S.E.2d 19 (1997), "[a]n insurer's duty to defend is normally tested by whether the allegations in the complaint against the insured are **reasonably susceptible of an interpretation that the claim may be covered by the terms of the policy**." (Emphasis supplied).

119.    In *Silk v. Flat Top Constr., Inc.,* 192 W. Va. 522, 453 S.E.2d 356 (1994), the Court noted that, "[a]n insurer must meet a rigorous standard to avoid its obligation to defend."

120.    A fair interpretation of the Policy, and all of the pleadings in the State Court Underlying Action, as a whole, cannot involve a reading that completely excludes coverage for all of the claims alleged against Plaintiff, and certainly cannot be read to eliminate the duty to defend.

121.    There are clearly portions of the pleadings and allegations which serve to trigger the duty to defend and Liberty Mutual must defend all allegations, whether covered or not; and Plaintiff's right to a defense will not be foreclosed unless such a result is inescapably necessary. *Horace Mann Ins. Co. v. Leeber*, 180 W. Va. 375, 376 S.E.2d 581 (1988).  Even if some portions of the claim ultimately result in no coverage, there are other portions of the claims and pleadings which should have entitled Plaintiff to a defense, at a minimum, and potentially coverage once all of the facts are determined.

122.    If the Court determines that Liberty Mutual's contentions of the Policy's coverage, or lack of coverage, for the core concerns of Plaintiff's' business operations is accurate, then the counts below for breach of contract and unjust enrichment, against the Insurance Market, necessarily flow from such a determination.

123.    A declaratory judgment is necessary and appropriate at this time in order that Plaintiff may ascertain the parties' rights, duties, and obligations as related to the State Court Underlying Action, under the Policy.

124.    Plaintiff requests that the Court declare the parties' rights and obligations and issue a judgment providing:

      a.    Declaratory relief that the events alleged in the State Court Underlying Action are covered by the Policy, and that Liberty Mutual is required to cover the loss

and tender a meaningful defense, including by refunding all of Plaintiff's attorney and expert witness defense costs incurred to date;

b. Costs of suit incurred herein, as well as pre and post judgment interest and all monetary damage allowed by law;

c. Resolution of any other disputes between the parties that become known or arise during the course of this litigation; and

d. Any further relief that the Court may deem just and proper.

Wherefore, Plaintiff demands judgment against Liberty Mutual, for compensatory damages, consequential damages, special damages, punitive damages, cost of suit, attorney's fees and expenses, and any and all such other relief available under the law or that the Court may determine to award.

## COUNT III – BREACH OF CONTRACT AGAINST LIBERTY MUTUAL

125. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

126. Liberty Mutual has breached its contract with Plaintiff by failing to provide coverage for the claims made in the Underlying Actions and by failing to provide a defense from the allegations in the Underlying Actions.

127. "Where an insured is required to retain counsel to defend himself in litigation because his insurer has refused without valid justification to defend him, in violation of its insurance policy, the insured is entitled to recover from the insurer the expenses of litigation, including costs and reasonable attorney's fees." Syl. Pt. 1, *Aetna Cas. & Sur. Co. v. Pitrolo*, 342 S.E.2d 156, 176 W. Va. 190 (1986).

128.    Liberty Mutual and Plaintiff entered into a contract for insurance in the Policy, and Liberty Mutual purported to insure Plaintiff's general business operations; however, upon filing a claim, Plaintiff's learned, after substantial delay, that Liberty Mutual essentially believes that the majority of Plaintiff's business operations, such as areas requested by Plaintiff from the Insurance Market in writing prior to purchasing the policy, like "construction/foundation work," and "subsidence and underground damage," are in fact, not insured, because said instances do not count as "property damage" or "occurrences" which is plainly wrong under West Virginia law.

129.    Liberty Mutual knew, either directly through actual knowledge, or indirectly through agency based upon the knowledge of the Insurance Market and its agents, servants, and employees, that Plaintiff was a contractor and provider of geotechnical wall building and foundation work, and that Plaintiff was seeking insurance coverage for its business operations.

130.    Further, Liberty Mutual knew that Plaintiff conducted construction work, and indeed, Liberty Mutual and the Insurance Market wrote workman's compensation insurance policies for Plaintiff, as well as other polices, and understood Plaintiff's business.

131.    Liberty Mutual has breached its contract of insurance by failing to fully investigate the claim, including whether the usage of subcontractors defeats the exclusions it seeks to enforce, and by failing to construe the Policy for the purpose of provided indemnity, as is required under West Virginia law.

132.    "An insurance company seeking to avoid liability through the operation of an exclusion has the burden of proving the facts necessary to the operation of that exclusion." Syl. pt. 7, *National Mut. Ins. Co. v. McMahon & Sons, Inc.*, 177 W.Va. 734, 356 S.E.2d 488 (1987).

133.   "Where the policy language involved is exclusionary, it will be strictly construed against the insurer **in order that the purpose of providing indemnity not be defeated**." *Id*. at Syl. pt. 5. (Emphasis supplied).

134.   An insurer's duty to defend its insured is broader than its duty to indemnify. *Camden-Clark Memorial Hosp. Ass'n v. St. Paul Fire and Marine Ins. Co*., 224 W.Va. 228, 237, 682 S.E.2d 566, 575 (2009).

135.   According to *Bruceton Bank v. U.S. Fid. & Guar. Ins. Co*., 199 W. Va. 548, 486 S.E.2d 19 (1997), "[a]n insurer's duty to defend is normally tested by whether the allegations in the complaint against the insured are **reasonably susceptible of an interpretation that the claim may be covered by the terms of the policy**." (Emphasis supplied).

136.   Here, the multitude of pleadings in both the State and Federal Court Underlying Actions clearly trigger the duty to defend, and Liberty Mutual has breached its obligations by failing to provide a defense, causing Plaintiff to incur hundreds of thousands of dollars in attorneys' fees and expert witness fees.

137.   In *Silk v. Flat Top Constr., Inc.,* 192 W. Va. 522, 453 S.E.2d 356 (1994), the Court noted that, **"[a]n insurer must meet a rigorous standard to avoid its obligation to defend**." (emphasis supplied).

138.   Liberty Mutual's cursory denials of coverage and refusal to tender a defense include its interpretation of policy definitions of "property damage" and "occurrence" that are directly opposite to the settled law of West Virginia since *Cherrington* was decided in 2013.

139.   Accordingly, Liberty Mutual has failed in its contractual obligations to its insured, the Plaintiff, as well as its additional duties to J.F. Allen, who is an additional insured under the

Building Contract, which contract was specifically provided, twice, to the Insurance Market prior to the purchase of the Liberty Mutual Policy.

140.    It is clear that Liberty Mutual, in the Policy, has written a document so ambiguous, convoluted, self-contradictory, and riddled with overlapping clauses as to allow Liberty Mutual to offer some excuse to avoid paying any claim.

141.    Liberty Mutual has utilized nebulous, contrived, confusing, and vague language to allow adjustors to only view claims as dollar amounts, and if the original complaint in the Underlying State Court Action, which requested in excess of $20 million, had not been so large, Liberty Mutual may well have taken a different view and tendered a defense.

142.    It is an oft-stated adage that insurance companies do not make money paying claims, and it is clear here that while Liberty Mutual agreed to insure Plaintiff's business against unforeseen losses resulting from clearly foreseen risks, under Liberty Mutual's asserted interpretation of the Policy, Liberty Mutual received premiums and Plaintiff received substantially less coverage and insurance than they were promised.

143.    Accordingly, Liberty Mutual has breached its contract with Plaintiff by failing to provide insurance coverage and a defense for their normal business operations, the requirements of the Building Contract, and the allegations in the Underlying Actions.

144.    Under black letter West Virginia law, Liberty Mutual owes an implied contractual duty of good faith and fair dealing to Plaintiff, as well as a fiduciary duty that arose when Liberty Mutual reviewed the claim under the policy for the claims against Plaintiff in the Underlying Actions.

145.    Liberty Mutual owes Plaintiff a duty of due care when handling third party claims against the Plaintiff, such as the Underlying Actions.

146.     Said duties, at a minimum, require Liberty Mutual to honestly, promptly, and fairly investigate the facts of coverage, evaluate damages, adjust the loss, communicate and cooperate with the insured, and pay for covered losses.

147.     Liberty Mutual has breached its duties to Plaintiff by failing to:

     a.   Conduct a timely investigation;

     b.   Provide coverage;

     c.   Provide sufficient coverage to resolve the claim; and

     d.   Tender a defense in the underlying actions.

148.     Liberty Mutual received timely and numerous documents from Plaintiff in regards to the claim(s) and Underlying Actions.

149.     Plaintiff purchased policies from Liberty Mutual and the Insurance Market which purportedly provided at least $2 million in base coverage, and umbrella coverage; however, Liberty Mutual is now asserting that the purchased coverage does not apply to any of Plaintiff's routine business activities.

150.     As such, Liberty Mutual is in breach of its common law duties regarding the contract of insurance it sold Plaintiff, including the doctrine of reasonable expectations.

151.     "With respect to insurance contracts, the doctrine of reasonable expectations is that the objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though a painstaking study of the policy provisions would have negated those expectations." *ALPS Prop. & Cas. Ins. Co. v. Bowles Rice, LLC*, (N.D.W.V. 2018); quoting Syl. Pt. 6, *New Hampshire Ins. Co. v. RRK, Inc*., 736 S.E.2d 52 (W. Va. 2012).

152.    To the extent Liberty Mutual has sold Plaintiff a Policy which does not cover the claim(s) in the Underlying Actions, Liberty Mutual has breached its contract with Plaintiff by accepting premiums but offering and selling a Policy which does not cover Plaintiff's normal business operations because Liberty Mutual asserts coverage does not apply.

153.    Liberty Mutual has breached its common law duties of good faith and fair dealing by engaging in activities, including, but not limited to:

    a.  Failing to pay the amount allegedly owed under the claim;

    b.  Failing to timely and fully inspect the location of the release event and determine the amount owed under the claim;

    c.  Waiting nearly a year to adjust the claim or determine coverage for the claim(s);

    d.  Scheming to defraud its policy holder, the Plaintiff;

    e.  Acting in reckless disregard for its obligations under the Policy and under the common law obligations created by West Virginia law and implicit in the contract between the Parties;

    f.  Accepting premiums without intention to pay monies owed for covered losses;

    g.  Fraudulently telling its policyholder that the losses/ claims alleged in the Underlying Actions were not covered by the Policy despite evidence that they are covered;

    h.  Claiming losses were not covered despite clear evidence that they were covered;

    i.  Claiming losses were due to uncovered causes despite evidence to support a covered loss;

    j.  In hiring and employing agents and adjustors to investigate the claim who are unqualified to determine the cause of loss, unqualified to understand and

interpret West Virginia law on construction defect disputes, and/or failed to

fully investigate to allow a full and accurate determination of coverage;

k.   In unilaterally denying covered losses without proper investigation; and

l.   In falsely misrepresenting its responsibilities under the Policy.

154.   Liberty Mutual's actions in failing to properly adjust the Plaintiff's claims are a breach of the implied covenant of good faith and fair dealing.

155.   Liberty Mutual knowingly breached the implied covenant of good faith and fair dealing in an attempt to deprive the Plaintiff of its rights and expectations under the insurance contracts.

156.   Because Liberty Mutual has breached its contractual obligations to Plaintiff, Plaintiff seeks annoyance, aggravation, inconvenience damages, as well as the "(1) the insured's reasonable attorneys' fees in vindicating its claim; (2) the insured's damages for net economic loss caused by the delay in settlement, and damages for aggravation and inconvenience." Syl. Pt. 1 of *Hayseeds Inc. v. State Farm Fire & Cas.*, 177 W. Va. 323, 352 S.E.2d 73 (1986); s*ee also Hadorn v. Shea*, 193 W. Va. 350, 456 S.E.2d 194 (1995); and *Miller v. Fluharty*, 201 W. Va. 685, 500 S.E.2d 310 (1997).

Wherefore, Plaintiff demands judgment against Liberty Mutual, on Count III, for compensatory damages, consequential damages, special damages, punitive damages, pre and post judgment interest, cost of suit, attorney's fees and expenses, and such other relief that the Court may award.

## COUNT IV – UNJUST ENRICHMENT AGAINST LIBERTY MUTUAL (IN THE ALTERNATIVE)

157.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

158.    Plaintiff pleads unjust enrichment in the alternative to its breach of contract count should the contract of insurance be found to be invalid or unenforceable by Plaintiff for any reason.

159.    Plaintiff provided Liberty Mutual with substantial premiums during in exchange for insurance coverage.

160.    Liberty Mutual purported to provide insurance coverage for Plaintiff's normal business operations during this period and accepted said premiums.

161.    Liberty Mutual has now asserted that the normal business operations of the Plaintiff, *i.e.* conducting construction work, are not covered due to the wrongful interpretation of "property damage" and "occurrence" in the Policy.

162.    Liberty Mutual knew that Plaintiff expected coverage for their normal business operations, and offered to provide insurance for the same while accepting premiums, but has denied coverage for said operations.

163.    Liberty Mutual has been unjustly enriched by accepting premiums without providing the promised insurance coverage, based upon Liberty Mutual's asserted position under the Policy.

164.    Plaintiff demands judgment against Liberty Mutual in the amount of all of the premiums provided to Liberty Mutual.

Wherefore, Plaintiff demands judgment in the alternative against Liberty Mutual, on Count IV, for compensatory damages, consequential damages, cost of suit, statutory interest on the

amount of the claim, and in addition to the claim, attorney's fees and expenses, and such other relief that the Court may award.

## COUNT V – BREACH OF CONTRACT AGAINST THE INSURANCE MARKET

165.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

166.    The Insurance Market, by and through its agents, servants, and employees, entered into a contract with the Plaintiff to act as an agent and broker for the purposes of selling insurance to Plaintiff for Plaintiff's business operations.

167.    The Insurance Market, in an agency relationship, became the agent for Plaintiff and acted on their behalf and identified and recommended that Plaintiff purchase the Policy from Liberty Mutual.

168.    The Insurance Market had authority from Plaintiff to act on its behalf, and did so act, and recommended that Plaintiff purchase the Policy.

169.    The Insurance Market obtained substantial premiums from the Plaintiff by acting as the agent and broker for Plaintiff's purchase of various insurance policies from Liberty Mutual.

170.    If Liberty Mutual's arguments as to the lack of coverage in the Policy for the claims alleged in the Underlying Actions are upheld by this court, The Insurance Market failed to procure the necessary insurance for Plaintiff.

171.    Additionally, The Insurance Market was specifically instructed in writing to procure insurance required under the Building Contract, such as contractual liability coverage and indemnification provisions and for "construction/foundation work," "subsidence and underground damage," and to "clos[e] all coverage gaps" prior to the April 2015 purchase of the Liberty Mutual Policy. (Exh. D)

172.    The Insurance Market did not provide said coverages, and instead recommended that Plaintiff purchase a policy which, according to Liberty Mutual, specifically excludes coverage for "contractual liability" and any work performed by Plaintiff. (Exh. J, P. 3-4)

173.    To the extent there is no umbrella policy coverage available because of the denial of coverage under the base Policy, the Insurance Market failed to procure the necessary insurance for the Building Contract, which is directly in breach of the Certificates of Insurance issued on multiple occasions by the Insurance Market and also fails to comply with the Building Contract.

174.    The Insurance Market breached its contract with Plaintiff by failing to procure the necessary insurance for the Plaintiff's business operations after entering into a contract to do so and failing to procure the insurance specifically requested by Plaintiff for the Building Contract.

175.    The Insurance Market had a contractual obligation to understand Plaintiff's business, and The Insurance Market agreed to operate as an agent and broker for Plaintiff, and procure insurance for the entire business, the vehicles and equipment used in the business, and the workers compensation policy for the workers driving the vehicles.

176.    The Insurance Market had actual knowledge of the detailed facets of the Plaintiff's business, including foundation work, geotechnical work, and the approximately $6.5 Million Building Contract.

177.    The Insurance Market had a contractual obligation to find and recommend insurance that would cover Plaintiff's known business operations.

178.    The Insurance Market breached its contractual obligation by, according to Liberty Mutual, failing to locate and recommend a policy to Plaintiff which would insure their normal business operations, and failing to provide the necessary insurance under the Building Contract,

which insurance The Insurance Market represented on multiple occasions that Plaintiff had successfully purchased.

Wherefore, Plaintiff demands judgment against The Insurance Market, on Count V, for compensatory damages, consequential damages, cost of suit, attorney's fees and expenses, and such other relief that the Court may award.

## COUNT VI – NEGLIGENCE AGAINST THE INSURANCE MARKET

179.   Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

180.   Plaintiff pleads negligence in the alternative to its breach of contract count should the contract claim be found to be invalid or unenforceable by Plaintiff for any reason, or should the Court find that the "gist of the action" doctrine does not apply to this dispute.

181.   The Insurance Market owed Plaintiff a duty to procure the insurance that the Plaintiff requested; *i.e.*, insurance for their construction business and the insurance required by the Building Contract.

182.   The Insurance Market owed Plaintiff a duty to act with reasonable care, skill, and diligence while acting as the agent and broker for the procurement of Plaintiff's insurance policies.

183.   The Insurance Market owed Plaintiff a duty to describe the coverage in the Policy to the Plaintiff, which The Insurance Market recommended to Plaintiff as adequate for their business operations, but according to Liberty Mutual's asserted positions, it was not adequate.

184.   The Insurance Market owed Plaintiff a duty to ensure that the Policy covered the Building Contract, and Plaintiff's other business operations.

185.   The Insurance Market advertises its business and employees as experts in the field of commercial insurance.

186.    The Insurance Market represented and held forth that it and its employees, agents, members, and/or servants were experts in the field of commercial insurance, and Plaintiff relied upon this representation.

187.    The Insurance Market, as an expert in the field of commercial insurance, had a duty to advise, guide, and direct Plaintiff's business coverage to provide insurance for Plaintiff's normal business operations and for the insurance required by the Building Contract.

188.    The Insurance Market breached its duties to Plaintiff by failing to recommend a suitable policy for the Plaintiff's business and by failing to provide the coverages required under the Building Contract.

189.    To the extent that there is no coverage for the allegations in the Underlying Actions under the Policy, The Insurance Market negligently breached its duties to Plaintiff and has caused significant and serious damages to Plaintiff, including but not limited to hundreds of thousands of dollars in attorney's fees and expert witness fees.

Wherefore, Plaintiff demands judgment against The Insurance Market, on Count VI, for compensatory damages, consequential damages, cost of suit, attorney's fees and expenses, and such other relief that the Court may award.

## COUNT VII – UNJUST ENRICHMENT AGAINST THE INSURANCE MARKET (IN THE ALTERNATIVE TO PLAINTIFF'S BREACH OF CONTRACT COUNT)

190.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

191.    Plaintiff provided The Insurance Market with its share of the commissions and or premiums of the insurance premiums it paid to Liberty Mutual in exchange for insurance coverage.

192.    The Insurance Market purported to locate and recommend appropriate insurance coverage for Plaintiff'' normal business operations during this period and accepted said commissions and premiums.

193.    Liberty Mutual is asserting that the normal business operations of the Plaintiff, *i.e.* construction work, are not covered due to its narrow interpretation of claims under the Policy.

194.    The Insurance Market knew that Plaintiff conducted construction work, and knew that Plaintiff was seeking insurance coverage for their work.

195.    The Insurance Market knew that Plaintiff expected coverage for their normal business operations, regardless of location, and offered to locate and recommend insurance for the same, but did not do so, to the extent the Underlying Actions are not covered claims.

196.    The Insurance Market has been unjustly enriched by accepting commissions and premiums without locating and recommending the promised and required insurance coverage, based upon Liberty Mutual's asserted position under the Policy.

197.    Plaintiff demands judgment against The Insurance Market in the amount of all of the commissions and premiums paid to The Insurance Market.

Wherefore, Plaintiff demands judgment against The Insurance Market, on Count VII, for compensatory damages, consequential damages, cost of suit, attorney's fees and expenses, and such other relief that the Court may award.

PLAINTIFF DEMANDS A TRIAL BY JURY.

Respectfully submitted,

REDSTONE INTERNATIONAL, INC.,

By counsel,

_____s/Michael Jacks/_____

Michael A. Jacks, Esq. (WV Bar #11044)
mike@jackslegal.com
`
Jacks Legal Group, P.L.L.C.
United Federal Credit Union Building
3467 University Ave, Suite 200
Morgantown, WV 26505
(304) 599-4770 (office)
(304) 906-9165 (mobile)
(304) 278-3187 (fax)