

Deposition of:
# Richard Walton

*May 29, 2020*

In the Matter of:

# Redstone International Inc vs. Liberty Mutual Fire Insurance Co et al

Veritext Legal Solutions
800-734-5292 | calendar-dmv@veritext.com |

CONFIDENTIAL

Page 1

1                    CONFIDENTIAL

2

3          IN THE UNITED STATES DISTRICT COURT

4      FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

5                   WHEELING DIVISION

6

7   REDSTONE INTERNATIONAL, INC.,

8          Plaintiff           Civil Action No.

9   vs.                        5:18-cv-175

10  LIBERTY MUTUAL FIRE INSURANCE

11  COMPANY and THE INSURANCE

12  MARKET, INC.,

13         Defendants

14  _____/

15          The virtual deposition of RICHARD WALTON was

16  held on Friday, May 29, 2020, commencing at 9:29

17  a.m., at the residence of the deponent, 1677

18  Northgate Drive, Pittsburgh, Pennsylvania  15241,

19  before Oneeka S. Hill, Notary Public.

20

21  REPORTED BY:  Oneeka S. Hill

Page 2

1    APPEARANCES:

2              ON BEHALF OF THE PLAINTIFF:

3              MICHAEL A. JACKS, ESQUIRE (Via Virtual)

4                   Jacks Legal Group, PLLC

5                   United Federal Credit Union Building

6                   3467 University Avenue

7                   Suite 200

8                   Morgantown, West Virginia  26505

9                   Telephone:  (304) 599-4770

10                  E-mail:  Mike@jackslegal.com

11             ON BEHALF OF THE DEFENDANT, LIBERTY MUTUAL

12             FIRE INSURANCE COMPANY:

13             TIMOTHY FITZGIBBON, ESQUIRE (Via Virtual)

14                  Nelson, Mullins, Riley & Scarborough,

15                  LLP

16                  101 Constitution Avenue, Northwest

17                  Suite 900

18                  Washington, D.C.  20001

19                  Telephone:  (202) 689-2800

20                  E-mail:  Tfitzgibbons@nelsonmullins.com

21         (Appearances continued on the next page.)

CONFIDENTIAL

```
                                          Page 3

 1   APPEARANCES:  (CONTINUED)

 2            ON BEHALF OF THE DEFENDANT, LIBERTY MUTUAL

 3            FIRE INSURANCE COMPANY:

 4            ROBERT L. MASSIE, ESQUIRE (Via Virtual)

 5                Nelson, Mullins, Riley & Scarborough,

 6                LLP

 7                949 Third Avenue, Suite 200

 8                P.O. Box 1856

 9                Huntington, West Virginia  25719

10                Telephone:  (304) 526-3500

11                E-mail:  Bob.massie@nelsonmullins.com

12            ON BEHALF OF THE DEFENDANT, THE INSURANCE

13            MARKET, INC.:

14            ANTHONY C. SUNSERI, ESQUIRE (Via Virtual)

15                Burns, White, LLC

16                The Maxwell Centre 3

17                32 20th Street, Suite 200

18                Wheeling, West Virginia  26003

19                Telephone:  (304) 231-1004

20                E-mail:  Acsunseri@burnswhite.com

21   ALSO PRESENT:  HEATH KEFOVER
```

CONFIDENTIAL

Page 4

1                            INDEX

2            Virtual deposition of Richard Walton

3                        May 29, 2020

4

5     Examination By:                              Page

6     Mr. Fitzgibbon                             6, 139

7     Mr. Sunseri                               94, 156

8     Mr. Jacks                                     154

9

10    Exhibit No:                                 Marked

11    Exhibit 1          Amended Notice              11

12    Exhibit 2          Plaintiff's Designation     14

13    Exhibit 3              E-mails                  43

14    Exhibit 4              E-mails                  47

15    Exhibit 5              E-mails                  65

16    Exhibit 6              E-mail                   70

17    Exhibit 7              Letter                   74

18    Exhibit 8              E-mails                  79

19    Exhibit 9          General Liability Notice     82

20    Exhibit 10            Correspondence            99

21    Exhibit 11         Proposal of Insurance       100

CONFIDENTIAL

```
                                              Page 5

 1              (Continued on the next page.)

 2    INDEX:  (CONTINUED)

 3

 4    Exhibit No:                          Marked

 5    Exhibit 12              E-mail          117

 6    Exhibit 13           Correspondence     130

 7    Exhibit 14           Correspondence     133

 8    Exhibit 15              E-mail          148

 9    Exhibit 16         Amended Complaint    140

10

11

12

13

14

15

16

17

18

19

20

21
```

CONFIDENTIAL

Page 6

1                        PROCEEDINGS

2                       - - - - - -

3    Whereupon,

4                        RICHARD WALTON,

5    called as a witness, having been first duly sworn to

6    tell the truth, the whole truth and nothing but the

7    truth, was examined and testified as follows:

8                EXAMINATION BY MR. FITZGIBBON:

9        Q    Good morning, Mr. Walton.  How are you?

10       A    Good.  How are you?

11       Q    I'm all right.  My name is Tim

12   Fitzgibbon.  I'm one of the attorneys for Liberty

13   Mutual Insurance Company in the lawsuit that

14   Redstone has initiated against Liberty Mutual and

15   The Insurance Market, Inc.

16                I'm going to be asking you some

17   questions today about different issues in that case.

18   I understand you've been deposed before, correct?

19       A    Yes.

20       Q    How many times?

21       A    Five or six, probably.

CONFIDENTIAL

Page 7

1      Q      Okay.  You're probably familiar with the

2    rules, but I'll just run over them quickly.  The

3    court reporter will be taking down my questions and

4    your answers, as well as any questions and answers

5    related to the other parties.

6            Particularly today, since we're doing

7    this remotely, it's difficult enough when we're all

8    sitting around a table --

9      A      Sure.

10     Q      -- for the court reporter to get

11    everything if you and I are talking at the same

12    time.  So I will try to wait for you to finish your

13    answers before I start asking another question, and

14    I would appreciate it if you would extend the same

15    courtesy and wait for me to finish my questions

16    before you start your answers.  It'll just make life

17    easier for the court reporter.

18            It would also help if you can speak

19    slowly and clearly.  Again, sometimes we get a

20    little bit of delay because of the internet

21    connection.  So if you can be as clear as possible,

CONFIDENTIAL

Page 8

1    it would be a big help.

2          A     Sounds good, yes.

3          Q     Okay.  We'll introduce exhibits and

4    we'll introduce them electronically over the Exhibit

5    Share, and you're connected to the Exhibit Share

6    now, correct?

7          A     Yes, sir.  I see, I see Exhibit Share

8    Redstone depositions and it's marked exclamation

9    marked exhibits, but the folder is empty.

10         Q     Okay.  We'll try one shortly and make

11   sure that it works.

12               If you need a break at any time -- I'll

13   try to take a break during the morning, we'll take a

14   lunch break, but if you need a break any time, just

15   speak up and we'll try to take a break.

16               If you are unable -- or, if I ask a

17   question, and sometimes I do, that you don't

18   understand, please feel free to ask me to rephrase

19   it.  If you answer I'm going to assume that you

20   understood the question and answered to the best of

21   your ability.  Okay?

Page 9

1      A      Uh-huh.  Sounds good.

2      Q      Where are you right now?

3      A      I am in my office in Belle Vernon,

4  Pennsylvania.  It's one of my field offices.

5      Q      Did you say Malvern?

6      A      Belle Vernon.

7      Q      Okay, Belle Vernon.  And what is your

8  residence address please?

9      A      1677 Northgate Drive, Pittsburgh,

10  Pennsylvania 15241.

11     Q      Thank you.  Where is your office

12  normally?

13     A      I have an office in Canonsburg as well,

14  at Southpointe.

15     Q      Okay.  Is anyone else in your office

16  with you right now?

17     A      There is not anyone in my office, in my

18  individual office, in the building there is other

19  people.

20     Q      Okay.  And you have your cell phone with

21  you right now?

CONFIDENTIAL

Page 10

1        A      Uh-huh.  I do.

2        Q      And again, I'm just going to ask that

3    during the deposition you do not communicate with

4    anyone --

5        A      Sure.

6        Q      -- over your cell phone or over your

7    computer?

8        A      And I just want to -- I have -- I might

9    ask you just like every 15 minutes, if I can just

10   look at my phone, would that be okay; just because

11   people will have questions for me and -- related to

12   my day-to-day operations of my business?

13       Q      I certainly don't mind taking a break

14   every hour, or so, for you to do that.  I think

15   doing it every 15 minutes will be a little

16   disruptive to the deposition.

17       A      Okay, that's fine.

18       Q      You just speak up when you need to check

19   your e-mail and we'll take a break.

20       A      Okay.  Very good.  I will.  Thank you

21   very much.

Page 11

```
 1        Q     And, do you understand that today,
 2   you'll be testifying as to certain issues in a
 3   capacity as the corporate representative of Redstone
 4   International, Inc.?
 5        A     Yes.  Yes.
 6              Am I the -- I didn't know if I'm the --
 7   am I the sole corporate representative for Redstone,
 8   International or --
 9        Q     Let's try to help you with that and
10   we'll try one of the exhibits and see how we do.
11              You should be getting what I'm going to
12   mark as RW-1, and you may have to hit your refresh
13   button the Exhibit Share.
14              Have you gotten that?
15              (Walton Exhibit 1 was marked for
16   purposes of identification.)
17        A     I just pushed the refresh button.  Got
18   it.
19        Q     What I've marked as Exhibit No. 1 is an
20   Amended Notice of Deposition for the corporate
21   designee of plaintiff, Redstone International, Inc.
```

CONFIDENTIAL

Page 12

1          Do you see that?

2     A     I do.

3     Q     And have you seen this document before?

4     A     I have.

5     Q     When did you see it?

6     A     I don't remember, but, I mean, I've --
7     I'm sure I've -- I mean, I've been -- you know --
8     I've seen all the e-mails that have transpired
9     related to it.  So I'm sure I have opened it and
10    looked at it.  I don't recollect the exact of it.

11    Q     Okay.  If you would scroll to the last
12    page, it should be Exhibit A deposition topics, do
13    you see that?

14    A     Yeah, I do see that.

15    Q     Okay.  And when you asked me earlier
16    whether you were the corporate designee and the sole
17    corporate designee for everything, I believe that
18    Redstone has designated you for topics as the
19    corporate designee for topics 3 through 11.

20    A     Sounds good.

21    Q     Okay.  And, you are not the sole

CONFIDENTIAL

Page 13

1   corporate designee with respect to some of those

2   topics.  Okay?

3        A    Sounds good.  Thank you.

4        Q    So you understand that when I ask you

5   questions about topics 3 through 11 today, your

6   answers will be the answers of Redstone

7   International, Inc., and will be binding on

8   Redstone, correct?

9        A    Understood.

10       Q    Okay.  Now, you mentioned earlier that

11  you were deposed maybe five or six times before.

12            Were you deposed in any underlying

13  actions in this case?

14            MR. JACKS:  Excuse me, Tim.  Can we just

15  go ahead and load my designation there, so he could

16  see there -- I think some of those there were

17  combination designations.  I think he was --

18            MR. FITZGIBBON:  Let me go back and get

19  it from -- I believe we marked it at Terry

20  Cunningham's.  So let me get it from Terry

21  Cunningham's.

Page 14

1                  MR. JACKS:  Thanks.  I just want him to

2      see how that was spread out.

3                  MR. FITZGIBBON:  No problem.  It'll take

4      me a minute to find it.

5                  There it is.  Bear with me while I get

6      it into this.

7      BY MR. FITZGIBBON:

8          Q     All right.  You should have the

9      plaintiff's designation of 30 B6 witnesses.  Do you

10     see that?

11         A     Do I have to -- I went back.  Yeah, and

12     I'm refreshing.

13         Q     Yep.

14         A     There we go.

15         Q     Do you have it?

16         A     I do, sir.

17         Q     All right.  I'm going to mark that as

18     RW-2, and if you will scroll to page -- pages 2 and

19     3.

20                  (Walton Exhibit 2 was marked for

21     purposes of identification.)

CONFIDENTIAL

Page 15

1      A      Uh-huh.

2      Q      You'll see that with respect to topic

3   No. 3, you and Mr. Terry Cunningham were the

4   corporate -- designated as the corporate designees

5   of Redstone.  You are the sole designee with respect

6   to 4 and 5, and you and Mr. Heath Kefover are the

7   corporate designees with respect to topics 6 through

8   9, and you are the sole designee on topics 10 and

9   11.

10          Do you see that?

11      A      I do.

12      Q      Okay.  Now, you had -- I think I was

13   asking you before whether you had been deposed in

14   any of the litigation in the underlying actions to

15   this coverage suit?

16      A      I was the -- I believe there was one

17   deposition.

18      Q      Okay.  And other than the deposition

19   that you gave in the underlying actions, what other

20   matters have you given depositions in?

21      A      Various forms of commercial litigation

CONFIDENTIAL

Page 16

1   not pertaining to this, to this case.

2        Q     Any of those cases pertaining to

3   commercial litigation involving Redstone?

4        A     I don't believe so.

5        Q     Okay.  When did you join Redstone?

6        A     2013, I think.  2012, 2013.

7        Q     And how did you come to join Redstone?

8        A     I had a historical relationship with

9   some of the shareholders there and there was -- they

10  were just interested in me, you know, helping out

11  with the business.  I had some free time.  So I

12  joined the team and took a job there, and the goal

13  was to kind of, you know, get equity over time in

14  the company.

15           So yeah, I just took a job helping

16  manage the business.

17       Q     Did you have equity in the company when

18  you first joined?

19       A     I did not, not day one.

20       Q     But when you joined, you were the CEO a

21  the CFO?

Page 17

1        A       Yes.

2        Q       On day one?

3        A       That's correct.

4        Q       And, were you, for the duration of your

5    tenure at Redstone, always the CEO and the CFO?

6        A       That is correct.

7        Q       And when did you leave Redstone?

8        A       I left Redstone -- let's say it was 2016

9    or 2017 when I formally resigned.

10       Q       And you left the company because you

11   resigned from the company?

12       A       Yeah, I, I just didn't have the time any

13   more to devote to it.  So, you know, I was -- I'm an

14   entrepreneur and I have various businesses, and that

15   was, you know, had been an area I had focussed on

16   for a period of time.  I just couldn't dedicate the

17   amount of time required to it anymore.

18               So, it was, you know, a company I

19   really, you know, loved and a lot of good people

20   there; just, you know, really just a matter of --

21   I'm involved as a, you know, advising and -- you

Page 18

```
 1    know -- very limited fashion, but as an employee I

 2    was no longer involved.

 3         Q     But you, at some point along the way,

 4    acquired equity in the company, correct?

 5         A     That's correct.

 6         Q     And you still hold that equity?

 7         A     I do.

 8         Q     How much of the company do you own?

 9         A     10 percent.

10         Q     Before you joined Redstone, had you had

11    any previous experience in construction?

12         A     I had some related to construction, more

13    on the oil and gas side, but from a heavy civil

14    construction standpoint, it was really kind of my

15    first entry into, you know, managing a construction

16    business.

17         Q     And when you arrived at Redstone, Heath

18    Kefover was the president?

19         A     He was, and he remains in that position.

20         Q     And he was president throughout your

21    tenure --
```

Page 19

1          A      Uh-huh.

2          Q      -- and through to this day?

3          A      Uh-huh.  That's correct.

4          Q      Okay.  When you left Redstone, what did

5     you do next?

6          A      I bought a trash hauling and landfill

7     company, and I've done that to this day.

8          Q      And, do you engage any services of

9     Redstone in connection with that company?

10         A      Some, yeah, on a limited basis.  There's

11    some -- we have some water detection wells that need

12    to be decommissioned and grouted and then kind of --

13    you know -- we have to redrill new ones and they do

14    that work for us.  I'm trying to think of some other

15    work they may have done.

16                They drilled a couple micropiles for a

17    foundation for thermal oxidizer, which is kind of a

18    high efficiency player.  I'm trying to think of what

19    else they would have done.

20                I think that's, I think that's it.  I

21    think there may have been some odds and end jobs, no

CONFIDENTIAL

Page 20

1    incredibly large jobs or anything, you know, sub six

2    figure.

3         Q    Okay.  And throughout your tenure at

4    Redstone, where did you work?

5         A    You know, really, I was always tried to

6    be where the jobs were, as much as possible, whether

7    it was, you know, Tennessee.  You know, we had some

8    jobs in New York City that I worked on for a while.

9    You know, we had our main office in Uniontown, where

10   we had -- you know -- we had a secretary there and

11   then -- you know -- but generally, you know, we were

12   all on the road a lot.

13        Q    The company or you personally?

14        A    Myself and most of the people in the

15   company, and we had our shop in Uniontown.

16        Q    So, you had a headquarters and a shop in

17   Uniontown?

18        A    We did have our shop in Uniontown, kind

19   of wherever Heath was is where -- is really kind of

20   the center is where things were from an operational

21   standpoint, in terms of, like, you know, evaluating

CONFIDENTIAL

Page 21

1    future jobs and estimating, et cetera.

2          Q      When you said you had a shop in

3    Uniontown, what did the shop do?

4          A      Repairs on equipment was predominantly

5    the focus.

6          Q      And headquarters were also in Uniontown?

7          A      Yes, the mailing address was in

8    Uniontown.

9          Q      And, was that throughout your tenure at

10   Redstone?

11         A      We, we changed to a shop in, in Scenery

12   Hill, Pennsylvania.

13         Q      Did the shop move to Scenery Hill or did

14   the whole headquarters, shop operation move to

15   Scenery Hill?

16         A      Just, just the shop.

17         Q      And so, did the headquarters stay in

18   Uniontown?

19         A      The headquarters really -- yeah, we had

20   our mailing address at Scenery Hill.

21         Q      So the headquarters moved to Scenery

Page 22

1   Hill as well?

2        A    Uh-huh.

3        Q    Okay.  Now, had you met Mr. Heath

4   Kefover before you joined Redstone?

5        A    I did.

6        Q    How did you know Mr. Kefover?

7        A    Through a mutual friend.

8        Q    And how long before you joined Redstone,

9   did you meet him for the first time?

10       A    Probably was -- it probably was six

11  months I'd say.  It wasn't like I knew him for 20

12  years or anything.

13       Q    Did you meet him in the context of

14  considering joining the company?

15       A    Yes, earlier on.  Yeah.  Yes.

16       Q    So, before you started considering

17  joining the company, you didn't know him?  You did

18  not know him, correct?

19       A    I did not, no.

20       Q    And I think you've described him

21  elsewhere as, the smartest person related to

CONFIDENTIAL

Page 23

1    construction that you know?

2           A      I agree.

3           Q      Is that accurate?

4           A      That is accurate.  He is a very good

5    constructor.

6           Q      And Mr. Kefover testified that when it

7    came down to sort of the division of labor between

8    the two of you, he was the on-site project guy to

9    get the project done, and I think he described you

10   as the financial contracts insurance guy.

11              Is that an accurate reflect of the

12   division of labor between the two of you?

13          A      Yeah.  I would probably -- I think it's

14   a very good way to say it.  I think, also -- you

15   think about it, I was looking at it from a risk

16   perspective, right.

17              So Heath was execution and I was risk

18   management, and you know, profitability.

19          Q      Did you have experience with insurance

20   before you came to Redstone?

21          A      Some, yeah, not, not a vast amount of

CONFIDENTIAL

Page 24

1   experience, but I, I had purchased

2   commercial-related insurance policies before.

3        Q    And in what context had you done that?

4        A    Real estate ownership.

5        Q    What kind of real estate?

6        A    Commercial real estate that I had owned

7   certain partnerships.

8        Q    And where were those located?

9        A    They were in Pennsylvania, some in West

10  Virginia.  That would be it, yeah.

11        Q    Okay.  When you arrived at Redstone --

12  and I think you said you started some time in 2012

13  or 2013, right?

14        A    Uh-huh.  That's correct.

15        Q    I think Mr. Kefover told us that the

16  company was founded in 2012?

17        A    Yeah, that's correct.  February, 2012 it

18  was founded.

19        Q    But, you were not there in the

20  beginning, right?

21        A    I was not.

Page 25

1    Q    And so, how many projects was the

2 company working on when you joined?

3    A    They were working on the -- what was the

4 name of that project?

5         There was a Clarksville, Tennessee

6 project, and there was a couple different oil and

7 gas projects.  So when I joined, the company was

8 doing a fair amount of oil and gas-related work, but

9 Heath's, you know, kind of poor competency was kind

10 of like in heavy silicone construction.

11        So one of the things that Heath and I

12 kind of worked together on was focusing on what

13 we're good at, which was, you know, the civil

14 construction side.  And you know, kind of moving

15 away from the more cyclical oil and gas service

16 work.

17        So, you know, at that time there wasn't

18 a lot of civil construction jobs going on.  I felt

19 like there was another one that was finishing up,

20 but the large one that was going on at the time

21 would have been the Clarksville, Tennessee job.

Page 26

1      Q     Okay.  You mentioned a couple of oil and

2   gas jobs.  Do you know where they were located?

3      A     All Pennsylvania, Ohio and West

4   Virginia.

5      Q     And in discovery responses that Redstone

6   has provided in this case, it stated that in 2014,

7   it was performing services in Kentucky, New York,

8   Ohio, Pennsylvania, Tennessee and West Virginia, is

9   that correct, to the best of your recollection?

10     A     That sounds right, yeah.

11     Q     Can you think of any other states in

12   which it was performing services in -- Redstone was

13   performing services in 2014?

14     A     Yeah.  In 2014?

15           You said Kentucky, Tennessee, Ohio --

16     Q     New York?

17     A     New York, yeah, definitely.

18     Q     Ohio?

19     A     Ohio, Pennsylvania, West Virginia.

20     Q     Yes.

21     A     The only other state I could think of

Page 27

1    would be Connecticut, potentially.  I just don't

2    remember the timing of the jobs.

3         Q    What job was in Connecticut?

4         A    It would have been the -- God, what was

5    that job?

6              It was some train station job.  I forget

7    the name of it.

8         Q    What about Maryland; was it performing

9    any services in Maryland?

10        A    I'm sorry, that's correct.  They may not

11   have been doing it at the time.  I know the company

12   had historically performed services in Maryland.

13        Q    Okay.  And going into 2015, in

14   Redstone's discovery responses, it said that it also

15   added services in North Carolina, South Carolina and

16   Virginia in 2015.

17             Is that consistent with your

18   recollection?

19        A    Yeah, the -- yeah, there was a -- trying

20   to remember the Carolina jobs.  I don't recollect

21   the -- I know there was a contractor we worked with

Page 28

1   down south, like, a prime contractor, but yes, there

2   was jobs like, in the Virginia, Carolinas.  I don't

3   remember the exact jobs.

4         Q    Okay.  And now, other than the states

5   that we've mentioned, can you think of any other

6   states that Redstone performed services in during

7   your tenure at Redstone?

8         A    We did a job in Alabama.  I'm not sure.

9   I don't, I don't recall.  I think that would be

10  pretty exhaustive, but there is --

11        Q    I'm sorry, go ahead.

12        A    There is a scenario I don't remember,

13  but I think that's a relatively exhaustive list.

14        Q    And Mr. Kefover told us that, for every

15  job that Redstone got, it submitted proposals for

16  multiple others, is that a fair statement?

17        A    Oh, yeah.  Yeah.

18        Q    Were you involved in the preparation of

19  proposals during your tenure at Redstone?

20        A    I was.

21        Q    Other than the states that we've

CONFIDENTIAL

Page 29

1    mentioned, I think you just mentioned a bid that

2    Redstone did not get in Alabama --

3         A    That's correct.

4         Q    Can you think of any other states in

5    which Redstone submitted bids, other than the ones

6    we've mentioned so far, and did not get the work

7    during your tenure at Redstone?

8         A    I, I do not.  I do not recall.  I

9    remember the West Virginia one because Heath and I

10   were down there for, for a while and the food was

11   really bad.  So, we got sideswiped at the end of

12   that.

13        Q    Was it your responsibility to handle the

14   insurance with respect to the various projects that

15   Redstone was engaged in during your tenure there?

16        A    Yeah.  I mean, I definitely helped with

17   the insurance.  Like I said, in terms of job

18   delineation, I think insurance definitely falls

19   within that risk management category.

20        Q    Again, fair to say that you were

21   responsible principally for the insurance side of

CONFIDENTIAL

Page 30

1    things, in terms of the Redstone operations?

2         A     Correct.

3         Q     And that Mr. Kefover was principally

4    responsible for the actual construction or other

5    work that Redstone was doing on a particular

6    project?

7         A     Correct.

8         Q     Other than the Liberty Mutual policy

9    that's at issue in this case, how many other

10   commercial general liability policies did you obtain

11   for Redstone during your tenure there?

12        A     I, I would -- I'm not sure of that exact

13   number.  It would have been -- I'm not sure if we

14   left Liberty Mutual while I was there or not.  I

15   know that we had obtained Liberty Mutual while I was

16   there.  So, there is definitely one prior, and other

17   than that, I would be speculating.

18        Q     And would the one prior be Kinsale?

19        A     That sounds right, yeah.

20        Q     Okay.  During your tenure at Redstone,

21   was there ever a time when Redstone had multiple

Page 31

1   commercial general liability policies covering the

2   same time period?

3        A     I just don't recollect that.  I would

4   assume no because there would be, you know, a policy

5   end and a policy begin, you know, within individual

6   lines, whether it's GO, auto, comp.

7        Q     Okay.  On the various projects that --

8   in the states that we just mentioned, did Redstone

9   employ subcontractors?

10       A     Not usually.  I mean, we rented

11  equipment, but very rarely did we -- you know --

12  we'd buy, we'd buy concrete, but our guys, you know,

13  would pump it, you know, through our grout pumps.

14            Not that, not that I can -- not that I

15  can recollect, no.

16       Q     What was your role in preparing

17  proposals for Redstone to submit for various

18  projects?

19       A     So Heath really -- you know -- as you

20  can imagine in proposals, there's various inputs.

21            So, you know, as Heath was kind of the

Page 32

1    master of production and you know, getting the job

2    done, you know.  He obviously was responsible for

3    kind of, you know, what we thought would be the

4    timing and -- of completion on a job, you know, and

5    he was obviously going to be the one who would

6    develop the means and the methods.

7              So, you know, would this go, and then

8    this would be stacked on that or -- you know --

9    would this be drilled, and then have to be grouted

10   and redrilled or -- you know -- he would be

11   developing that overall approach to constructing the

12   job and determining, and determining how quickly

13   that job would be performed.

14             You know, he also had a very practical

15   mind as it related to what would be like a potential

16   outside risk on a job, whether it be third-party

17   quality assuring a certain part of the project.

18             You know, I mean, he was highly involved

19   in all of it, you know, and I think before any bid

20   went out, you know -- you know -- I was ultimately

21   -- you know -- we would have a discussion.  We'd go

CONFIDENTIAL

Page 33

1   over the job, dive into the prints.

2            We'd go over the details but, at the end

3   of the day, Heath was the guy who, you know, kind of

4   gave the blessing on the bid because, you know, he

5   was the one who was going to, at the end of the day,

6   be responsible to build it.

7            And you know, we had a very good, you

8   know, relationship, where I was kind of, you know,

9   focussed on kind of watching his back on the things

10  that, you know, I felt like I could control and in

11  areas where I felt like, you know -- you know -- he

12  was focused on executing, you know, trying to kind

13  of cover any blind spots so that he wasn't

14  blind-sided.

15     Q    And you just mentioned that you tried to

16  contribute in the areas that you could control.

17            Can you give me an idea substantively

18  what those were?

19     A    Costs.  You know, costs would be a big

20  thing, you know; try to manage costs anywhere I

21  could.

CONFIDENTIAL

Page 34

1          You know, that would probably be the

2     biggest, the biggest area.

3          Q     And how would you describe during your

4     tenure at Redstone, your working relationship with

5     Mr. Kefover?

6          A     Fantastic.  Great friend.

7          Q     And on a typical workday when you were

8     at Redstone, how often would you communicate with

9     Mr. Kefover?

10         A     Oh, all the time.  I mean, it depended

11    on the works that we had that day, right, you know.

12              If he was -- you know -- if he was --

13    where he was or what he was doing, or where I was or

14    what I was doing, right, but ultimately, we became

15    partners and you know, we were kind of -- you

16    know -- we kind of did our best to divide and

17    conquer what we could, you know, right; like any

18    business getting, getting going, right.

19         Q     Now, with respect to the Mobley

20    project -- and when I say the "Mobley project," I

21    want to make sure we're talking about the same thing

Page 35

1    and it's the subject matter of the litigation, which

2    is the retaining wall project at Mobley, West

3    Virginia.  Okay?

4         A     Yes, sir.  Understood.

5         Q     With respect to the Mobley project,

6    Mr. Kefover testified that he was there just about

7    every day from sometime in September or October of

8    2014, through approximately March of 2015.

9              He was on site every day?

10        A     He was.

11        Q     Fair enough.

12        A     I think that is -- I think he may have

13   -- I think he may have lived there at one point.

14   I'm serious.

15             But no, I mean, he was, he was all in

16   there.

17        Q     And during that period of time, how

18   often would you communicate with him while he was at

19   Mobley?

20        A     Very consistent, you know, sourcing

21   materials.  You know, just doing whatever I could to

Page 36

1    support kind of the -- you know -- that was, that

2    was the -- that was the company at that point,

3    right.

4              Like, that was the -- you know -- we

5    kind of shifted all resources to that project, you

6    know, for the entire company, just given the size of

7    the projects and, and -- you know -- what we thought

8    was a very good project.

9              I still tend to think it's a good

10   project.  But yeah, I mean, consistently.  Right.

11        Q    Well, during the period of time that

12   Redstone was working on the Mobley site, it had

13   other projects that it was working on, didn't it?

14        A    It would -- if there was -- you know --

15   I have to remember.  There were probably some that

16   were kind of winding down, but in terms of like

17   focus, you know, we weren't out trying to, you know,

18   overload ourselves at that point; like, we

19   consistently had a bid pipe line, you know.

20              But, it would have been for stuff, you

21   know, further out, and you know, given some of the

Page 37

1    timing challenges on this project, you know, when

2    you're, you know, managing resources, right, and

3    executing those projects on time, you know, and

4    safely to make a profit and -- you know --

5    obviously, there was multiple variables unforeseen

6    on this project.

7                So, you know, as we kind of -- on the,

8    you know, mid to latter end of the project, you

9    know, started kind of bidding and procuring more

10   work, we would have had other jobs because they

11   probably would have -- we probably were hopeful that

12   the Mobley job were done, candidly, but they

13   weren't.  So, it wasn't.

14               So, we had to start another job.

15        Q    And I think you previously described

16   your involvement at Mobley as you being the least

17   involved day-to-day at the Mobley site of any of the

18   Redstone folks?

19        A    That would be correct.

20        Q    And so, during that period of time, you

21   were principally back at the Uniontown office?

Page 38

1      A      I would principally be either -- I'd be

2   in Uniontown.  I would be -- trying to think

3   where -- yeah, probably be in Uniontown most of the

4   time.

5           The reason I'm thinking is, at that

6   point I kind of -- you know -- there was a point I

7   started wearing multiple hats in different

8   companies.  So, you know, my -- I think at that

9   point in time, I still would have been in Uniontown.

10      Q      And you also worked from home

11   periodically during that time?

12      A      Home?

13           We had another business -- or I did that

14   -- you know -- I would be in -- I'd be in Waynesboro

15   a lot, Clarksburg a lot, just for oil and gas

16   construction work.

17           So, you know, if I was -- if I had

18   something to do with Kathy or -- who was the

19   secretary there at the time.  But I have quite a

20   hectic life, if you can't tell by me asking to check

21   my phone.

CONFIDENTIAL

Page 39

1          So the -- you know -- how often was I at

2     that office?

3          Maybe one day a week, you know.  I think

4     that's probably the -- certainly could be three

5     days.

6          Could there be two weeks where I wasn't

7     there?  Both.

8          So I would say, on average, one to two

9     days a week.

10     Q     When did you first become aware that

11     there were problems with respect to the Mobley

12     project of any sort?

13     A     Probably the moment we started dealing

14     -- we started talking to Greg Hadjs, who was the

15     president of JF Allen.  It was probably my general

16     concern.

17          It's just, just seems like this was

18     going to be a litigious scenario.  You know, there

19     are certain people that you go into jobs with and

20     there seems to be a constructive discourse, and

21     there are certain who don't.  So I think that's

CONFIDENTIAL

Page 40

1    where I -- you know -- as we kind of started working

2    with them, I'm like, this could be a challenging

3    project.

4              Yeah, that's probably when I first

5    realized -- you know -- and I remember explicitly

6    saying to Heath, you know, "We'd better take some

7    really good notes here."

8              And Heath was working there day and

9    night, and I think he said to me, you know, "It's

10   hard for me to be a professional note-taker when I'm

11   trying to build a -- one of the largest walls in

12   America, you know, in the middle of the winter with

13   crews running 24/7."

14             I'm just like, "I don't know what to

15   tell you, you know.  You've just got to find a way

16   because this is, this is going to be a challenge."

17        Q    And JF Allen Company is the other party

18   to the subcontract with Redstone at the site,

19   correct?

20        A    Yes, sir.  They would have been the

21   prime contractor directly with the owner of the

Page 41

1   site.

2        Q     And, who was Mr. Hadjs -- or, his role

3   was project manager for JF Allen?

4        A     President.

5        Q     Oh, president.  Okay.

6              And, do you recall when you first

7   started dealing with Mr. Hadjs?

8        A     On the contracting part of it, really.

9   I mean, there was -- you know -- when we started

10  getting into the contracting part of it and then I

11  really started dealing with Greg, and then, you

12  know, as the -- you know -- the job started

13  progressing, you know, obviously, we're

14  communicating more, you know.  He's communicating

15  with Heath a lot.

16             And yeah, that would be the primary time

17  we started communicating with him.

18       Q     And, did Mr. Kefover express to you his

19  concerns or dissatisfaction with JF Allen at the

20  site?

21       A     I'm honestly -- you know -- initially,

CONFIDENTIAL

Page 42

1    there wasn't like a major kind of execution concern

2    with JF Allen.  I think candidly, right, jobs

3    getting going, you know, I just kind of had -- you

4    know -- we had done a few jobs at that point.  We

5    had kind of sent some people, because Redstone

6    generally is working as a sub to some kind of major

7    civil contractor.

8                    And you know, at that point in time, you

9    know, on the job, there was a pretty good younger PM

10   out on the -- project manager on the JF Allen side.

11   What's his name?

12                   Garrett.  Ted Garrett, and we had always

13   dealt with Ed Farris, the estimator, who was pretty

14   reasonable.

15                   So, you know -- when we were bidding the

16   project, that is.

17                   You know, and Ted was -- seemed to be a

18   good kind of go-getting guy, and the job, you know,

19   getting rolling, you know, working well, you know.

20                   I think my apprehension was, you know,

21   like I had kind of introduced, you know, or kind of

Page 43

1   said to you earlier, you know, once we started

2   contracting with them, you know, and that just kind

3   of reared its head a little bit, you know.  That's

4   why I told him to take copious notes.

5        Q    So, your advice was to be careful?

6        A    Essentially, yeah.

7             MR. FITZGIBBON:  I'm going to mark

8   another exhibit.  This should be, I think, RW-3.

9             (Walton Exhibit 3 was marked for

10  purposes of identification.)

11       A    Just backing out of this one and I'm

12  going into the -- going to refresh.

13       Q    Okay.  Do you have it?

14       A    Yep.

15       Q    What I've marked as Exhibit RW-3, it

16  appears to be an e-mail -- or an e-mail trail.  The

17  top of which appears to be an e-mail, February 10,

18  2015 from you to Greg Hadjs.

19             Do you see that?

20       A    I do.

21       Q    And if you scroll down to the bottom of

CONFIDENTIAL

Page 44

1    the first page of the exhibit, you'll see an e-mail

2    from Mr. Kefover to Ted Garrett and to Jeff Waggett,

3    with a cc. to you, and the subject matter is "Mobley

4    Office trailer."

5              Do you see that?

6        A    Yes, sir, I do.

7        Q    And is that Ted Garrett -- is that who

8    you just mentioned as the young --

9        A    Project manager.

10       Q    Project manager?

11       A    That is correct.

12       Q    And who is Jeff Waggett?

13       A    Jeff Waggett was one of our project

14   managers.

15       Q    Okay.  And Mr. Kefover's e-mail

16   indicates to Mr. Garrett that he is going to be

17   moving into a small mobile mini that's being

18   delivered.  And it's advising Mr. Garrett to make

19   arrangements for a cell phone booster and WI-FI for

20   his trailer because "we will be removing it."

21             Do you see that?

Page 45

1      A     That's correct.

2      Q     Can you tell me, what did Mr. Kefover

3   tell you about why he was moving out of -- well,

4   first of all, did Mr. Kefover discuss this with you

5   before he moved out of the trailer?

6      A     Yeah.  You know, Greg was very

7   disruptive to the operation of our business, and you

8   know, we just really needed to create some kind of

9   delineation.  And additionally, you know, we wanted

10  to make sure we were keeping our paperwork and you

11  know, we just -- there needed to be a silo, right.

12          Heath needed to take a call related to

13  something or a business, you know, just -- it's hard

14  to kind of explain the awkwardness of some of the JF

15  Allen folks with us.

16     Q     This would be an example of sort of

17  early on, your concern about the relationship

18  between Redstone and JF Allen at the site?

19     A     Right.

20     Q     Okay.  And, did that tension increase

21  after February 2015?

Page 46

1      A      I don't think, like, this was like a
2   moment when tension generally -- you know --
3   generally prompted tension.  You know, this was kind
4   of standard, you know, Greg sending some kind of
5   emotional e-mail, which is kind of standard
6   practice.  There's just kind of flare-ups and kind
7   of flare-downs, you know.

8               I'm not sure -- you know, I think Ted
9   still had probably a pretty good working
10  relationship with the guys out there.  I don't know
11  if it would have really, you know, hurt.

12              You know, I just don't really remember
13  explicitly, but, you know, when Ted was there,
14  things were still pretty good.  I can tell you that.
15  That's what I recall.

16      Q      So you don't recall pointing to this
17  incident as an indication that -- and I think your
18  words were "things were starting to go sideways with
19  JF Allen at the site"?

20      A      This was a part of the overall kind of
21  Greg epidemic.  You know, it was the challenge of

Page 47

1  communication with him proliferating amongst more

2  than just myself and the, and the challenging

3  dialogue, you know, with which he creates, as you

4  can even see by his own kind of -- you know -- kind

5  of senior manager in Ted Garrett, you know.

6           You know, I would deem to be a, you

7  know, young, smart, very smart guy, you know, who

8  ultimately just said, you know, I'm not going to be

9  a part of your, you know, your dispute.

10           MR. FITZGIBBON:  I'm going to

11  introduce RW-4.  Let me know when you've had a

12  chance to review that document please.

13           (Walton Exhibit 4 was marked for

14  purposes of identification.)

15      A     Just pushing refresh.  It is there.

16           It's RW-4.  I got confused.

17      Q     Again, what I've marked as RW-4 is

18  another e-mail trail.  The top e-mail is an e-mail.

19  It appears to be an e-mail from you to Mr. Hadjs

20  dated March 15 2015.

21           Do you see that?

Page 48

1      A      Yes, sir.

2      Q      And the second e-mail in the trail is a

3   e-mail from an individual named Brian Leatherman to

4   Mr. Hadjs and to a Delbert Leatherman.

5           Do you see that?

6      A      Yes, sir, I do.

7      Q      And who is Brian Leatherman?

8      A      So I don't remember exactly when that

9   was, but Ted left the company, JF Allen company, and

10  they brought out a new PM, Brian Leatherman, who is

11  one of their paving project managers and he replaced

12  Mr. Garrett.

13     Q      And, do you recall what prompted this

14  e-mail exchange?

15     A      Likely -- it would be speculation, the

16  prompting, but my assumption would have been that

17  Greg wanted their to be some documentation related

18  to some kind of chink in the armor.  So that, you

19  know, we could use it as discovery five years later,

20  and you know, hence, the paper trail required.

21           Do I think that we had -- I think we had

Page 49

1   guys working out there and you know, working their

2   tails off, and I think this is just some, you know,

3   BS e-mail.

4        Q    And, do you recall describing this

5   exchange as a further example of things starting to

6   go sideways between Redstone and JF Allen, and JF

7   Allen using this as an effort to undermine Redstone?

8        A    I think the effort to undermine Redstone

9   would be a perfect way to say it, sir, and I think

10  you can see kind of by the tone of my e-mail that,

11  I'm trying to broker some peace in this overall --

12  you know -- in this overall goal and just trying to

13  take a step back in kind of the risk mitigation

14  responsibility, where -- you know -- what Greg never

15  understood, and to this day, still does not seem to

16  understand is that, he and us were in this contract

17  together to build this wall and you know, we needed

18  to work together, you know, and sometimes that

19  required push back on the customer and not just push

20  down onto Redstone.

21            But unfortunately, that was kind of not

Page 50

1    the mode of operation.  It kind of -- you know --

2    the -- what the hunch that I had unfortunately was

3    true and -- you know -- and this is a perfect

4    manifestation of that.

5         Q    And when you say "sometimes it requires

6    -- I'm sorry, Mike.  Go ahead.

7              MR. JACKS:  In your last question, I

8    think you said something like, "Do you recall

9    referring?"

10             I'm assuming you're talking about

11   Mr. Walton's prior deposition in the underlying

12   case, is that what you're talking about?

13             MR. FITZGIBBON:  Yeah.

14             MR. JACKS:  So I just wanted -- when you

15   preface questions like that, I'm just going to

16   assume we're talking about that depo.  Unless

17   there's some dispute about it, I don't think we need

18   to introduce it here.

19             MR. FITZGIBBON:  Well, the only reason I

20   would need to introduce it is if I need to refresh

21   his recollection or if the answer is inconsistent

Page 51

1    with a prior one.

2              MR. JACKS:  Okay, that's fine.

3              THE WITNESS:  Yeah.  Counselor, I think

4    I'm not going to remember.  I will tell you I didn't

5    read my deposition, so -- but, you know, the facts

6    are the facts.

7              But, my memory has eroded.  So I just --

8    you know -- if there's inconsistent -- you know --

9    if there's any questions, just -- you know -- if I

10   jog my memory, I can get it there.

11   BY MR. FITZGIBBON:

12        Q    Mr. Walton, I'm sorry.  I didn't hear

13   the part.

14              You said you did read your prior

15   deposition from the underlying case or you did not?

16        A    I did not.

17        Q    In preparation for this?

18        A    I did not.

19        Q    What did you do in preparation for this

20   deposition?

21        A    I reviewed some historical e-mails.  I

Page 52

1   talked to Mike.  That was about it.

2            Not a whole -- I'm not going to -- not

3   as much as Mike probably wanted me to.

4        Q    By "Mike," you're referring to

5   Mr. Jacks.

6            Did you have occasion to talk with

7   Mr. Kefover prior to your deposition to prepare for

8   it?

9        A    I talked to Heath candidly.  We talked

10  very little about the deposition.

11           I talked to him this morning.  I talked

12  to -- you know -- but I called him this morning

13  about a bull gear on a drill that I own, needing to

14  get rebuilt, and I was asking if he had heard

15  anything from the shop, the one shop that he knows,

16  and then we talked about this for about 15 minutes.

17       Q    And was Mr. Jacks on the line during

18  that call?

19       A    He was not.

20       Q    Okay.  And so, what did Mr. Kefover tell

21  you about this deposition?

Page 53

1      A      He told me -- we actually kind of talked

2   what we understood about yesterday, which was that

3   -- I essentially said to him -- you know -- I

4   essentially said to him that I don't understand how

5   The Insurance Market didn't give us the coverage and

6   if we would have -- I mean, you're going to get me

7   right to the point, but, you know, if there was a --

8   I looked at the contract stuff last night and you

9   know, I asked explicitly for the coverage and you

10  know, if there was gas coverage, you know, just pay

11  for it.

12             So, you know, I just -- you know -- that

13  was really it.  And then we kind of -- you know --

14  we didn't understand how, how, how it didn't -- you

15  know -- I would do the e-mail.  I'm the one who

16  would care very much about putting things into

17  writing and you know, when I tried to make it as

18  simple as possible -- and I just kind of was talking

19  to him about how I just didn't understand how it

20  could ever get this messed up.

21             That was really the under oath -- the

1    truth of what our conversation was this morning.

2         Q     What did Mr. Kefover say in response to

3    that?

4         A     That, that -- well, I'm under oath.  So

5    I'm going to tell you exactly what he said.

6               We now learned -- you know -- Roger had

7    a master's degree in kinesiology and seemed to

8    manifest in his overall insurance analysis that was

9    performed, and that was kind of it.

10        Q     And when you just made the reference to

11   Mr. Waters having a master's in kinesiology and it

12   manifested itself in, in this instance, what did you

13   interpret that to mean?

14        A     I think it meant that, you know, we

15   provided -- you know -- you know, I provided Roger

16   with -- if I refer to Roger, you tell me what you

17   want.  Roger or Mr. Waters?

18        Q     Either one.

19        A     Okay.  I told Roger the e-mail about the

20   contract.  You know, I thought it was pretty, pretty

21   explicit.  You know, this was a, a big kind of risk

Page 55

1   for us, you know, going into this job and you know,

2   I wanted to be kind of belt and suspenders, you

3   know, safe.

4            But, you know, he was our, he was our

5   broker and that was the insurance that, you know,

6   that was the insurance that we got.

7            So, you know, again, I'm not a, I'm not

8   a lawyer and you know, kind of expected to get what,

9   you know, what we asked for.

10       Q    Have you reviewed the amended complaint

11  in this case, that Redstone file against Liberty

12  Mutual and The Insurance Market?

13       A    Sir, I probably have.  I just don't

14  recall.  I just --

15       Q    There is an allegation in paragraph 22

16  of that complaint that says that Redstone was

17  completely reliant upon The Insurance Market to

18  provide the insurance that Redstone needed.

19            Is that a fair statement?

20       A    I believe that is.  I believe that is a

21  fair statement.

CONFIDENTIAL

Page 56

1      Q    So your communications about insurance

2  for the Mobley project during this time period, the

3  Liberty -- the time period of the Liberty Mutual

4  policy, your communications about obtaining

5  insurance for the project were strictly with

6  Mr. Waters?

7      A    I do remember.  I was looking at this in

8  a an e-mail before and I vaguely recall this, but

9  that we may have sent it to other brokers to, to

10  look at and I can't remember if that was that --

11  that was this year or prior.  I think it was this

12  year, the year we ended up going with Liberty.

13           So, there was likely other communication

14  occurring with another broker evaluating other

15  insurance proposals.

16      Q    But, you did not communicate, did you,

17  directly with any of the insurance carriers?

18      A    No, sir, I did not.

19      Q    Let me go back for a minute to the

20  Mobley site and we were -- we looked at an e-mail

21  from February and an e-mail from March, and things

Page 57

1    are -- to use your word, "going sideways" a bit with

2    JF Allen, certainly by March 15th, which is the date

3    of RW-4 that we just marked.

4              Did they continue to go sideways even

5    more when the anchors began sheering at the site?

6        A    You know, not, not really because there

7    wasn't like a, there wasn't like a major cause for

8    concern.  You know, the -- you know, it was still,

9    it was still relatively constructive at that time

10   and not -- you know -- there was some anchors that

11   broke.  You know, that, that can happen for various

12   reasons, and you know, you just -- you repair them.

13             And you know, I think that there was --

14   at least, you know, from my perspective, I -- and

15   again, I'm not, you know, the experienced

16   constructor, but when I remember talking to -- you

17   know -- talking to Heath about it and being like,

18   "Hey, is there something kind of broadly wrong

19   here," and he's like, you know, "I think, I think it

20   should be -- I think it should be good, you know.

21   We're going to -- you know -- we didn't install

Page 58

1   anything incorrectly, you know.  We followed all the

2   procedures and we did it, you know, in accordance

3   with our drawings."

4           And I'm like -- cause I'm like,

5   "Honestly, if we're screwing something up, just tell

6   me, right, cause we can manage that," and he was

7   like, "You know, honestly, you know, all ego aside,

8   you know, no, I really don't feel like that."

9           And I was, you know, very comfortable

10  with Heath, you know, being very honest with me

11  about that.  You know, we built a strong rapport and

12  I felt like there was a level of trust there at that

13  point, and I was kind of like, you know, let's just

14  -- you know -- we're going to fix what was broken

15  and you know, keep kind of moving along, you know.

16          Something happened, right.  Something

17  got bumped or something got -- you know -- bad batch

18  of steel or you know, something, right.  It was not

19  this kind of global nightmare that this whole thing

20  kind of turned into at that point.

21              I think once there was this concern that

Page 59

1   there was this kind of global nightmare, that was

2   really the inflection point where I think JFA was

3   kind of -- took the position that, all right, well,

4   we need a scapegoat, you know, we're going to cut --

5   we're going to just bury Redstone and come with -- I

6   think Greg verbatim said to me, "You know, I just

7   don't think you guys have the, quote, unquote,

8   firepower to endure this.  So, we're just going to

9   pretty much just try and crush you."

10           And I said, "Okay.  Well, you do what

11  you got to do, brother.  I'm going to do what I got

12  to do."

13      Q     So when the anchors began to sheer,

14  Mr. Kefover talked to you about that, right?

15      A     He did.  I remember.  I remember it

16  explicitly cause he was concerned when it happened

17  and he went -- like, I think he drove out, you know,

18  looked at it in the middle of -- like, when the

19  first -- for the first inclination of a sheering

20  occurred, he went out immediately to make sure that

21  there wasn't anything wrong with, you know, our --

CONFIDENTIAL

Page 60

1    anything major wrong with what we were doing and he

2    felt, you know, pretty good about it.  That was kind

3    of where, you know, I left it with him.

4           We probably talked about it for 45

5    minutes or so.  And you know, the answer was that it

6    was kind of an isolated thing and we're going to

7    repair them and move on, right.

8           Obviously, that was not the case.

9       Q    Did he express to you concern that

10   problems with the fill material were causing the

11   anchors to sheer?

12      A    That was obviously, like, highlighted as

13   a problem at some point.  I'm being -- I do not

14   recall the exact time with which the fill

15   settlement, you know, became a general concern.

16          I don't think it was like a -- kind of

17   global concern at that point, you know, if there was

18   like some poorly compacted material, you know.

19          I don't think it was like, lock, stock

20   and barrel to be fill settlement at that point.  I

21   think that was kind of further assessed as time went

Page 61

1   on, but I think that, you know, there may have -- I

2   think that was one of a couple things that, you

3   know, may have -- the five anchors I know that had

4   broken, I don't think we -- you know -- there was a

5   concern we did it -- you know -- did we install

6   something wrong?

7            No.  Right, that was kind of our first,

8   you know, concern, right, and then it was like,

9   okay, so, from here, you know, we need to fix this.

10  There's probably a number of variables that impacted

11  this -- these anchors.  But, in terms there being

12  some kind of general means and method, global flaw

13  in the approach that has now been further

14  determined, that was not, like, you know, the

15  clearcut issue at the time that I recall.  Heath may

16  feel like, you know, he knew lock, stock and barrel

17  that this was the problem.

18           You know, my understanding was that some

19  anchors broke, you know -- you know -- things break

20  on a site.  Part of it might have been, you know,

21  fill settlement, part of it might have been a number

Page 62

1   of different things and the -- that we were going to

2   fix them and move on, and we weren't going to get

3   into some broad debate about what the root cause was

4   and that's kind of the way it went down that I

5   recall.

6        Q    Did he express to you at the time of the

7   first or second anchor sheering, a concern for the

8   safety of the Redstone workers at the site, such

9   that he was in favor of halting construction after

10  the first few anchors broke?

11       A    I don't know if safety was -- I honestly

12  don't, don't remember.  I mean, I think safety was,

13  you know, working at night, you know, the wall face

14  and the overall testing approach that changed.  I

15  know Heath had some general concerns about safety.

16            I don't know -- I don't remember if that

17  -- like, the anchor sheering was like the red flag

18  that -- you know -- I think the primary concern on

19  safety was, you know, testing on that, on the

20  working face, the way they were, and testing at

21  night and just -- you know -- I don't remember that,

CONFIDENTIAL

Page 63

1   you know, being -- I don't remember a discussion of

2   that being like the -- you know -- Heath freaking

3   out about safety due to those anchors breaking.  I

4   don't.

5        Q    You don't recall whether such a

6   discussion took place or you recall that it did not?

7        A    I do not recall that a discussion like

8   that took place.

9             MR. FITZGIBBON:  Okay.  This might be a

10  good time for a short break if --

11            THE WITNESS:  That'll be great, yeah.

12            MR. FITZGIBBON:  I'm trying to be

13  cognisant of not taking more than an hour before --

14            THE WITNESS:  I need to get another cup

15  of coffee.  So I'll --

16            MR. FITZGIBBON:  All right.  Let's take

17  10 or 15 minutes and come back.

18            THE WITNESS:  Thank you, sir.

19            (A break was taken.)

20  BY MR. FITZGIBBON:

21       Q    You made reference earlier this morning

Page 64

1   in your testimony to a shop that Redstone had.

2            Do you recall that?

3        A    Uh-huh.

4        Q    Did Redstone make anything at that shop

5   that was used on the Mobley site?

6        A    Not that I'm aware of.  It would have --

7   maybe stage material or prepared some machinery, but

8   it's not impossible that some component of that was

9   potentially -- no, I mean, I can't imagine.

10           No.  I mean, there might have been

11  something done that was used out there, but I can't

12  -- I'm not aware or -- of the specifics if there was

13  something or not.  I just don't know.

14       Q    Do you have any knowledge as to whether

15  the wailers that were used at the Mobley site were

16  fabricated by Redstone?

17       A    I do not know.

18       Q    Okay.  Do you recall a time when you

19  were asked to provide signature pages for Redstone's

20  application for insurance with respect to the Mobley

21  site?

Page 65

1        A      I do not recall that.

2        Q      Okay.  Bear with me one second.

3        A      Take your time.

4               MR. FITZGIBBON:  I think this is RW-5,

5    is that right?

6               Is that what I'm up to?

7               THE WITNESS:  Yes, sir.  Problems with

8    Friday after a holiday week is that -- off the

9    record.

10              (A discussion was held off the record.)

11              (Walton Exhibit 5 was marked for

12   purposes of identification.)

13   BY MR. FITZGIBBON:

14       Q      Mr. Walton, I just sent you what I

15   marked as RW -- Exhibit RW-5.

16       A      Yep.  I'm just refreshing the page,

17   waiting for it to come through.

18       Q      Okay.  And RW-5 is an exhibit that

19   consists of multiple pages, the first of which

20   appears to be an e-mail from you to Kelly Johnston

21   and Roger Waters dated, Monday, April 13, 2015.

Page 66

1          Do you see that?

2     A     Yes, sir, I do.

3     Q     And the subject line is "Signature pages

4    of insurance."

5          Do you see that?

6     A     Yes, sir, I do.

7     Q     And your note to Ms. -- to Mr. Rogers

8    and Ms. Johnston says, "Please find attached," and

9    if you scroll down to the first page -- or the

10   second page of the exhibit, there appears to be a

11   signature line at the bottom of the page with a

12   signature in blue, do you see that?

13    A     Yeah.

14    Q     Is that your signature?

15    A     It is, in all of its beauty.

16    Q     And is that equally beautiful signature,

17   does that also appear on the bottom of the page that

18   is marked Exhibit A746?

19    A     That is my signature.

20    Q     And that is a signature that is on a

21   form that bears the label, "Accord 125."

Page 67

1          Do you see that immediately beneath your

2     signature?

3          A    I'm looking at the -- I'm looking at the

4     Exhibit 00743, and I signed that, and then there's

5     Exhibit 00744.  There's no -- nothing signed on

6     that, and then 00745, no signature, then there's

7     00746 does have that signature, and I see below

8     that, it says, "Accord 125."  That's correct.

9          Q    And that's the signatures dated 4-9-15,

10    do you see that?

11         A    That is correct.

12         Q    If you scroll to the next page, is that

13    your signature at the bottom of Accord Form 130?

14         A    That is.

15         Q    And if you scroll to the next page, is

16    that your signature at the bottom of Accord Form

17    131?

18         A    Yes, I believe that's correct.

19         Q    Okay.  And the next page is Application

20    for Executive Officer Exemption for the Provision of

21    Pennsylvania Workers' Compensation Act, do you see

CONFIDENTIAL

Page 68

1    that?

2         A     Yes, sir.

3         Q     And if you scroll to the signature line

4    for that, which is on the next page, the page that

5    bears the number Exhibit A00750, do you see that?

6         A     I do.

7         Q     And is that your signature on that page

8    under the executive officer's declaration?

9         A     Yes, sir, it is.

10        Q     And if you scroll two more pages back to

11   Exhibit A, page 752, there's another signature line

12   there.

13              Do you see that?

14        A     I do.

15        Q     And is that your signature?

16        A     It is.

17        Q     And if you scroll two more pages back

18   again, another signature page on the top of -- on

19   754.

20              Do you see that?

21        A     Uh-huh.

Page 69

1          Q     That's your signature?

2          A     It is.

3          Q     And then on the page that's labeled,

4     "Endurance," do you see that policy holder

5     disclosure?

6          A     I do.

7          Q     And is that your signature at the

8     bottom?

9          A     It is.

10         Q     And on 756, is that your signature?

11         A     It is.

12         Q     Okay.  And when you sent the signature

13    pages, you understood that those were the signature

14    pages for the insurance application?

15         A     Yeah, it looks like -- I'm looking at

16    the -- I have in the subject of the e-mails is the

17    insurance.  Yes, that appears to be the case.

18    That's correct.

19         Q     Okay.  Do you recall any discussion or

20    communications with The Insurance Market regarding

21    landslides at the Mobley site?

Page 70

1          A     I do not.  I do not.

2                MR. FITZGIBBON:  Okay.  I'm going to

3     introduce -- give me one second, make sure I have

4     the right exhibit.

5                This should be 006, right?

6                (Walton Exhibit 6 was marked for

7     purposes of identification.)

8          Q     Mr. Walton, I just sent you what I've

9     marked as Exhibit RW-6, and ask you to take a look

10    at that when you get a chance?

11         A     I do see that, yes.

12         Q     Okay.  And what's been marked as Exhibit

13    RW-6, it bears bates number at the top, it says,

14    "Exhibit A00071 and 72" on the next page; 71 appears

15    to be an e-mail from you to Roger Waters dated

16    February 16, 2015.

17               Do you see that?

18         A     Uh-huh.

19         Q     And if I can direct your attention to

20    the last paragraph of the e-mail?

21         A     Uh-huh.

Page 71

1     Q     It states, "I would like to try to have

2   a decision on this as soon as possible, as we have

3   had slides out on Mobley and we are wide open right

4   now on the subsidence risk."

5           Do you see that?

6     A     I do see that.

7     Q     What were you referring to there?

8     A     I don't, I don't remember.  I really --

9   I've seen this e-mail and I don't -- I really don't

10  remember.

11          I think my understanding was when there

12  was some -- the only thing that I could think -- and

13  I'm going to caveat this with, you know, best of my

14  recollection was, there was some testing that

15  occurred at the face -- I mean, not the face of the

16  wall, the inside of the wall, and some earth had

17  slipped and hit one of our drilleries and it almost

18  hit a guy, and then that changed the -- and then

19  that changed the means and methods for testing,

20  having to go out to the working face.

21              That was the -- that would have been

Page 72

1    what I understood to have happened.

2         Q      Have you finished your answer or are you

3    still looking at the document?

4         A      No, no, no.  Yeah, that finishes my

5    answer --

6         Q      Okay.

7         A      The only thing I can recollect is the,

8    is the slide that happened at, like -- if you're

9    thinking about the wall, though, when I say "the

10   face of the wall," it's like the outside and then

11   the inside is where the earth was placed and the

12   hill face.  Some earth slid there and hit our drill

13   and almost hit a person.

14        Q      And what did you mean when you said, "We

15   are wide open right now on the subsidence risk"?

16        A      That if, that if that earth would have

17   fallen and hit a, a drillery and really caused

18   material damage or killed somebody, that it would

19   have been a bad situation.

20              So, you know, we needed to have

21   protection in the event that an unforeseen condition

1    occurred and God forbid, you know, a hill slide

2    occurred or something, and somebody got hurt and

3    died, you know.

4        Q    And at this point in time, in February

5    of 2015, the Liberty Mutual policy had not yet

6    incept, correct?

7        A    I believe that is correct.  It looks

8    like we're getting a quote for it now.

9        Q    And so, your policy at that point, your

10   being Redstone, was with Kinsale?

11       A    Yes, sir.

12       Q    And was subsidence not covered under the

13   Kinsale policy?

14       A    I am assuming it is not based upon this

15   e-mail.

16       Q    Okay.  But, you were aware that that was

17   a risk at the site at the time?

18       A    Yeah.  Yeah.  I think that slip, that

19   kind of changed the testing protocol from what I

20   remember, and what kind of prompted this level of

21   reaction from me would have been that.

CONFIDENTIAL

Page 74

1          And the railroad protection policy, I'm

2   not sure if there was -- I don't know if there was a

3   CSX job we were working on at the time.  If there

4   was like, any kind of underground mine subsidence

5   concerns there.

6          We were working near the rail.  I just

7   don't -- I don't know, but that's the only thing I

8   can think of.

9          My guess is, I don't -- I just don't

10  remember.

11     Q     Do you recall when you received a copy

12  of the Liberty Mutual policy?

13     A     I don't think I ever received a full

14  copy of the policy.

15          MR. FITZGIBBON:  I'm going to mark

16  another exhibit as Exhibit RW-7.

17          (Walton Exhibit 7 was marked for

18  purposes of identification.)

19          THE WITNESS:  You know, the only other

20  thing I could think of is when I received a copy of

21  the policy, it would have been -- you know -- I know

Page 75

1   they gave us binders, like, after things were --

2   once we had a policy in place, I might have received

3   it at that point.  That's the only thing I can

4   recall.

5        Q    I just sent you what I've marked as

6   Exhibit RW-7.  Let me know when you've had a chance

7   to open it and review it.

8        A    Got it.  Was this mailed to me?

9        Q    What I've marked as Exhibit RW-7 appears

10  to be a letter dated June the 5, 2015 addressed to

11  you from Kelly Johnston, do you see that?

12       A    Uh-huh.

13       Q    Do you know who Kelly Johnston is?

14       A    I think she worked at The Insurance

15  Market, if I remember.

16       Q    And Ms. Johnston's letter asks you to

17  find enclosed that your renewal policies, including

18  general liability policy number TB2-641-444555-025.

19            Do you see that?

20       A    Uh-huh.

21       Q    And, do you recognize that policy number

Page 76

1  as the number of the Liberty Mutual policy that's at

2  issue in this case?

3      A    I do not know the insurance policy

4  number.

5      Q    Do you see in the fourth -- or, the

6  third paragraph, the bill for these policies is

7  being sent to you by Liberty Mutual.

8          Do you see that?

9      A    Yeah.

10     Q    And that you should remit payment to

11 Liberty by the date due.

12         Do you see that?

13     A    I do.

14     Q    Okay.  Do you have any reason to doubt

15 that you did not -- that you received this letter on

16 or about June the 5, 2015, forwarding policies to

17 you at the Uniontown, Pennsylvania address?

18     A    I -- this is, this is, honestly, the

19 first time I remember this letter, and I think it's

20 a little bizarre that they -- I feel like they just

21 assigned like a -- the premium financing thing back

Page 77

1   in April and then, like, two months later, I'm

2   getting this, you know, letter that -- I mean,

3   there's a dated letter that says this.

4              If there was a letter mailed to me,

5   which was this, I don't recollect reading it.  I

6   just don't remember.

7              They very well could have sent this

8   letter to the office, you know.  As I said, I was,

9   you know, in that office on -- you know -- on

10  average, a day or two a week.

11             So this ultimately get to my hands?

12  It's possible, but I did most of my correspondence

13  via e-mail.

14             So that's why I asked in the beginning.

15  I don't know if this was e-mailed to me, because I

16  don't recall this letter.

17       Q    At this point in time, in June of 2015,

18  you still would have been the person responsible at

19  Redstone for insurance issues, right?

20       A    Correct.  Oh, yeah.

21       Q    And with respect to the payment of

CONFIDENTIAL

Page 78

1    premium, would that have been something that fell

2    under your responsibilities?

3         A    That would have fallen under my

4    responsibility.  That's correct.

5         Q    Do you have any reason to doubt that

6    that top general liability policy number is the

7    Liberty Mutual policy number for the period April

8    12, 2015, April 12, 2016?

9         A    I have no reason to doubt that.  I do

10   not.

11        Q    Were you the person at Redstone who

12   would have been responsible for providing the

13   insurance -- your insurers with any notice of

14   occurrence under the applicable insurance policies

15   issued to Redstone?

16        A    Yes, I would have probably been the

17   primary person would have done that.  That's

18   correct.

19        Q    Would you have been the person who would

20   be giving notice of claims?

21        A    Yes, predominantly, I would have

Page 79

1  probably been that person.

2       Q    And in about this time period, in 2015

3  let's say, you weren't executive officer of the

4  company, correct?

5       A    I was.

6       Q    And Mr. Kefover was an executive officer

7  of the company in 2015, correct?

8       A    He was.

9       Q    Okay.  I'm sending you what I've marked

10 as Exhibit RW-8 and I'd ask you to just take a look

11 at it and let me know when you're finished reading

12 it.

13            (Walton Exhibit 8 was marked for

14 purposes of identification.)

15       A    Okay.

16       Q    The second e-mail in the chain appears

17 to be an e-mail from you to Roger Waters and Kay

18 Johnston dated, Monday, December 21, 2015.

19            Do you see that?

20       A    I'm sorry, sir.  Would you repeat that?

21       Q    The second e-mail in the exhibit -- and

CONFIDENTIAL

Page 80

1   by the way, this exhibit, for purposes of

2   identification, bears the bates numbers Exhibit

3   E-0001 through 0003.

4           On the first page of the exhibit there,

5   are a series of e-mails.  The middle one appears to

6   be an e-mail from you, correct?

7       A    Yes, sir, that looks correct.

8       Q    And is it forwarding to Mr. Waters a

9   tender for defense from JF Allen.

10          Do you see that?

11      A    Yes, sir.  That is correct.

12      Q    And what was the purpose for which you

13  were sending that to Mr. Waters?

14      A    I'm assuming my lawyer at the time,

15  Bruce Stanley, probably told me to send it to the

16  insurance.

17      Q    Okay.  The third sentence in that e-mail

18  says, "Additionally, we are in ongoing civil

19  litigation on this matter in multiple fronts."

20          Do you see that?

21      A    Yes.

Page 81

1      Q    So as of December 21, 2015, Redstone is

2   already engaged in civil litigation regarding the

3   Mobley site, and to use your words, "on multiple

4   fronts"?

5      A    Correct.  Yes, sir.

6      Q    Do you know whether, prior to this

7   e-mail from you on December 21, 2015, you had asked

8   anyone from The Insurance Market to put any of

9   Redstone's insurance carriers on notice with respect

10  to any of that litigation on multiple fronts?

11     A    I -- I'm not aware.

12     Q    So you don't know of any prior notice?

13     A    I'm not aware of any prior notice, no.

14     Q    Bear with me for a second.  I seem to

15  have frozen.

16     A    The one caveat to that I would say, and

17  I'm just thinking about this, is that, we had a --

18  you know -- an ongoing familial relationship with

19  The Insurance Market.  So, it's not as if they were

20  with Roger Waters in particular.

21           So, it's not as if they would have been

CONFIDENTIAL

Page 82

1   aware that there was issues out there.  I think that

2   -- I just don't know how the timing lines up, but in

3   terms of a formal notice, this is -- I barely

4   remember this, but I think that -- point being is

5   that this is the -- I'm sure this is the only formal

6   notice we sent.

7        Q    Can you go back?  You said you had an

8   ongoing familial relationship?

9        A    Yeah, we talked to The Insurance Market,

10  right.  We would talk to them on an ongoing basis

11  about our insurance needs.

12       Q    Okay.  You had an ongoing business

13  relationship?

14       A    Yeah, yeah, yeah.

15       Q    We've got -- I think this is 9, right?

16            I'm marking it exhibit -- I'm sending it

17  to you RW No. 9.  Let me know when you've opened it

18  and had a chance to review it.

19            (Walton Exhibit 9 was marked for

20  purposes of identification.)

21       A    Yes, sir, I see that.

Page 83

1      Q     Okay.  Have you ever seen this before?

2            And again, for the record, the exhibit

3  is a two-page exhibit bearing bates numbers Exhibit

4  E-0005 and 06.

5      A     I have not seen this before.

6      Q     Okay.  If you will scroll down to

7  "Description of occurrence," do you see that?

8      A     I do.

9      Q     There is the statement that -- the last

10 sentence I believe says, "Allegations brought by

11 Mark West, Liberty Mainstream and Resources, LLC,

12 that Redstone's performance was defective in

13 multiple respects."

14           Do you see that?

15     A     Yes, sir, I do see that.

16     Q     And then there's a another sentence

17 saying, "A letter was provided on November 4, 2015

18 giving the allegations of the deficient

19 performance."

20           Do you see that?

21     A     I do see that.

Page 84

1      Q      Have you ever seen that November 4, 2015

2  letter regarding the alleged deficient performance?

3      A      I probably saw such a -- I don't, I

4  don't recollect a specific letter.  There was a lot

5  of letters.

6      Q      Did Redstone provide the information

7  regarding the description of the occurrence to The

8  Insurance Market stating that it was allegations of

9  -- that Redstone's performance was defective in

10  multiple respects?

11      A      It looks like in that prior

12  correspondence I did, but I don't, I don't believe

13  there was another -- at least not that I'm aware of.

14      Q      Okay.  If you would scroll back to

15  Exhibit 8.

16      A      Exhibit 8?  You said go back to

17  Exhibit 8?

18      Q      Yep.  And if you'll scroll to the second

19  page of the exhibit, there's a statement in -- first

20  of all, who is Mr. Stanley?

21      A      He is a counselor for Stanley Schmidt.

CONFIDENTIAL

Page 85

1   He's a prior litigator at Reed, Schmidt; he and

2   Alicia Schmidt.

3        Q    And is he representing Redstone in the

4   underlying litigation?

5        A    He is still.  He was at that time.  I

6   believe he still is.

7        Q    Okay.  In the middle of the paragraph,

8   it -- of his e-mail, it says, basically, "JFA is

9   basically asking us to indemnify them for claims

10  made by Mark West for issues identified by Dr. Bruce

11  in his letter for scheduled delays and for the lien

12  filings."

13            Do you see that?

14       A    Yes, sir, I do.

15       Q    And is that -- who is Dr. Bruce?

16       A    Dr. Bruce was a third-party engineer we

17  hired to perform an analysis of the wall.

18       Q    And what are the lien filings that are

19  being referred to there?

20       A    The lien filings were liens filed on the

21  property due to non-payment by JF Allen to us and

Page 86

1    the subsequent nonpayment to our underlying material

2    men and like some rental equipment providers.

3         Q     And, do you recall that the original

4    project completion date in the contract was March

5    31, 2015?

6         A     I don't recall explicitly, but I know

7    that it was, it was -- the project was definitely

8    delayed.

9         Q     And it was delayed beyond March 31,

10   2015?

11        A     That sounds, that sounds right.

12        Q     You have any reason to doubt that the

13   initial project completion date was March 31, 2015

14   under the contract?

15        A     I know that under the base bid as

16   originally provided to us, that would have been a

17   proper starting and ending date, and as the scope of

18   work evolved, that ending date would have, you know,

19   moved.

20        Q     To the best of your knowledge, was there

21   ever an amendment to the contracts extending the

Page 87

1   March 31st project completion date?

2        A     Related to -- I can't speak to JFA

3   contract with Mark West.  You know, I think that we

4   had made multiple -- we had filed multiple, you

5   know, claims to JFA stating changes in working

6   conditions that would have commensurately extended

7   its time.  We assumed that, and incorrectly, that

8   those claims were then being passed along to Mark

9   West.

10        We discovered after a fair amount of

11  time that those were not being passed along to Mark

12  West, and then I think that kind of gets back to the

13  original risk management strategy of JF Allen when,

14  when they maybe felt they were going to have

15  challenges meeting the schedule.

16        Q     And, could you identify who Mark West is

17  with respect to the Mobley site?

18        A     Sure.  Mark West -- I'm not sure the

19  ultimate contract signor of the Mobley site, but I

20  think it was Mark West, Liberty, Midstream, and they

21  were the owner of, I believe the real property and

CONFIDENTIAL

Page 88

1    business operation at the Mobley compression

2    station.

3        Q    Have you reviewed the original contract

4    between Mark West and JF Allen?

5        A    I have after -- I have.  Historically

6    I've reviewed it after signing.

7        Q    And you reviewed the subcontract between

8    JF Allen and Redstone, right?

9        A    Yes, sir, I did.

10       Q    Okay.  And again, I don't want there to

11   be any confusion.  I can show you the documents if I

12   need to.

13           With respect to the original agreement

14   between Mark West and JF Allen, the project

15   completion date specified in that contract was March

16   21, 2015, wasn't it?

17       A    I believe that's correct.

18       Q    The contract specifically said "time was

19   of the essence," right?

20       A    Correct.

21       Q    And at the time that you signed -- that

Page 89

1   Redstone signed the subcontract, which I believe was

2   in September of 2014, is that right?

3          A     That sounds correct.

4          Q     And you were the person who signed the

5   subcontract on behalf of Redstone, weren't you?

6          A     That is correct, yes.

7          Q     So, at the time that you signed, you

8   understood that the project completion date was

9   March 31, 2015, right?

10         A     I think that -- that's right.  I

11  think -- no is the answer to that.  I wasn't able to

12  see the underlying contract agreement with Mark West

13  with JF Allen until after we signed our agreement

14  with JFA.

15         Q     So, you did not know, at the time you

16  signed the subcontract, that your work was supposed

17  to be finished by March 31, 2015?

18         A     No, we were not aware of that.

19         Q     When did you think you had to be

20  finished by?

21         A     We assumed we were putting together a

CONFIDENTIAL

Page 90

1   construction schedule afterwards, you know, with JF

2   Allen in the ordinary course of, you know, making a

3   gantt chart and you know -- for example, like, we

4   never assumed 24/7 operations, you know.  You had

5   to -- we were surprised by that.

6        Q     I want to make sure I understand this.

7   The subcontract that you signed with JF Allen did

8   not incorporate certain provisions of the main

9   contract between Mark West and JF Allen?

10       A     I honestly --

11       Q     Upon the project completion date?

12       A     I honestly -- and -- I honestly do not

13  remember there being a specific discussion related

14  to the March 31st completion date, because I

15  remember -- and this is what I remember when that

16  was conveyed to Heath and I, we were like, that

17  doesn't seem reasonable, and that's when we started

18  running day and night crews immediately.

19       Q     When was that information about the

20  project completion date conveyed to you and to

21  Mr. Kefover for the first time?

Page 91

1     A      I, I, I don't recall the exact time.

2   And again, I'm working off my best memory of it.

3          I do remember the entire contract

4   negotiation with Mark West, we were not a part of

5   it, and Mr. Hadjs made it very clear that, you know,

6   we were working for them on this project, "them"

7   being JF Allen, and that's why the engineer signed

8   contracts directly with JF Allen.  Even the payment

9   schedule that he came up with was not something we

10  had agreed to.

11          So, you know, for -- we had submitted,

12  you know, a basic kind of schedule of values, we

13  always do, and then he made up some -- you know --

14  some treed and nontreed payment schedule, you know.

15          I remember telling him, "Well, that's

16  not going to work because" -- and then Heath kind of

17  explained to him that, you know, you built this thing like

18  building a bathtub, you know.  I guess, sort of like

19  -- there's less water at the bottom to start and

20  we're not going to be able to -- you know -- we're

21  going to have to be paid on a percentage of

Page 92

1  completion basis and that's -- the monetary side is

2  what I remember the most, because of it being so,

3  kind of, out of left field, and I remember the

4  scheduling part of that being obscure as well.

5           I do not recall what we were -- you know

6  -- if we were, if we were committing to a hard and

7  fast deadline like that, we would have, you know,

8  pro-actively built a project schedule, I assume, in

9  an amount of time.

10          But had there ever been a discussion

11  related to that time that, that JF Allen had?  I

12  don't recall.  I really, I really do not.

13          I remember being surprised about many,

14  many things in the prime contract with Mark West and

15  JFA.

16      Q    And, you did not have an opportunity to

17  review relevant portions, including the completion

18  date of that contract, before you signed your

19  subcontract?

20      A    I would have to look back, sir, but I do

21  not recall.

CONFIDENTIAL

Page 93

1          MR. FITZGIBBON:  Rather than spend more

2    time on this, I think I'm just going to get the

3    exhibits that I need to show you what you need to

4    show, and we can either take a break at this point

5    for lunch, if that meets people's approval, or if I

6    -- I will pass, as long as I can come back, and once

7    I have the documents I need, show you those

8    documents.

9          THE WITNESS:  If there's a document that

10   jogs my memory on the matter, that'll be very good.

11         MR. FITZGIBBON:  Anthony, I don't know

12   -- or Mike, I don't know if you want to proceed and

13   then I'll just reserve the right to come back and

14   conclude on that subject at some point, or if you

15   want to break for lunch, I can conclude after lunch.

16         MR. JACKS:  I'm not real hungry right

17   now.  I mean, I don't know if anybody else wants a

18   break, it's fine with me --

19         THE WITNESS:  I'm good to chug along

20   cause I would prefer to get it hammered out.

21         MR. FITZGIBBON:  Okay.  I will pass and

CONFIDENTIAL

Page 94

1   come back when I have the -- we'll break for lunch

2   at some point.  When we do, I'll get the documents

3   and I'll come back to you.

4           In the meantime, I'll pass to

5   Mr. Sunseri.

6           EXAMINATION BY MR. SUNSERI:

7   Q    Okay.  Thank you.  Mr. Walton, my name

8   is Anthony Sunseri.  I represent the insurance

9   company.

10          Can you hear me well?

11  A    Yeah, I do.

12  Q    You previously testified that you had

13  your deposition taken approximately five to six

14  times related to commercial matters, is that

15  correct?

16  A    Uh-huh.

17  Q    Have any of those prior depositions that

18  you have ever provided been related to litigation

19  involving insurance coverage?

20  A    Yes.

21  Q    And in what capacity were you being

Page 95

1    deposed for that particular case?

2         A    I think I was a corporate representative

3    for that case.

4         Q    Okay.  And you were a corporate

5    representative for who?

6         A    Elite Oil Field Services.

7         Q    So you were formerly employed by Elite

8    Oil Field Services?

9         A    I was.

10        Q    And in that case, was Elite Oil Field

11   Services suing their insurance carrier?

12        A    Yes, I believe it was a suit against the

13   insurance carrier.

14        Q    And in that same suit, were they also

15   suing their insurance broker?

16        A    I believe.  I believe so, yeah.

17        Q    So, in that case that you were providing

18   deposition testimony regarding that insurance

19   coverage issue from your -- or from the perspective

20   of a corporate representative, Elite Oil Field

21   Services was the plaintiff?

Page 96

1      A     That is correct.  That is correct, yes.

2      Q     And, in what venue --

3            MR. JACKS:  And, just to try to redirect

4   here -- and I'm not trying to interrupt you, really,

5   but this was an underlying case in Greene County,

6   Pennsylvania, where there was a spill and a

7   pollution liability claim from a trucking -- from a

8   gas well and Elite was a defendant in that case.

9            I believe that's the case that Rich

10  actually gave a deposition in and there was a tag

11  along insurance claim against Travelers.

12           I mean, I represented Elite in that

13  case.  I think this was 2016.

14           THE WITNESS:  Mike, you're right.  I

15  never gave a deposition for the case between Elite

16  and Travelers.  The deposition I gave was for -- was

17  I deposed?

18           I was deposed in that.

19           MR. JACKS:  Actually, you were.

20           THE WITNESS:  Yeah, I was.  I was

21  deposed in that case.  I remember it was at the

Page 97

1   hotel in Greene County, but it was related to a

2   spill and I was also part of mediation discussions,

3   but I was never -- Mike is exactly right.  I was

4   never deposed as part of the insurance.

5              MR. JACKS:  Yeah, there weren't any

6   depositions in that insurance case, Anthony.

7   BY MR. SUNSERI:

8         Q    Okay.  And again, where was that case

9   filed, Elite versus Travelers Insurance, do you

10  recall, Mr.  Walton; what county?

11             THE WITNESS:  Mike, do you remember?

12             It was probably --

13             MR. JACKS:  I think it was Washington

14  County.

15             THE WITNESS:  No, it definitely wasn't

16  Washington.  Maybe it was.

17             MR. JACKS:  If you give me a minute --

18             MR. SUNSERI:  No, that's fine.  No

19  worries.  No worries.  We could just press on.

20        Q    Did that case go to trial, Mr. Walton?

21        A    I don't believe so.

CONFIDENTIAL

Page 98

1      Q    Do you recall how it ended, what the

2  disposition of that case was to conclude the

3  litigation or is it still going on?

4      A    It's concluded.  And what had happened

5  was, there -- I believe the insurance company signed

6  a reservation of rights to it, and then, ultimately,

7  the case settled and the whole underlying litigation

8  was kind of put to bed.

9      Q    Okay.  Hang on one moment.  I'm just

10  trying to find some exhibits here.

11          And Mr. Walton, during the entire time

12  that you were employed by Redstone, were you

13  involved in all the insurance renewals for Redstone?

14      A    Yeah.  Yes.

15      Q    Okay.  Mr. Walton, I'm loading what is

16  going to be marked as -- are we on 9?

17          THE REPORTER:  I think this is 10.

18          MR. FITZGIBBON:  I thought it was 10.

19          MR. SUNSERI:  Okay.

20          THE WITNESS:  Let me know whenever you

21  load it.

Page 99

1            MR. SUNSERI:  Yeah, it's loading right

2      now.

3            (Walton Exhibit 10 was marked for

4      purposes of identification.)

5      A      Got it.  It popped up.

6      Q      Okay.  Perfect.  Mr. Walton, do you

7      recognize this correspondence, which is dated

8      February 18, 2015, which appears to be from you to

9      Kelly Johnson -- excuse me, Roger Waters.

10            Excuse me.

11      A      I'm sorry, I --

12      Q      I'm sorry, you do recognize it?

13      A      I'm reviewing it.

14      Q      Oh, sorry.

15      A      Yeah.  I mean, it looks like --

16      Q      You recognize this correspondence, this

17      communication between you and Roger Waters?

18      A      I don't remember it.  It looks like it's

19      -- it looks like a correspondence we had for sure.

20      Q      Sure.  On the second page of what we're

21      marking as Exhibit 10, that appears to be

Page 100

1   correspondence from Roger Waters directed to you,

2   which the first line reads, "It was brought to my

3   attention that I do not have access to when the

4   markets for our Redstone renewal quotes.  My Liberty

5   Mutual market has been blocked by submission from

6   another agent."

7           Did you previously seek a quote for a

8   Liberty Mutual policy from another agent prior to

9   February 13th of 2015?

10      A    I did.

11      Q    And, do you recall who that agent was?

12      A    What's his name?

13           It was --

14      Q    Was it Mitch Sharpton?

15      A    Not Mitch Sharpton.  It was a guy from

16   Tennessee.

17           MR. SUNSERI:  Okay.  I'm loading a

18   another exhibit.  This is going to be Exhibit 11.

19           (Walton Exhibit 11 was marked for

20   purposes of identification.)

21           Okay.  I believe it's loaded now.

Page 101

1           THE WITNESS:  Yeah, that -- I'm getting

2    a lot of feedback.

3           MR. SUNSERI:  Okay.  I'm sorry?

4           THE WITNESS:  I'm getting a lot of

5    feedback.  I'm hearing my voice every time after.

6           MR. SUNSERI:  On your end?

7           THE WITNESS:  I wasn't having that

8    before.

9    BY MR. SUNSERI:

10       Q    Okay.  So Mr. Walton, do you recognize

11   this -- what's characterized as Proposal of

12   Insurance for Redstone International, LLC, 2015, 20

13   16?

14       A    I don't recognize it, but it looks to be

15   a quote we probably received.

16       Q    Okay, and if you could just scroll down

17   through that.  If you could, this is on page 4 of

18   Exhibit 12 with the page that starts, "Marketing

19   Summary."

20           Do you see that?

21       A    I do, sir.

CONFIDENTIAL

Page 102

1     Q    And, you don't recall who you

2  communicated with at Mid-State/Sharpton Insurance

3  for purposes of this quote, do you?

4     A     I do remember the guy.  I just don't

5  remember his name.

6     Q    Okay.  What do you remember about that

7  particular guy?

8     A     That he did our bonds for us.  Exactly

9  what, I don't remember --

10    Q    Okay.  And, do you know how, how you

11  came to have a conversation, assuming you had a

12  conversation with this gentleman with

13  Mid-State/Sharpton Insurance, to proceed in securing

14  a quote for this Liberty Mutual product, which is

15  here referenced in this particular quote?

16    A     I think we had historically not been

17  very happy with -- I'm just looking at this quote.

18           We had had a very good relationship from

19  a bonding standpoint, and I think we asked him to

20  give us some quotes.  Most likely, yeah, that's what

21  I remember.

CONFIDENTIAL

Page 103

1      Q      Sure.  Sure.  And this

2  Mid-State/Sharpton Insurance, did they have an

3  appreciation as far as what you guys did, as far as

4  your scope of business, your operations?

5      A      Yeah, very much.  They would have, you

6  know, given us performance bonds for associated

7  work.

8      Q      Sure.  So, they knew what you were

9  doing, they knew where you were doing it, correct?

10     A      I would assume so, yes, sir.

11     Q      And if you scroll down, this is on

12  page -- this is on page 9 of that exhibit.

13     A      I see.

14     Q      Which is -- I'm trying to see here.

15            It's a reference to Liberty in the quote

16  summary in the first column, do you see that?

17     A      I do.

18     Q      Is your understanding, as you take a

19  look at this and review this that, that pertains to

20  the quote for the Liberty -- for a Liberty Mutual

21  general liability policy?

—

CONFIDENTIAL

Page 104

1          A      That appears to be correct, sir.  Yes.

2          Q      And right below those fields for

3    Liberty, there's a Kinsale and the word "current."

4                 Do you see where that is?

5          A      Yes, sir, I do.

6          Q      And that Kinsale policy, it looks like

7    the terms which are provided in the fourth block as

8    you move right from Kinsale current, those terms --

9    there's much more terms -- there appear to be much

10   more exclusions, too, in that particular block, as

11   opposed to the Liberty Mutual policy, correct?

12         A      There appears to be more items noted as

13   excluded, correct.

14         Q      Okay.  And you'd also agree, as far as

15   the premium, the premium was cheaper for the Liberty

16   policy than it was for the Kinsale policy?

17         A      That is correct.

18         Q      So this Liberty policy that was

19   provided, was, was any other insurance suggested or

20   offered by this particular Mid-State/Sharpton

21   Insurance Company pursuant to, pursuant to get

Page 105

1   quotes as they did here?

2       A     I think this was a snapshot in time, in

3   terms of what they had gotten feedback in quoting,

4   and you know, then, you know, Roger, you know,

5   wanted the business, and you know, you can see, you

6   know, he was copied on one of the e-mails as one of

7   our business partners at the time.

8              Jim had said that he wanted Roger to be

9   able to evaluate our insurance for us and that's

10  when we did the DOR allowing, allowing insurance

11  market.  We didn't have a lot of conversations with

12  the Mid Sharpton.

13      Q     Mid Mitch Sharpton?

14      A     Mid Mitch Sharpton, yeah.

15      Q     Tell you what.  I know that you're

16  eating right now, Rich.  I'm going to propose that

17  we take a break, if everybody's fine with that, and

18  allow everyone to eat.

19             Does anyone have any objection?

20             MR. FITZGIBBON:  No objection here.

21             THE WITNESS:  I'm good.

CONFIDENTIAL

```
                                             Page 106

 1              MR. SUNSERI:  Mike?

 2              MR. JACKS:  No objection.  I mean, I

 3   think maybe 45 minutes --

 4              MR. SUNSERI:  Yeah, I was going to say

 5   to come back on at like 12:45, if that's appropriate

 6   or acceptable to everyone.

 7              MR. JACKS:  So I know Rich has to do a

 8   full day's work when this is over.

 9              So kind of want to get on with it.

10              THE WITNESS:  Yeah.  I mean, I'll stop

11   eating, you know.  I don't care.

12              MR. FITZGIBBON:  With all due respect,

13   we did start at least a half an hour late.  Why

14   don't we take a 45-minute break, and we will try to

15   get through it as quickly as we can when we get

16   back?

17              THE WITNESS:  Yeah.  I mean, I'm going

18   to have a hard stop.  So if we have to reschedule

19   later, we'll have to reschedule later too.

20              MR. SUNSERI:  What would that be hard

21   stop time?
```

CONFIDENTIAL

Page 107

```
 1              THE WITNESS:  2 o'clock.  I have a 3

 2   o'clock meeting.

 3              MR. FITZGIBBON:  This is the first we're

 4   hearing of this, Mike.

 5              MR. JACKS:  How much more do you guys

 6   have?

 7              I'm probably going to have 10 or 15

 8   minutes with him, so.

 9              MR. FITZGIBBON:  I told you what I have.

10   I have one clean up item and that's it.

11              MR. JACKS:  Okay.

12              MR. SUNSERI:  I think I can do what I

13   need to do.  Why don't we take a 15-minute break at

14   least --

15              THE WITNESS:  Perfect.

16              MR. FITZGIBBON:  Let's say we'll be back

17   at 12:30.

18              MR. SUNSERI:  I agree.  12:30 we'll be

19   back.

20              MR. FITZGIBBON:  Yep.

21              (A break was taken.)
```

Page 108

1    BY MR. SUNSERI:

2         Q    Mr.  Walton, I'm going to show you what

3    we will refer to Exhibit 11.  You've got the loading

4    file pinwheel rolling through.

5         A    Yep.  I got it.

6         Q    And, do you recall if this was a -- does

7    this appear to be a proposal of insurance for all

8    the lines of insured that Redstone maintained at

9    this particular time in February of '15?

10        A    Looks pretty exhaustive, yeah.

11        Q    Okay.  And, do you recall being advised

12   by Mid-State/Sharpton Insurance that any of the

13   brokers -- or any of the carriers, rather, that

14   applications for insurance for Redstone was

15   submitted at this point were declined for any

16   reason?

17        A    I'm looking at this back at this premium

18   summary, that what it looks like it is.

19        Q    Okay.  Do you know what instructions, if

20   any, you gave to Mid-State/Sharpton, as far as go

21   and get a quote of all our lines of insurance we

Page 109

1    maintain at this time?

2            Was there something in that vain that

3    was provided?

4        A    I would assume I probably would have

5    showed them our historical policy and look to get

6    comparable insurance going forward, and talk to them

7    about our business operations and -- you know --

8    like any service provider.

9        Q    I think my question is -- I'm sorry, I

10    didn't mean to --

11        A    No, you're good.

12        Q    Mid-State/Sharpton, as far as the bond

13    work that they were doing for you, what exactly -- I

14    mean, what kind of information would you have to

15    give Mid-State/Sharpton in order to get them to

16    provide a bond for a particular job?

17        A    The contract.

18        Q    Okay.  And, did you secure bond through

19    Mid-State/Sharpton Insurance for the Mobley site

20    work?

21        A    We did not.

CONFIDENTIAL

Page 110

1      Q     Okay.  Do you know if they were ever

2  provided with the Mobley site contract or

3  subcontracts?

4      A     They were not.  I assume not.

5      Q     But, they did know that you were

6  involved, or that Redstone was involved, in

7  performing micropile work, right?

8      A     They were.

9      Q     How else -- well, what other kind of

10  work was Redstone doing at this particular point in

11  time?

12      A     Like, subsurface technical work.

13      Q     Was that similar to the work that they

14  were doing as of April of 2015?

15      A     Yeah, I would assume so.

16            Yeah.  I mean, no new lines of business.

17      Q     No new lines, okay.

18            And if you could scroll down within that

19  same exhibit.  Actually, it's on page 26 of the

20  exhibit or you can go by the bates number, Exhibit A

21  and it's 1270.

Page 111

1       A       Looking at it.

2       Q       Are you there?

3               And this appears to be a document which

4    is titled, "Liberty Mutual Insurance Commercial

5    Insurance Energy Coverage Proposal for Redstone

6    International, Inc.," and it has an effective period

7    of April 12 of '15 through April 12 of '16,

8    underwriter Steven Grant.

9               Do you know who Steven Grant is?

10      A       Never talked to him in my life.

11      Q       Do you believe that you were provided

12   with this by Mid-State/Sharpton Insurance?

13      A       I think I'm operating under the

14   reasonable assumption that what you're providing me

15   is what Ms. Sharpton provided to me.

16      Q       Okay.

17      A       So the answer to that question is yes.

18      Q       Okay.  As far as going back to the

19   insurance proposal that Mid-State/Sharpton prepared,

20   would you have occasion to review that whenever you

21   received it from Mid-State/Sharpton?

CONFIDENTIAL

Page 112

1          A       Would I have looked at this, what you

2     have sent me?

3          Q       Would you have reviewed what's been

4     marked as Exhibit 11 to your deposition, "Proposal

5     of Insurance Redstone International, Inc., 2015,

6     '16," prepared -- well, it appears it's been

7     prepared by Mid-State/Sharpton Insurance?

8          A       I did not read this entire thing.

9          Q       Did you read any of it?

10         A       No, likely very little of it.

11         Q       Okay.

12         A       Yeah, that's -- can I -- I mean, that's

13    why we hire insurance broker.

14         Q       Okay.  You can go back to Exhibit 10.

15    Are you there?

16         A       Uh-huh.

17         Q       Okay.  According to this e-mail, which

18    is dated February 18 of 2015, which you direct to

19    Roger Waters, there's a reference in the attachments

20    to a CGL Form.

21                 Do you see that, CGL Form 04-3 edition?

CONFIDENTIAL

Page 113

1       A      Yeah.

2       Q      And then if you note down under No. 1,

3   Subpart A, you advise, "I have attached the Liberty

4   coverage form," and then if you scroll down along

5   those e-mails is a Commercial General Liability

6   Coverage Form.

7              Do you see that?

8       A      Where does it say, "I have attached"?

9       Q      It is in the first page of that e-mail

10  under No. 1, lower case A.

11      A      Yep, I see that.

12      Q      And then the referenced coverage form

13  follows, do you see that?

14      A      Yeah, it appears to be.  Right.

15      Q      Where would you have gotten this

16  coverage form that you would have forwarded to Roger

17  Waters on February 18th of 2015 under this e-mail

18  correspondence?

19      A      I assume I would have gotten it if -- I,

20  I don't recall.

21              If it was not in the discovery, I'm sure

CONFIDENTIAL

Page 114

1   you guys would tell me where I got it.  But it would

2   either have been from Mid-State or, or Insurance

3   Market.

4        Q    Okay.  So, have you ever -- in the

5   course of your dealings with renewal for Redstone,

6   ever provided a CGL Form to The Insurance Market?

7        A    I don't know that.  I mean --

8        Q    Going back to the first page of that

9   e-mail, the second sentence provides that you wanted

10  your insurance with Liberty Mutual, correct?

11       A    Uh-huh.

12       Q    And that's under the same e-mail that

13  you provide the reference to CGL Form that you

14  forward, correct?

15       A    Uh-huh.

16       Q    And that appears to be the same e-mail

17  that you provide this proposal, proposal update,

18  which we've broken up into two exhibits.  It's

19  Exhibit 11, the proposal of insurance provided by

20  Mid-State/Sharpton.

21            Have you done that in the past?  Have

Page 115

1    you ever gotten a quote from another insurance

2    broker and submitted it to The Insurance Market and

3    said, "Here's a quote, this is what I want"?

4         A     No, I don't -- I think this is the first

5    time we've ever done that and the only time I did

6    that.  And I think what prompted that was when we

7    were going to bid a job in New York, you know, we

8    had had a job in New York historically, that I think

9    like a CO, Certificate of Insurance, was provided

10   for and that had predated me at Redstone, and when

11   the other -- when we were looking at getting

12   insurance for a new job that we were looking at

13   bidding, it was determined that we didn't have

14   coverage in New York.  And I think everyone was

15   obviously taken aback by the fact that our

16   historical policy didn't cover a state with which we

17   were doing work in.

18              If we had known we were not going to be

19   insured in a market that we were doing work in, we

20   would have bought additional insurance.  So when

21   that occurred, we said, "Okay.  Well, obviously we

Page 116

1    have some concerns with Insurance Market."

2              Insurance Market then was able to have

3    there -- you know -- I think it's -- I don't

4    remember this, you know, Insurance X, whatever it's

5    called, but there was the Kinsale stuff, and then I

6    went to another broker and get this coverage, you

7    know, especially this New York gap that was there

8    and you know, I -- then Roger had wanted -- found

9    out that when we kind of went to quote the business,

10   that we were getting quotes from other brokers, from

11   Liberty Mutual, and he wanted the business back.

12             So, you know, he had used his

13   relationships to get our board of directors to, to

14   DOR Insurance Market back, so that they could do the

15   negotiation with Liberty Mutual.

16             You know, the New York stuff is what had

17   prompted that scenario to occur, you know.  In terms

18   of not being covered at Mobley or being covered at

19   Mobley, the -- you know -- I think given the fact

20   that I probably sent the contract language to him on

21   multiple occasions, you know, I had assumed that our

Page 117

1   historical Kinsale was shortsighted, the required

2   insurance, and I assumed that it would be in the

3   renewal and he was aware of it.

4              I don't know what else to say.

5        Q    Oh.  I lost it.  Hang on one moment

6   please.  I'm trying to get something to load.

7              Mr. Walton, we're identifying Exhibit

8   No. 12 to your deposition, which is loading now.

9              (Walton Exhibit 12 was marked for

10  purposes of identification.)

11             So, just to go back before we address

12  Exhibit 12, those New York exclusions, did The

13  Insurance Market get those New York exclusions for

14  Redstone?

15       A    Not sure I understand the question.

16             Did they get the exclusions removed?

17       Q    Yes.

18       A    No, it was in the Mid-State stuff that

19  the New York stuff was already removed.

20       Q    Okay.  So for Exhibit 12 now, this

21  appears to be correspondence dated March 25, '15

CONFIDENTIAL

Page 118

1    from Roger Waters to Rich Walton.

2              Do you recognize this particular e-mail

3    correspondence?

4         A    I do not, but I'm reading it, trying to

5    re-educate myself.

6         Q    Have you had a chance to review it?

7         A    Yeah, just give me one second.

8         Q    Okay.  You're good.

9         A    I am.

10        Q    Okay.  If you scroll down on the

11   exhibit, there's something similar to what we've

12   already taken a look at.  There's the -- it's on

13   page 9.  It starts on page 9 of that exhibit and

14   it's a document titled, "Liberty Mutual

15   Insurance-Commercial Insurance Energy Coverage

16   Proposal for Redstone, Inc. Effective" --

17        A    Page number of the -- or is there a

18   bates number on this?

19        Q    No, there's not a bates number.  Page 9.

20        A    Okay.  Page 9 of the PDF or is it page

21   9 --

CONFIDENTIAL

Page 119

1          Q     Page 9 of the PDF.

2          A     Okay.

3          Q     If you can scroll down to page -- this

4     is page 11 of that same PDF.

5          A     Okay.

6          Q     States "General liability" at the top,

7     and then there's limits of liability which are

8     provided.

9                Do you see that?

10         A     I'm on page 11.

11         Q     Okay.

12         A     And then page 11 of the PDF.

13         Q     Page 12.

14         A     Page 12, okay.

15         Q     Yeah.  Is that the one that have

16    "General Liability Liberty Mutual Insurance Company"

17    at the top?

18         A     Yep, Liberty Mutual Fire Insurance

19    Company.

20         Q     And then, if you look, there's a little

21    bit down the page, about fourth of the way down,

CONFIDENTIAL

Page 120

1   there's four series of fields, which start,

2   "Endorsement name, Form number, Fill in, if any, and

3   Comments."

4           Do you see that?

5       A    Uh-huh.

6       Q    If you go down to the very last box

7   under "Endorsement name," there's an exclusion

8   that's referenced.

9           Do you see that?

10      A    Uh-huh.  I do.

11      Q    And then over two blocks from there,

12  "Fill in, if any, all professional services."

13          Do you see that?

14      A    I do.

15      Q    Did you review this quote at any time

16  before you were -- before the Liberty Mutual policy

17  was bound?

18      A    I did not.

19      Q    Is there a reason why you would not

20  have?

21      A    Because, again -- I mean, I -- we're

Page 121

1    looking at page -- you know -- I mean, the main

2    reason I wouldn't have is I would have relied on

3    them or relied on --

4         Q    Okay.  If you can go back to Exhibit 10.

5         A    Uh-huh.

6         Q    That second sentence on that e-mail

7    correspondence of February 18, 2015 from you to

8    Roger Waters, you advise, "I went on insurance with

9    Liberty Mutual.  So let's work to get the attached

10   quote in place ASAP," correct?

11        A    Yep, that's correct.

12        Q    Was there another line of insurance or

13   insurance carriers that were proposed under that

14   insurance proposal which was provided by

15   Mid-State/Sharpton?

16        A    No, I think we had the existing Kinsale,

17   and I'm just putting the history back together.

18             There was this Cover X he was doing and

19   Liberty.

20        Q    Okay.  So how would you know to make the

21   proposal where direction that you want your

CONFIDENTIAL

Page 122

1    insurance with Liberty?

2         A     Because we didn't have any other

3    insurance options --

4         Q     Okay.

5         A     -- other than Kinsale and Cover X.

6         Q     Okay.

7         A     And Liberty is -- you know -- was just

8    more of a known, you know, good insurance company

9    that we thought -- you know -- I never heard of

10   Cover X.

11        Q     Okay.  And again, you don't know why you

12   would have attached the Liberty form in this e-mail

13   and provide it to Roger?

14        A     Seems like I had some general concerns

15   related to subsidence and I probably wanted to make

16   sure that, after that slide had occurred, I want to

17   hit that drill that we had coverage for it.  I think

18   that was probably the concern at that point.

19        Q     And, did The Insurance Market secure

20   insurance that covered subsidence-type claims with

21   that renewal for the April 12, 2015 to April 12,

Page 123

1    '16?

2        A    I believe so.  That's correct.  But I

3    think it's important that I'm not performing like an

4    in depth analysis of this insurance policy.  I'm

5    taking what had been a practical scenario and

6    saying, "Hey, this hadn't happened -- you know --

7    you're saying, historically, we had exclusions for

8    subsidence.  That seems like it could be dangerous

9    going forward."

10            You know, relative to, you know, me

11   providing this kind of analysis to my broker, for

12   him then to just go and you know, secure the things

13   that I want, you know, I think -- you know.

14       Q    You would agree with me that,

15   Mid-State/Sharpton knew what you guys did and they

16   provided those same policy of insurance, correct?

17       A    Those would have been the initial quotes

18   they would have received, right, but obviously Roger

19   took over and took it from there, right.

20            So, it was no kind of initial, you know,

21   further due diligence that had occurred.

Page 124

1      Q     What kind of due diligence was supposed

2   to be conducted?

3      A     In terms of -- I would expect our broker

4   to kind of analyze our policy and understand the

5   risks, you know, before we, you know, sign anything

6   with them.  You know, I felt like we clearly

7   outlined those risks in numerous occasions.

8            So, you know, I'm not sure why the

9   responsibility is like, you know, falling back on us

10  to have made sure what we had asked for on multiple

11  occasions was in this, you know, huge document.

12     Q     As far as any of the insurance that any

13  of the contracts or sub-agreements for the Mobley

14  site work that was being done, did anyone express

15  any objections to any insurance, or lack of

16  insurance, that Redstone had for purpose of the work

17  they were doing there?

18     A     Greg Hadjs had provided me what the

19  insurance was and required.  That was sent over to

20  The Insurance Market.  They sent me back a

21  Certificate of Insurance and I sent it along

Page 125

1    representing that it was the insurance be provided

2    that I requested.

3         Q    Okay.  My question was, did anyone make

4    any objections to the insurance?

5         A    No, because I -- no, because they didn't

6    review the underlying policies.

7         Q    How do you know that?

8         A    They never requested them; like, JF

9    Allen never requested them, you know.

10        Q    In the litigation that's currently

11   pending for the Mobley site work that Redstone was

12   involved in, are there any allegations or claims, to

13   your knowledge, pertaining to Redstone not having

14   the proper insurance?

15        A    I do not -- I'm not sure, no.

16             MR. JACKS:  There are claims for

17   indemnification, Anthony, and breach of contract,

18   including lack of the indemnification.  I mean, it's

19   somewhere in one of the JF Allen pleadings I think.

20             I think I produced those, but if you

21   want to see them, I think I can find them if I

CONFIDENTIAL

Page 126

1   didn't produce them.

2        Q      As of March 25, 2015, did -- or had

3   Redstone experience any issues with anchors sheering

4   at the Mobley site?

5        A      I think there was issues with anchors at

6   that point.  I don't know if, you know, we were

7   aware of what the ultimate root cause would have

8   been at that point in time.

9        Q      Was any of the information, assuming

10  that that's the case, there was issues with the

11  sheering of anchors in March '15, was any of that

12  information shared with The Insurance Market?

13       A      I do not recall whether it was or was

14  not.

15       Q      As far as when Redstone received notice

16  of the claims that are subject of the Mobley site

17  work that they were performing, do you recall when

18  that was?

19       A      It looks like there was that November

20  4th letter that Bruce had received from Doug LaSota

21  that ultimately he missed, or something, for a

Page 127

1  couple weeks.

2       Q     Who, Bruce missed it for a couple weeks?

3       A     It look like in that e-mail -- there's a

4  November 4th letter that he claimed that LaSota

5  claimed he got, that he's saying, you know, he just

6  was getting.  So, that was, that was the first time

7  we had received notice of those claims by the

8  contractor.

9       Q     Bear with me.  I'm just trying to move

10  through the previously marked exhibits.

11            Okay.  If you could, could you go to

12  Exhibit No. 8 please?

13       A     8, you said?

14       Q     Yes.

15       A     Yes.

16       Q     Okay.  And you were just talking a few

17  moments ago about there being this couple week gap

18  regarding the letter that Bruce may have missed.

19            Is it your understanding that, The

20  Insurance Market was first put on notice of this

21  claim on December 21 of 2015?

Page 128

1      A      I think that's the case.  It looks like

2   the first time they put on a formal notice, correct.

3      Q      Okay.  And in your December 21, 2015

4   correspondence, which is -- it's the second

5   communication from the top on that first page,

6   there's a reference to -- it's the third sentence,

7   "Additionally, we are in ongoing civil litigation on

8   this matter in multiple fronts."

9           What were you referring to there?  I

10  mean, what else was going on?

11     A      Termination for lack of resources and

12  our --

13     Q      Then that next sentence, "It would be

14  helpful to get some feedback in terms of what our

15  policy will cover."

16          What policy or policies were you

17  referring to there?

18     A      I think any and all policies, you know,

19  we were seeking advice of our, you know, our

20  insurance team.

21     Q      So based on the allegations as you

Page 129

1    understood them, at least as far as December 21,

2    2015, you didn't know what insurance would or

3    wouldn't cover with regards to this claim, right?

4        A     I know that -- that this is a complex

5    situation and I did not have an opinion of what

6    would -- what everything, ultimately, be covered and

7    I would like to get my insurance advisors analysis

8    of our policy.

9        Q     You know The Insurance Market doesn't

10   make the determination whether there is or isn't a

11   coverage for a claim that's submitted by a carrier,

12   correct?

13       A     I understand that, but they also have

14   claim representatives and advisors.

15       Q     I understand that, but, ultimately, who

16   made the denial of coverage in this matter under the

17   Liberty policy?

18            It wasn't The Insurance Market, was it?

19       A     No, it was Liberty Mutual.

20            THE REPORTER:  Mr. Walton, could I ask

21   you to remove your hand from you mouth please?

CONFIDENTIAL

Page 130

1          Thank you.

2          THE WITNESS:  Sorry about that.

3      Q    Mr. Walton, have you ever received

4  correspondence from Liberty Mutual denying coverage,

5  or indemnification for the litigation pertaining to

6  the work you folks were doing out there on the

7  Mobley site?

8      A    I think there was a -- I know there was

9  probably some initial denial letter and -- you know

10  -- an then -- I just don't recall how that evolved.

11          You know, I know there was an initial

12  denial and then there was some kind of -- something

13  was evoked regarding coverage.

14          MR. SUNSERI:  Okay.  I've marked in the

15  marked exhibit folder, Exhibit 13.

16          (Walton Exhibit 13 was marked for

17  purposes of identification.)

18          THE WITNESS:  Got it.

19      Q    And this appears to be correspondence

20  dated February 3, 2016 under letterhead, "Liberty

21  Mutual Insurance," and it appears to be directed to

CONFIDENTIAL

Page 131

1   you.

2              Is that a fair characterization of that

3   document?

4        A    That's a fair characterization.

5        Q    Do you remember receiving this

6   correspondence?

7        A    I mean, really, no, I don't.  I don't --

8   I know there was -- we were denied.

9        Q    Do you have any recollections having

10  gone through this correspondence and taking a look

11  at the basis for the denial provided for in this

12  correspondence?

13       A    We likely relied on our counselors, just

14  to kind of give us a synopsis.

15       Q    By "counselors," do you mean --

16       A    Lawyers.

17       Q    -- counsel who's representing Redstone

18  in the underlying Mobley site litigation?

19       A    Yes, sir.

20       Q    So with that said, you wouldn't have

21  gone and reviewed the CGL coverage form and saw what

CONFIDENTIAL

Page 132

1   was and wasn't covered according to this

2   correspondence, is that fair?

3        A     That is fair.

4        Q     After you received this correspondence,

5   did you have any communications with anyone at The

6   Insurance Market regarding the position taken by

7   Liberty Mutual?

8        A     I don't think I personally did.

9        Q     Okay.  Did you have any conversations

10  with anyone at Redstone as -- whether they had any

11  conversations with anyone at The Insurance Market in

12  response to this correspondence of February 3, 2015

13  from Liberty Mutual?

14       A     Probably all -- I do not recall.  I

15  mean, I'm sure we -- you know -- the time is --

16  Jimmy was involved.  He may have spoken with Roger.

17       Q     You don't know --

18       A     I don't recollect there being some kind

19  of in depth call, you know, walking through this.

20            MR. WALTON:  Sure.  If you could,

21  Mr. Walton, I marked in the exhibit folder, Exhibit

CONFIDENTIAL

Page 133

1    14.

2            (Walton Exhibit 14 was marked for

3    purposes of identification.)

4            THE WITNESS:  I have it open.

5        Q    Okay.  And this appears to be

6    correspondence dated October 20, 2016, under

7    letterhead of "Liberty Mutual Insurance" directed to

8    you, is that correct?

9        A    Yes, sir.

10       Q    And you were still with -- and I forget

11   when -- I believe it was 2016 that you left the

12   employ of Redstone, is that correct, or did I not

13   hear that correctly earlier?

14       A    I -- I'm not -- I'm definitely not

15   stalling.  I'm trying to remember.

16       Q    And if you don't remember, that's fine.

17       A    Yeah, it was -- I was not actively

18   involved at this point.  I think formally my no

19   longer being a W-2 employee occurred late '16, early

20   '17, but, you know, I was not super-involved.

21       Q    Sure.  But as far as this

CONFIDENTIAL

Page 134

1   correspondence, do you recall ever having received

2   or viewed this correspondence?

3       A    I do not recall, sir.  My assumption is

4   that I did not -- it might have been on an e-mail

5   from, you know, Attorney Stanley or Mike, and I may

6   have opened it and looked at it, but I wasn't kind

7   of front and center, in terms of, you know

8   understanding it.

9       Q    Sure.  Have you ever been advised that

10  any particular type of insurance was available at

11  the time of the renewal for Redstone in April of

12  2015, for effective policy periods April 12, 2015

13  through April 12, 2016, that would have provided

14  coverage for the nature of the claims that are the

15  subject of the Mobley site litigation?

16      A    We were not and -- you know -- we would

17  have -- if we would have known we had not that

18  coverage, we would have asked and sought it.

19      Q    And what coverage are you referring to?

20      A    The defective work coverage you just

21  referred to.

Page 135

1      Q    Okay.

2      A    Because that's what we had to have as

3  part of our contract with JFA.

4      Q    My question is, has anyone ever told you

5  that that insurance was available for Redstone to

6  purchase?

7      A    They were not -- we were not.

8      Q    As far as providing approval for the

9  insurance --

10     A    I was going to say, not that I recall

11  that that was told to me, so.

12     Q    Okay.  As far as who provided the

13  approval for the insurance for effective policy

14  periods of April 12, '15, April 12, '16, were you

15  that person on behalf of Redstone?

16     A    I would have been -- me.  I would have

17  been the prime person myself, Jeff Waggett would

18  have likely assisted, you know, Heath would have

19  been part of some of the conversation and all of the

20  shareholders, you know; Brandon, Dwayne and Jimmy.

21     Q    Okay.

CONFIDENTIAL

Page 136

1      A      But yes.  You know, I would have been

2  relied upon, you know, to, to seek out various forms

3  of insurance and provide that information to the

4  respective brokers.

5      Q      I guess my question is more geared

6  toward who would have the final say in providing

7  that approval.

8              Was it you or was it someone else or was

9  it a collected effort?

10             I'm just trying to understand that

11  process of who gives the "yes."

12     A      It definitely wasn't me because I was

13  trying to go with the other broker, and then, you

14  know, there was some, you know, relationships with

15  you know, Roger and the company, and therefore, it

16  was, you know, put back onto The Insurance Market

17  to, to take to Liberty policy and kind of run from

18  there, in terms of the overall process.

19     Q      Okay.  Mr. Walton, I'm looking for an

20  exhibit.  Just bear with me.

21     A      Take your time.

Page 137

1      Q      So, do you recall providing approval for

2  the Liberty policy for the renewal period April 12,

3  '15, April 12, '16?

4      A      I believe that in terms of approval, we

5  -- you know -- I would have been the one who had --

6  yes, let's do it with Liberty Mutual versus somebody

7  else.

8      Q      Sure.  Do you recall if you had a

9  meeting with Roger Waters in April of 2015, to

10  review the proposed insurance for the renewal of

11  April 12, 2015?

12      A      I do not recollect having a meeting with

13  Roger about our insurance in April.

14      Q      Okay.  And as far as I know, you

15  referenced earlier in your deposition that you're an

16  entrepreneur.

17            Are you involved in any other

18  businesses?

19      A      Currently?

20      Q      Yes.

21      A      Yes.

CONFIDENTIAL

Page 138

1       Q     What other lines of business are you
2    currently involved?

3       A     Trucking, energy.  Those are pretty much
4    the two, two big areas.

5       Q     And you're married, Mr. Walton?

6       A     I am.

7       Q     And is your wife employed?

8       A     She is a real estate agent.

9       Q     Do you or your wife have any of your
10   insurance for any of your businesses through The
11   Insurance Market?

12      A     I'm, I'm not, I'm not sure.  Maybe
13   historically something had been or -- I know that I
14   probably had some stuff with them at some point in
15   time.

16      Q     Okay.  For some of your other
17   businesses?

18      A     Uh-huh.

19            MR. SUNSERI:  Okay.  Mr. Walton, I think
20   that's all the questions I have at this particular
21   point in time.  Thank you.

CONFIDENTIAL

                                                    Page 139

1              I'm going to pass you to Mr. Fitzgibbon.

2              THE WITNESS:  You have a good day.

3              MR. SUNSERI:  Thank you.

4              MR. FITZGIBBON:  Mike, do you want me to

5      go or do you want to go?

6              MR. JACKS:  Mine is going to be pretty

7      brief, Tim.  How long do you think you have?

8              MR. FITZGIBBON:  I just want to clean up

9      one issue.  Maybe 30 minutes most, at most.

10             It depends on his answers, obviously,

11     but I think it could go pretty quickly.

12             THE WITNESS:  Whatever works for you.

13             MR. FITZGIBBON:  What number exhibit are

14     we up to, Oneeka?

15             MR. SUNSERI:  We're on Exhibit 16 I

16     think.

17             MR. FITZGIBBON:  This is a bit of a

18     larger file, so it may take a minute.

19                 EXAMINATION BY MR. FITZGIBBON:

20         Q     Mr. Walton, I just sent you Exhibit 16.

21     It may take a minute to get there.  Let me know when

CONFIDENTIAL

                                              Page 140

1    you have it.

2              (Walton Exhibit 16 was marked for

3    purposes of identification.)

4         A    Did you have anything good for lunch?

5         Q    I didn't have lunch yet, unfortunately.

6              All right.  You should have it.

7         A    Yep, it's up.  It's just loading.

8         Q    Okay.  What I've marked as RW-16 is the

9    Amended Complaint and the exhibits to the Amended

10   Complaint in this action.

11        A    It is, it is loaded.  Got it.

12        Q    It's a lengthy document.  Bear with me.

13   I'd like you to scroll down to page 41 of the

14   document, and feel free to scroll down through

15   additional pages as you need.

16             My initial question to you is, do you

17   recognize that as the Redstone subcontract with JF

18   Allen?

19        A    Yes, sir.  Yes, sir, it is.

20        Q    Okay.  If you go to page 43, Section

21   301, "Time was of the essence in the subcontract,"

Page 141

1    correct?

2         A    Yes, sir.

3         Q    And --

4         A    Sorry, Section 43.

5         Q    And "Time was of the essence in the

6    subcontract," right?

7         A    Yes, sir.

8         Q    If you go to page 45.

9         A    Okay.

10        Q    The Section 501-B, "Final payment," do

11   you see that?

12        A    Yes, sir.

13        Q    It says, "Upon final completion of the

14   Mobley 5 retaining wall project, an acceptance of

15   the work by Mark West, Liberty Midstream and

16   Resources, LLC, in accordance with paragraph 2.0,

17   work completion schedule of the Mobley 5 retaining

18   wall contract (provisions attached)."

19             Do you see that?

20        A    Yes, I do.

21        Q    Do you recall those provisions being

Page 142

1    attached to your subcontract?

2         A    So I -- I'm just looking at the overall

3    agreement.

4              So when we -- okay.

5              Yeah, the proposal, August 26, 2014 on

6    page 99?

7         Q    No.  What I'm asking you is that made a

8    specific reference to paragraph 2.0 work completion

9    schedule of the Mobley 5 retaining wall contract and

10   that I'm reading from page -- from Section 5.01B in

11   your subcontract, Redstone subcontract.

12             Do you see that?

13        A    I do see that.

14        Q    Okay.  And then, if you flip to page 46,

15   in Section 701-E, it says, "Exhibits to this

16   sub-agreement," and the first listed item is

17   "Applicable portions of the construction contract

18   between Mark West."

19             Do you see that?

20        A    Can you repeat that, sir?

21             I'm sorry.

Page 143

1       Q     Sure.  On page 46 of the exhibit, there

2    is a heading article seven, subcontract documents,

3    and section 701-E says that, "Exhibits to this

4    sub-agreement include applicable portions of the

5    construction contract."

6              Do you see that?

7       A     That is correct.

8       Q     Okay.  And then if you flip to page 48

9    of the agreement, of the exhibit, that's your

10   signature on the subcontract, right?

11      A     That is me, and I remember to this day

12   thinking that I signed the attached and not that.

13   But --

14      Q     Now I want you to scroll to page 429 of

15   the exhibit.  And again, this exhibit is the Amended

16   Complaint filed by Redstone with the attachments to

17   it.

18              Let me know when you're at page 429.

19      A     I am, sir.

20      Q     Do you see beginning on page 429 is a

21   document labeled, "Construction Contract Mobley 5

CONFIDENTIAL

Page 144

1    Retaining Wall Construction"?

2            Do you see that?

3        A    Yes, sir.

4        Q    And if you scroll down to Section 2.0,

5    there is the work completion schedule and project

6    completion that's referenced in the section of your

7    subcontract that we looked at a minute ago.

8            Do you see that?

9        A    Yes, that's correct.  I think you're

10   definitely -- I know what you're saying.  So I do

11   recall is that --

12       Q    Well, let me ask the question.

13           If you look at Section 2.1, that

14   specifies a project completion date of March 31,

15   2015.

16           Do you see that?

17       A    Yes, I do.

18       Q    And by virtue of the provisions we've

19   just looked at, that provision clearly is

20   incorporated into your -- Redstone's subcontract at

21   the site, correct?

CONFIDENTIAL

Page 145

1      A      Yes, it is.

2      Q      I was just trying to clarify and help

3  get back to the answer you gave earlier.  You were

4  uncertain as to whether this was incorporated.

5            Does this help refresh you recollection

6  --

7      A      Yeah.  Yeah, I remember.  So the --

8  because I'm looking back at the -- like, at the

9  quote and the treed area versus non-treed area, and

10  that kind of gets into the whole, whole other issue.

11            But you know, some of these, you know,

12  term prior to our execution of -- our execution of a

13  subcontract -- and again, I'm, I'm jogging my

14  memory, but it appears that this contract was

15  finalized.

16            You know, we were kind of made aware of

17  some of these conditions, you know, that we

18  obviously subsequently agreed to those conditions as

19  part of our, as part of our contract.  That's

20  correct.

21      Q      So, my question is when you executed the

CONFIDENTIAL

Page 146

1    subcontract, a provision that was incorporated by

2    reference into the subcontract was the project

3    completion date of March 31st of 2015, correct?

4         A    That's correct, yes --

5              MR. FITZGIBBON:  Can you all just hang

6    on one second?  Somebody is banging on my front

7    door.  I'll be back in just a second.

8              (A break was taken.)

9              THE WITNESS:  The one thing I will say

10   is definitely, as I remember, it seems correct, but

11   you know, as, you know, as kind of the job had

12   changed and evolved.

13             You know, as I said, we had submitted

14   change orders to JF Allen, saying, "Hey, you know,

15   job has increased in size or sequence has changed or

16   laid down area had changed, and that's going to

17   require more money and time."

18             We assumed wrongfully that those change

19   orders were being reviewed and passed along.

20             I don't know if that's material or not,

21   but I'm just being honest about what our assumption

CONFIDENTIAL

Page 147

1    was.

2              MR. FITZGIBBON:  Okay.  And then if I

3    can mark one other exhibit.

4              MR. JACKS:  I think we skipped 15, Tim.

5    If you want to do 15.  I know we're out of order,

6    but.

7              MR. FITZGIBBON:  Did we skip 15?

8              MR. JACKS:  That's what I got.

9              MR. FITZGIBBON:  Oneeka, do we not have

10   a 15?

11             THE REPORTER:  I wasn't in the Exhibit

12   Share.  I was kind of following along with Mr.

13   Sunseri.  Let me look.

14             Yeah, I don't see a 15.

15             MR. FITZGIBBON:  Okay.  I'll try to mark

16   this one as 15 then.  I'm getting the pinwheel of

17   death.

18             THE WITNESS:  Seems to be a phrase coin

19   of this week.

20             MR. JACKS:  No matter how inconvenient a

21   Zoom deposition is, I think on the whole, it's still

CONFIDENTIAL

Page 148

1    more convenient than all of us driving to any one

2    city anywhere to be sitting in a room together.

3              MR. FITZGIBBON:  Under the circumstance,

4    that's absolutely true.

5    BY MR. FITZGIBBON:

6         Q    All right.  It's populated so let me get

7    that to you.

8              You should have it now, Mr. Walton.

9              (Walton Exhibit 15 was marked for

10   purposes of identification.)

11        A    I'm refreshing.

12        Q    What was marked as Exhibit 15 is a

13   two-page document bearing bates numbers

14   TIMIB483-484.

15        A    Yes, sir, I see that.

16        Q    Okay.  And the top one appears to be an

17   e-mail from you to Sherry Pusey.  Do you see that

18   dated, Friday, June 16, 2017?

19        A    I think that -- I don't think that's

20   from me.  I think that's from Roger.

21        Q    Oh, I'm sorry.  My bad.

CONFIDENTIAL

Page 149

1              Have you seen this e-mail before?

2      A     I was on the e-mail.  So I'm sure I --

3  I'm sure I opened the attachment and reviewed it.

4      Q     Can you scroll to the second page?

5      A     Yes, sir.

6      Q     Do you know who Angela Bullock is?

7      A     The name rings a bell, but I do not

8  know.

9      Q     Well, if we go back to the subject

10 matter, it says, "Letter for Kinsale."

11             Do you see the subject matter of the

12 e-mail?

13     A     I do, and I'm speculating that it's

14 somebody who works at Kinsale.

15     Q     So, did there come a time that Redstone

16 submitted a claim with respect to the Mobley site to

17 Kinsale?

18     A     I believe so, yeah.

19     Q     The basis for submitting the claim to

20 Kinsale was because the anchors began failing while

21 the Kinsale policy was in effect, correct?

Page 150

1      A    I think we submitted -- I think it was

2    -- I think, honestly, it was confusing to us.

3              So, you know, we had switched carriers.

4    You know, I think we submitted to Kinsale.  We

5    submitted to Liberty and I figured -- I assumed we

6    probably would have figured out where we were

7    covered.

8      Q    Well, if I can direct your attention to

9    the second page of the exhibit, there is a heading

10   that says, "Parties Involved."

11             Do you see that?

12     A    Yes, sir, I do.

13     Q    And then immediately under that section

14   of the bullet points, there's a paragraph that says,

15   "During the construction back in sequence of the

16   project, the anchors that were installed by Redstone

17   started to structurally fail."

18             Do you see that?

19     A    I do.

20     Q    And, isn't the reason that that

21   information is there is because it started to fail

Page 151

1    during the Kinsale policy?

2         A    You know, I think I go back to the

3    original point being that, you know, when, when the

4    anchors failed, I don't really recollect exactly

5    what time, what anchors failed and what the root

6    cause was related to those initial anchors versus

7    other anchors.  I would just be -- I didn't write

8    this letter.  So I'd just be speculating.

9              But so, as it relates to what time, with

10   what anchors and insurance strategy related to --

11   because it was Kinsale or because Liberty, I don't

12   think we put that much thought into it.

13        Q    Did you review this letter before it was

14   sent to Kinsale?

15        A    I did not.

16        Q    Mr. Kefover didn't ask for your input

17   into the letter?

18        A    No, I was highly uninvolved at this

19   point.

20        Q    Earlier there was an exhibit, Exhibit 8,

21   where you had written an e-mail indicating that you

Page 152

1    wanted to discuss whether the claims -- we wanted to

2    discuss with someone from The Insurance Market

3    whether the claims were covered.

4              Do you remember that e-mail?

5         A    Yes, sir.

6         Q    What did The Insurance Market tell you

7    when you said you wanted to discuss whether the

8    claims were covered?

9         A    I think if I remember, Tim, I believe it

10   was probably with, like -- it probably was a call

11   and they probably said they'd look into it, you

12   know.  I mean, we obviously had a lot of lawyers

13   involved at that point.

14             So, you know, I don't remember exactly

15   what Insurance Market said, I think is the honest

16   answer.

17        Q    Do you remember with whom you spoken The

18   Insurance Market about it?

19        A    I'm sure that Sherry was involved.  She

20   was in-house claims lady.  She seemed, you know,

21   pretty smart, and you know, I -- I'm sure Roger was

CONFIDENTIAL

Page 153

1    on the call.

2         Q     And going back to this Exhibit 15, who

3    made the determination to submit the claim to

4    Kinsale?

5         A     Exhibit 15 you said, sir?

6         Q     Exhibit 15, yes.

7         A     Yeah, I jumped back to 8.

8               The -- I assumed it probably would have

9    been the board, shareholders, lawyers, you know.

10        Q     Okay.  During your tenure at Redstone,

11   did Mark West ever tell Redstone that it had to send

12   fill offsite because it was unable to store it

13   behind the wall?

14        A     Send fill off site?

15              No, I don't believe that was the case.

16   I remember we gave up a lay down area and Heath

17   being, like, irate about it, and that gave him some

18   areas to place more of the screened material.

19              MR. FITZGIBBON:  Okay.  I've got no

20   further questions.

21              MR. JACKS:  Rich -- Tim, just off the

Page 154

1   record for a second.

2          (A discussion was held off the record.)

3          EXAMINATION BY MR. JACKS:

4   Q    Michael Jacks on behalf of Redstone.

5   Rich, I just got a few summary questions here for

6   you.

7          The first question is, did Roger Waters,

8   or anyone at The Insurance Market, tell you in

9   September of 2014 that the Kinsale policy did not

10  provide the insurance coverage required by the

11  Mobley contract?

12  A    No, we were not told that the insurance

13  required another -- contract was not included in the

14  insurance policy.

15  Q    And then, at any point in 2015 when you

16  were -- before the Liberty Mutual policy was

17  purchased, did Roger Waters, or anyone at The

18  Insurance Market, tell you that the upcoming Liberty

19  Mutual policy did not provide the coverage required

20  under the Mobley contract?

21  A    No.  No, we were not told that the new

Page 155

1    policy didn't have coverage under the Mobley

2    contract, as required by the Mobley contract.

3         Q    At any point, did Roger Waters, or

4    anyone at The Insurance Market, tell you there were

5    exclusions in any of those policies, Liberty Mutual

6    or Kinsale, that would impact your work at Mobley,

7    or coverage for your work at Mobley?

8         A    They did not.  It's why I had sent the

9    contract over explicitly to ensure that.

10        Q    During this time period, again, between

11   -- basically during the Mobley work, based upon what

12   you were told by The Insurance Market, Roger Waters,

13   did Redstone -- and again, you're testifying as a

14   corporate representative of Redstone for this,

15   believe it had the insurance coverage required by

16   the Mobley contract?

17        A    Yes, we would have -- that would be the

18   assumption, given that's what we asked for.

19        Q    And if, at any point, between September

20   14 and the entire completion of the Mobley project,

21   through August -- or through Redstone leaving the

CONFIDENTIAL

Page 156

1  project in August of '15, if The Insurance Market

2  had told Redstone that it did not have the necessary

3  insurance coverage required by the Mobley contract,

4  what would you have done?

5        A    We would have gone out to whatever

6  market we could to buy a policy.  So that we weren't

7  not insured, as required, and as we represented to

8  the contractor, which we worked for, that we had

9  insurance, especially on a 6.5 million dollar job.

10              MR. JACKS:  That's all the questions I

11  have.

12              EXAMINATION BY MR. SUNSERI:

13        Q    I have a few questions, follow-up

14  questions to Mike's questions.

15              So again, no one ever told you that

16  insurance coverage was available at the time that

17  you renewed in April of 2015 for that renewal period

18  of April 12, '15 through '16, that insurance was

19  available for Redstone to purchase which would cover

20  the claims which are now the subject of the Mobley

21  site litigation; no one's told you that, have they?

CONFIDENTIAL

Page 157

1      A    No one told us there was additional

2   insurance to buy, and I think --

3      Q    Let me stop you right there.

4           My question is, what type of insurance?

5           No one's told you there was insurance

6   available for Redstone to purchase or that they were

7   even a candidate to purchase insurance at that

8   particular time; has anyone?

9      A    We didn't, we didn't ask if there was

10  additional insurance to buy because we assumed we

11  had it in the prior policy.

12     Q    But I'm saying subsequent to the denial

13  by Liberty Mutual and Kinsale for the Mobley site

14  litigation and those particular claims, no one's

15  told you that insurance was available for that

16  particular time for Redstone to purchase, which

17  would provide coverage for those claims, correct?

18     A    I'm just -- I'm sorry.  Are you asking

19  me, after Liberty Mutual and Kinsale denied the

20  coverage, did somebody tell us that there's

21  insurance that we could have bought to cover for

Page 158

1    those claims?

2        Q    Not only to purchase, that you would

3    have qualified for.

4        A    We haven't, we haven't speculated on

5    that, like, regarding whether we would have

6    qualified for it at that point in time.

7        Q    And while you were at Redstone, did you

8    ever have professional liability insurance coverage?

9        A    We did not have professional liability

10   cause we always outsourced all the engineering and

11   all the quality assurance.

12       Q    And you understand how an exclusion

13   operates under an insurance policy, don't you?

14       A    I understand exclusions exist under

15   insurance.  Hence, the reason I hire an agent and

16   tell them what I want in the insurance.

17       Q    And have you ever requested a copy of

18   your insurance policy from The Insurance Market to

19   read the policy, to determine if you have insurance

20   for a particular item?

21       A    No, because I ask them -- I tell them

Page 159

1  what insurance I want and they provided that

2  insurance.

3       Q     I guess my question is a little bit

4  different than what you understood.

5            My question is, have you ever asked

6  Redstone to review a policy for existing insurance

7  that Redstone had while you were at Redstone, to

8  make a determination as to what coverage you had?

9       A     Have I asked Redstone?

10      Q     Uh-huh.  Have you asked The Insurance

11 Market for a copy of your insurance policy, so that

12 you could determine what coverage you had?

13      A     I'm sure we have at some point.

14      Q     I'm asking if you have.

15      A     I don't, I don't remember.

16      Q     Is that something you would have done?

17      A     I probably would have asked to see a

18 policy at some point.

19            But I guess my question to you, is that,

20 did that obfuscate all the responsibility of the

21 broker to provide the insurance I asked for?

CONFIDENTIAL

Page 160

1      Q    This deposition -- I'm asking the

2  questions.

3      A    Okay.

4      Q    We can talk about that off the record if

5  you'd like.

6           All of your businesses that you have,

7  that you've been involved in, did you ever provide a

8  CGL policy to an insurance broker and said, "This is

9  the insurance that I want"?

10     A    No.

11          MR. SUNSERI:  That's all the questions I

12  have.

13          MR. JACKS:  Tim, do you have anything?

14  I don't have anything.

15          MR. FITZGIBBON:  I have nothing further.

16  It sounds like you're finished, Mr. Walton.

17          THE WITNESS:  Thank you, guys.

18          (The virtual deposition concluded at

19  1:47 p.m.)

20          (THE REPORTER:  Mr. Jacks, are you

21  ordering a copy of the transcript?

CONFIDENTIAL

Page 161

1            MR. JACKS:  Yes, please, electronic copy

2   is fine.  I don't need a paper copy.

3            MR. SUNSERI:  I'll take an expedited.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

CONFIDENTIAL

Page 162

1          CERTIFICATE OF DEPONENT

2

3          I hereby certify that I have read and

4    examined the foregoing transcript, and the same is a

5    true and accurate record of the testimony given by

6    me.

7

8          Any additions or corrections that I feel

9    are necessary will be made on the Errata Sheet.

10

11

12

13          _____

14                RICHARD WALTON

15

16          _____

17                   DATE

18

19    (If needed, make additional copies of the Errata

20    Sheet on the next page or use a blank piece of

21    paper.)

CONFIDENTIAL

Page 163

1                          ERRATA SHEET

2      CASE:

3      WITNESS NAME:                    DATE:

4      PAGE/LINE          SHOULD READ          REASON FOR CHANGE

5      _____

6      _____

7      _____

8      _____

9      _____

10     _____

11     _____

12     _____

13     _____

14     _____

15     _____

16     _____

17     _____

18     _____

19     _____

20     _____

21     _____

Page 164

1  State of Maryland

2  City of Baltimore, to wit:

3      I, ONEEKA S. HILL, a Notary Public of the

4  State of Maryland, City of Baltimore, do hereby

5  certify that the within-named witness personally

6  appeared before me at the time and place herein set

7  out, and after having been duly sworn by me,

8  according to law, was examined by counsel.

9      I further certify that the examination was

10 recorded stenographically by me and this transcript

11 is a true record of the proceedings.

12     I further certify that I am not of counsel to

13 any of the parties, nor in any way interested in the

14 outcome of this action.

15     As witness my hand and notarial seal this 5th

16 day of June, 2020.

17                    _Oneeka Hill_

18

19                    ONEEKA S. HILL,

                      Notary Public

20 My Commission Expires:

21 June 20, 2021

[& - 43]                                                                    Page 1

**&**

**&**   2:14 3:5

**0**

**0001**   80:3
**0003**   80:3
**0005**   83:4
**006**   70:5
**00743**   67:4
**00744**   67:5
**00745**   67:6
**00746**   67:7
**04-3**   112:21
**06**   83:4

**1**

**1**   4:11 11:12,15,19
  113:2,10
**10**   4:20 15:8 18:9
  43:17 63:17 98:17
  98:18 99:3,21
  107:7 112:14
  121:4
**100**   4:21
**101**   2:16
**11**   4:11,21 12:19
  13:5 15:9 100:18
  100:19 108:3
  112:4 114:19
  119:4,10,12
**117**   5:5
**12**   5:5 78:8,8
  101:18 111:7,7
  117:8,9,12,20
  119:13,14 122:21
  122:21 134:12,13
  135:14,14 137:2,3
  137:11 156:18
**125**   66:21 67:8
**1270**   110:21
**12:30**   107:17,18

**12:45**   106:5
**13**   5:6 65:21
  130:15,16
**130**   5:6 67:13
**131**   67:17
**133**   5:7
**139**   4:6
**13th**   100:9
**14**   4:12 5:7 133:1
  133:2 155:20
**140**   5:9
**148**   5:8
**15**   5:8 10:9,15
  47:20 52:16 63:17
  107:7,13 108:9
  111:7 117:21
  126:11 135:14
  137:3 147:4,5,7,10
  147:14,16 148:9
  148:12 153:2,5,6
  156:1,18
**15241**   1:18 9:10
**154**   4:8
**156**   4:7
**15th**   57:2
**16**   5:9 70:16
  101:13 111:7
  112:6 123:1
  133:19 135:14
  137:3 139:15,20
  140:2,8 148:18
  156:18
**1677**   1:17 9:9
**17**   133:20
**175**   1:9
**17847**   164:18
**18**   99:8 112:18
  121:7
**1856**   3:8
**18th**   113:17

**1:47**   160:19

**2**

**2**   4:12 14:18,18,20
  107:1 133:19
**2.0**   141:16 142:8
  144:4
**2.1**   144:13
**20**   22:11 101:12
  133:6 164:21
**200**   2:7 3:7,17
**20001**   2:18
**2012**   16:6 24:12,16
  24:17
**2013**   16:6,6 24:13
**2014**   26:6,13,14
  35:8 89:2 142:5
  154:9
**2015**   27:13,16 35:8
  43:18 45:21 47:20
  65:21 70:16 73:5
  75:10 76:16 77:17
  78:8 79:2,7,18
  81:1,7 83:17 84:1
  86:5,10,13 88:16
  89:9,17 99:8
  100:9 101:12
  110:14 112:5,18
  113:17 121:7
  122:21 126:2
  127:21 128:3
  129:2 132:12
  134:12,12 137:9
  137:11 144:15
  146:3 154:15
  156:17
**2016**   17:8 78:8
  96:13 130:20
  133:6,11 134:13
**2017**   17:9 148:18
**202**   2:19

**2020**   1:16 4:3
  164:16
**2021**   164:21
**20th**   3:17
**21**   79:18 81:1,7
  88:16 127:21
  128:3 129:1
**22**   55:15
**231-1004**   3:19
**24/7**   40:13 90:4
**25**   117:21 126:2
**25719**   3:9
**26**   110:19 142:5
**26003**   3:18
**26505**   2:8
**29**   1:16 4:3

**3**

**3**   3:16 4:13 12:19
  13:5 14:19 15:3
  43:8,9,15 107:1
  130:20 132:12
**30**   14:9 139:9
**301**   140:21
**304**   2:9 3:10,19
**31**   86:5,9,13 89:9
  89:17 144:14
**31st**   87:1 90:14
  146:3
**32**   3:17
**3467**   2:6

**4**

**4**   4:14 15:6 47:11
  47:13,16,17 57:3
  83:17 84:1 101:17
**4-9-15**   67:9
**41**   140:13
**429**   143:14,18,20
**43**   4:13 140:20
  141:4

**[45 - anthony]**                                    Page 2

**45**   60:4 106:3,14
141:8
**46**   142:14 143:1
**47**   4:14
**48**   143:8
**4th**   126:20 127:4

**5**

**5**   4:15 15:6 65:4
65:11,15,18 75:10
76:16 141:14,17
142:9 143:21
**5.01b**   142:10
**501**   141:10
**526-3500**   3:10
**599-4770**   2:9
**5:18**   1:9
**5th**   164:15

**6**

**6**   4:6,16 15:7 70:6
70:9,13
**6.5**   156:9
**65**   4:15
**689-2800**   2:19

**7**

**7**   4:17 74:16,17
75:6,9
**70**   4:16
**701**   142:15 143:3
**71**   70:14
**72**   70:14
**74**   4:17
**752**   68:11
**754**   68:19
**756**   69:10
**79**   4:18

**8**

**8**   4:18 79:10,13
84:15,16,17
127:12,13 151:20

**153**:7
**82**   4:19

**9**

**9**   4:19 15:8 82:15
82:17,19 98:16
103:12 118:13,13
118:19,20,21
119:1
**900**   2:17
**94**   4:7
**949**   3:7
**99**   4:20 142:6

**a**

**a.m.**   1:17
**a00071**   70:14
**a00750**   68:5
**a746**   66:18
**aback**   115:15
**ability**   8:21
**able**   89:11 91:20
105:9 116:2
**absolutely**   148:4
**acceptable**   106:6
**acceptance**   141:14
**access**   100:3
**accord**   66:21 67:8
67:13,16
**accurate**   23:3,4,11
162:5
**acquired**   18:4
**acsunseri**   3:20
**act**   67:21
**action**   1:8 140:10
164:14
**actions**   13:13
15:14,19
**actively**   92:8
133:17
**actual**   30:4

**added**   27:15
**additional**   115:20
140:15 157:1,10
162:19
**additionally**   45:9
80:18 128:7
**additions**   162:8
**address**   9:8 21:7
21:20 76:17
117:11
**addressed**   75:10
**advice**   43:5 128:19
**advise**   113:3 121:8
**advised**   108:11
134:9
**advising**   17:21
44:18
**advisors**   129:7,14
**agent**   100:6,8,11
138:8 158:15
**ago**   127:17 144:7
**agree**   23:2 104:14
107:18 123:14
**agreed**   91:10
145:18
**agreement**   88:13
89:12,13 142:3,16
143:4,9
**agreements**
124:13
**ahead**   13:15 28:11
50:6
**alabama**   28:8 29:2
**alicia**   85:2
**allegation**   55:15
**allegations**   83:10
83:18 84:8 125:12
128:21
**alleged**   84:2
**allen**   39:15 40:17
41:3,19 42:2,10

**45**:15,18 46:19
48:9 49:6,7 57:2
80:9 85:21 87:13
88:4,8,14 89:13
90:2,7,9 91:7,8
92:11 125:9,19
140:18 146:14
**allow**   105:18
**allowing**   105:10
105:10
**amended**   4:11 5:9
11:20 55:10 140:9
140:9 143:15
**amendment**   86:21
**america**   40:12
**amount**   17:17
23:21 25:8 87:10
92:9
**analysis**   54:8
85:17 123:4,11
129:7
**analyze**   124:4
**anchor**   62:7,17
**anchors**   57:5,10
59:13 60:11 61:3
61:11,19 62:10
63:3 126:3,5,11
149:20 150:16
151:4,5,6,7,10
**angela**   149:6
**answer**   8:19 50:21
60:5 72:2,5 89:11
111:17 145:3
152:16
**answered**   8:20
**answers**   7:4,4,13
7:16 13:6,6
139:10
**anthony**   3:14
93:11 94:8 97:6
125:17

anybody 93:17
anymore 17:17
appear 66:17
  104:9 108:7
appearances 2:1
  2:21 3:1
appeared 164:6
appears 43:16,17
  47:19 65:20 66:10
  69:17 70:14 75:9
  79:16 80:5 99:8
  99:21 104:1,12
  111:3 112:6
  113:14 114:16
  117:21 130:19,21
  133:5 145:14
  148:16
applicable 78:14
  142:17 143:4
application 64:20
  67:19 69:14
applications
  108:14
appreciate 7:14
appreciation
  103:3
apprehension
  42:20
approach 32:11
  61:13 62:14
appropriate 106:5
approval 93:5
  135:8,13 136:7
  137:1,4
approximately
  35:8 94:13
april 65:21 77:1
  78:7,8 110:14
  111:7,7 122:21,21
  134:11,12,13
  135:14,14 137:2,3

137:9,11,13
  156:17,18
area 17:15 34:2
  145:9,9 146:16
  153:16
areas 33:11,16
  138:4 153:18
armor 48:18
arrangements
  44:19
arrived 18:17
  24:11
article 143:2
asap 121:10
aside 58:7
asked 12:15 53:9
  55:9 64:19 77:14
  81:7 102:19
  124:10 134:18
  155:18 159:5,9,10
  159:17,21
asking 6:16 7:13
  15:13 38:20 52:14
  85:9 142:7 157:18
  159:14 160:1
asks 75:16
assessed 60:21
assigned 76:21
assisted 135:18
associated 103:6
assume 8:19 31:4
  50:16 92:8 103:10
  109:4 110:4,15
  113:19
assumed 87:7
  89:21 90:4 116:21
  117:2 146:18
  150:5 153:8
  157:10
assuming 50:10
  73:14 80:14

102:11 126:9
assumption 48:16
  111:14 134:3
  146:21 155:18
assurance 158:11
assuring 32:17
attached 66:8
  113:3,8 121:9
  122:12 141:18
  142:1 143:12
attachment 149:3
attachments
  112:19 143:16
attention 70:19
  100:3 150:8
attorney 134:5
attorneys 6:12
august 142:5
  155:21 156:1
auto 31:6
available 134:10
  135:5 156:16,19
  157:6,15
avenue 2:6,16 3:7
average 39:8
  77:10
aware 39:10 64:6
  64:12 73:16 81:11
  81:13 82:1 84:13
  89:18 117:3 126:7
  145:16
awkwardness
  45:14

| b |
| --- |
b 141:10
b6 14:9
back 13:18 14:11
  33:9 37:21 49:13
  49:19 56:19 63:17
  68:10,17 76:21
  82:7 84:14,16

87:12 92:20 93:6
  93:13 94:1,3
  106:5,16 107:16
  107:19 108:17
  111:18 112:14
  114:8 116:11,14
  117:11 121:4,17
  124:9,20 136:16
  145:3,8 146:7
  149:9 150:15
  151:2 153:2,7
backing 43:11
bad 29:11 58:17
  72:19 148:21
baltimore 164:2,4
banging 146:6
barely 82:3
barrel 60:20 61:16
base 86:15
based 73:14
  128:21 155:11
basic 91:12
basically 85:8,9
  155:11
basis 19:10 82:10
  92:1 131:11
  149:19
batch 58:17
bates 70:13 80:2
  83:3 110:20
  118:18,19 148:13
bathtub 91:18
bear 14:5 65:2
  81:14 127:9
  136:20 140:12
bearing 83:3
  148:13
bears 66:21 68:5
  70:13 80:2
beautiful 66:16

[beauty - cases]                                                                     Page 4

**beauty**  66:15
**bed**  98:8
**began**  57:5 59:13
   149:20
**beginning**  24:20
   77:14 143:20
**behalf**  2:2,11 3:2
   3:12 89:5 135:15
   154:4
**believe**  12:17
   13:19 15:16 16:4
   55:20,20 67:18
   73:7 83:10 84:12
   85:6 87:21 88:17
   89:1 95:12,16,16
   96:9 97:21 98:5
   100:21 111:11
   123:2 133:11
   137:4 149:18
   152:9 153:15
   155:15
**bell**  149:7
**belle**  9:3,6,7
**belt**  55:2
**beneath**  67:1
**best**  8:20 26:9
   34:16 71:13 86:20
   91:2
**better**  40:6
**beyond**  86:9
**bid**  29:1 32:19
   33:4 36:19 86:15
   115:7
**bidding**  37:9
   42:15 115:13
**bids**  29:5
**big**  8:1 33:19
   54:21 138:4
**biggest**  34:2,2
**bill**  76:6

**binders**  75:1
**binding**  13:7
**bit**  7:20 43:3 57:1
   119:21 139:17
   159:3
**bizarre**  76:20
**blank**  162:20
**blessing**  33:4
**blind**  33:13,14
**block**  104:7,10
**blocked**  100:5
**blocks**  120:11
**blue**  66:12
**board**  116:13
   153:9
**bob.massie**  3:11
**bond**  109:12,16,18
**bonding**  102:19
**bonds**  102:8 103:6
**booster**  44:19
**bottom**  43:21
   66:11,17 67:13,16
   69:8 91:19
**bought**  19:6
   115:20 157:21
**bound**  120:17
**box**  3:8 120:6
**brandon**  135:20
**breach**  125:17
**break**  8:12,13,14
   8:14,15 10:13,19
   61:19 63:10,19
   93:4,15,18 94:1
   105:17 106:14
   107:13,21 146:8
**breaking**  63:3
**brian**  48:3,7,10
**brief**  139:7
**broad**  62:3
**broadly**  57:18

**broke**  57:11 61:19
   62:10
**broken**  58:14 61:4
   114:18
**broker**  49:11 55:5
   56:14 95:15
   112:13 115:2
   116:6 123:11
   124:3 136:13
   159:21 160:8
**brokers**  56:9
   108:13 116:10
   136:4
**brother**  59:11
**brought**  48:10
   83:10 100:2
**bruce**  80:15 85:10
   85:15,16 126:20
   127:2,18
**bs**  49:3
**build**  33:6 40:11
   49:17
**building**  2:5 9:18
   91:18
**built**  58:11 91:17
   92:8
**bull**  52:13
**bullet**  150:14
**bullock**  149:6
**bumped**  58:17
**burns**  3:15
**burnswhite.com**
   3:20
**bury**  59:5
**business**  10:12
   16:11,16 18:16
   34:18 38:13 45:7
   45:13 82:12 88:1
   103:4 105:5,7
   109:7 110:16
   116:9,11 138:1

**businesses**  17:14
   137:18 138:10,17
   160:6
**button**  11:13,17
**buy**  31:12,12
   156:6 157:2,10

**c**

**c**  3:14
**call**  45:12 52:18
   132:19 152:10
   153:1
**called**  6:5 52:12
   116:5
**candidate**  157:7
**candidly**  37:12
   42:2 52:9
**canonsburg**  9:13
**capacity**  11:3
   94:21
**care**  53:16 106:11
**careful**  43:5
**carolina**  27:15,15
   27:20
**carolinas**  28:2
**carrier**  95:11,13
   129:11
**carriers**  56:17
   81:9 108:13
   121:13 150:3
**case**  6:17 13:13
   16:1 26:6 30:9
   50:12 51:15 55:11
   60:8 69:17 76:2
   95:1,3,10,17 96:5
   96:8,9,13,15,21
   97:6,8,20 98:2,7
   113:10 126:10
   128:1 153:15
   163:2
**cases**  16:2

**[category - concluded]**

| | | | |
|---|---|---|---|
| **category** 29:19 | **changed** 21:11 | **coffee** 63:15 | 17:18 18:4,8 19:7 |
| **cause** 57:7 58:4,6 | 62:14 71:18,19 | **cognisant** 63:13 | 19:9 20:13,15 |
| 59:16 62:3 93:20 | 73:19 146:12,15 | **coin** 147:18 | 22:14,17 24:16 |
| 126:7 151:6 | 146:16 | **collected** 136:9 | 25:2,7 27:11 36:2 |
| 158:10 | **changes** 87:5 | **column** 103:16 | 36:6 40:17 48:9,9 |
| **caused** 72:17 | **characterization** | **combination** | 79:4,7 94:9 98:5 |
| **causing** 60:10 | 131:2,4 | 13:17 | 104:21 119:16,19 |
| **caveat** 71:13 81:16 | **characterized** | **come** 16:7 59:5 | 122:8 136:15 |
| **cc** 44:3 | 101:11 | 63:17 65:17 93:6 | **comparable** 109:6 |
| **cell** 9:20 10:6 | **chart** 90:3 | 93:13 94:1,3 | **compensation** |
| 44:19 | **cheaper** 104:15 | 106:5 149:15 | 67:21 |
| **center** 20:20 134:7 | **check** 10:18 38:20 | **comfortable** 58:9 | **competency** 25:9 |
| **centre** 3:16 | **chink** 48:18 | **commencing** 1:16 | **complaint** 5:9 |
| **ceo** 16:20 17:5 | **chug** 93:19 | **commensurately** | 55:10,16 140:9,10 |
| **certain** 11:2 24:7 | **circumstance** | 87:6 | 143:16 |
| 32:17 39:19,21 | 148:3 | **comments** 120:3 | **completely** 55:17 |
| 90:8 | **city** 20:8 148:2 | **commercial** 15:21 | **completion** 32:4 |
| **certainly** 10:13 | 164:2,4 | 16:3 24:2,6 30:10 | 86:4,13 87:1 |
| 39:4 57:2 | **civil** 1:8 18:13 | 31:1 94:14 111:4 | 88:15 89:8 90:11 |
| **certificate** 115:9 | 25:13,18 42:7 | 113:5 118:15 | 90:14,20 92:1,17 |
| 124:21 162:1 | 80:18 81:2 128:7 | **commission** | 141:13,17 142:8 |
| **certify** 162:3 | **claim** 96:7,11 | 164:20 | 144:5,6,14 146:3 |
| 164:5,9,12 | 127:21 129:3,11 | **committing** 92:6 | 155:20 |
| **cetera** 21:1 | 129:14 149:16,19 | **communicate** 10:3 | **complex** 129:4 |
| **cfo** 16:21 17:5 | 153:3 | 34:8 35:18 56:16 | **component** 64:8 |
| **cgl** 112:20,21 | **claimed** 127:4,5 | **communicated** | **compression** 88:1 |
| 114:6,13 131:21 | **claims** 78:20 85:9 | 102:2 | **computer** 10:7 |
| 160:8 | 87:5,8 122:20 | **communicating** | **concern** 39:16 |
| **chain** 79:16 | 125:12,16 126:16 | 41:14,14,17 | 42:1 45:17 57:8 |
| **challenge** 40:16 | 127:7 134:14 | **communication** | 58:21 60:9,15,17 |
| 46:21 | 152:1,3,8,20 | 47:1 56:13 99:17 | 61:5,8 62:7,18 |
| **challenges** 37:1 | 156:20 157:14,17 | 128:5 | 122:18 |
| 87:15 | 158:1 | **communications** | **concerned** 59:16 |
| **challenging** 40:2 | **clarify** 145:2 | 56:1,4 69:20 | **concerns** 41:19 |
| 47:2 | **clarksburg** 38:15 | 132:5 | 62:15 74:5 116:1 |
| **chance** 47:12 | **clarksville** 25:5,21 | **comp** 31:6 | 122:14 |
| 70:10 75:6 82:18 | **clean** 107:10 139:8 | **compacted** 60:18 | **conclude** 93:14,15 |
| 118:6 | **clear** 7:21 91:5 | **companies** 38:8 | 98:2 |
| **change** 146:14,18 | **clearcut** 61:15 | **company** 1:11 | **concluded** 98:4 |
| 163:4 | **clearly** 7:19 124:6 | 2:12 3:3 6:13 | 160:18 |
| | 144:19 | 16:14,17 17:10,11 | |

[concrete - customer]                                                    Page 6

concrete  31:12
condition  72:21
conditions  87:6
   145:17,18
conducted  124:2
confidential  1:1
confused  47:16
confusing  150:2
confusion  88:11
connected  8:5
connecticut  27:1,3
connection  7:21
   19:9
conquer  34:17
considering  22:14
   22:16
consistent  27:17
   35:20
consistently  36:10
   36:19
consists  65:19
constitution  2:16
constructing
   32:11
construction
   18:11,12,14,15
   23:1 25:10,14,18
   30:4 38:16 62:9
   90:1 142:17 143:5
   143:21 144:1
   150:15
constructive  39:20
   57:9
constructor  23:5
   57:16
context  22:13 24:3
continue  57:4
continued  2:21 3:1
   5:1,2
contract  49:16
   53:8 54:20 86:4

86:14 87:3,19
88:3,15,18 89:12
90:9 91:3 92:14
92:18 109:17
110:2 116:20
125:17 135:3
141:18 142:9,17
143:5,21 145:14
145:19 154:11,13
154:20 155:2,2,9
155:16 156:3
contracting  41:8
   41:10 43:2
contractor  27:21
   28:1 40:21 42:7
   127:8 156:8
contracts  23:10
   86:21 91:8 124:13
contribute  33:16
control  33:10,16
convenient  148:1
conversation  54:1
   102:11,12 135:19
conversations
   105:11 132:9,11
conveyed  90:16,20
copied  105:6
copies  162:19
copious  43:4
copy  74:11,14,20
   158:17 159:11
   160:21 161:1,2
corporate  11:3,7
   11:20 12:16,17,19
   13:1 15:4,4,7 95:2
   95:4,20 155:14
correct  6:18 8:6
   13:8 17:3,6 18:4,5
   19:3 22:18 24:14
   24:17 26:9 27:10
   29:3 30:2,7 37:19

40:19 44:11 45:1
67:8,11,18 69:18
73:6,7 77:20 78:4
78:18 79:4,7 80:6
80:7,11 81:5
88:17,20 89:3,6
94:15 96:1,1
103:9 104:1,11,13
104:17 114:10,14
121:10,11 123:2
123:16 128:2
129:12 133:8,12
141:1 143:7 144:9
144:21 145:20
146:3,4,10 149:21
157:17
corrections  162:8
correctly  133:13
correspondence
   4:20 5:6,7 77:12
   84:12 99:7,16,19
   100:1 113:18
   117:21 118:3
   121:7 128:4 130:4
   130:19 131:6,10
   131:12 132:2,4,12
   133:6 134:1,2
costs  33:19,19,20
counsel  131:17
   164:8,12
counselor  51:3
   84:21
counselors  131:13
   131:15
county  96:5 97:1
   97:10,14
couple  19:16 25:6
   26:1 61:2 127:1,2
   127:17
course  90:2 114:5

court  1:3 7:3,10
   7:17
courtesy  7:15
cover  33:13
   115:16 121:18
   122:5,10 128:15
   129:3 156:19
   157:21
coverage  15:15
   53:5,9,10 94:19
   95:19 111:5 113:4
   113:6,12,16
   115:14 116:6
   118:15 122:17
   129:11,16 130:4
   130:13 131:21
   134:14,18,19,20
   154:10,19 155:1,7
   155:15 156:3,16
   157:17,20 158:8
   159:8,12
covered  73:12
   116:18,18 122:20
   129:6 132:1 150:7
   152:3,8
covering  31:1
create  45:8
creates  47:3
credit  2:5
crews  40:13 90:18
crush  59:9
csx  74:3
cunningham  15:3
cunningham's
   13:20,21
cup  63:14
current  104:3,8
currently  125:10
   137:19 138:2
customer  49:19

**cut** 59:4
**cv** 1:9
**cyclical** 25:15

**d**

**d.c.** 2:18
**damage** 72:18
**dangerous** 123:8
**date** 57:2 76:11
86:4,13,17,18 87:1
88:15 89:8 90:11
90:14,20 92:18
144:14 146:3
162:17 163:3
**dated** 47:20 65:21
67:9 70:15 75:10
77:3 79:18 99:7
112:18 117:21
130:20 133:6
148:18
**day** 10:12,12
16:19 17:2 19:2,7
33:3,5 34:11 35:7
35:9 37:17,17
39:3 40:8 49:15
77:10 90:18 139:2
143:11 164:16
**day's** 106:8
**days** 39:5,9
**deadline** 92:7
**dealing** 39:13 41:7
41:11
**dealings** 114:5
**dealt** 42:13
**death** 147:17
**debate** 62:3
**december** 79:18
81:1,7 127:21
128:3 129:1
**decision** 71:2
**declaration** 68:8

**declined** 108:15
**decommissioned**
19:12
**dedicate** 17:16
**deem** 47:6
**defective** 83:12
84:9 134:20
**defendant** 2:11
3:2,12 96:8
**defendants** 1:13
**defense** 80:9
**deficient** 83:18
84:2
**definitely** 26:17
29:16,18 30:16
86:7 97:15 133:14
136:12 144:10
146:10
**degree** 54:7
**delay** 7:20
**delayed** 86:8,9
**delays** 85:11
**delbert** 48:4
**delineation** 29:18
45:9
**delivered** 44:18
**denial** 129:16
130:9,12 131:11
157:12
**denied** 131:8
157:19
**denying** 130:4
**depended** 34:10
**depends** 139:10
**depo** 50:16
**deponent** 1:17
162:1
**deposed** 6:18
13:11,12 15:13
95:1 96:17,18,21
97:4

**deposition** 1:15
4:2 10:3,16 11:20
12:12 15:17,18
50:11 51:5,15,20
52:7,10,21 94:13
95:18 96:10,15,16
112:4 117:8
137:15 147:21
160:1,18
**depositions** 8:8
15:20 94:17 97:6
**depth** 123:4
132:19
**describe** 34:3
**described** 22:20
23:9 37:15
**describing** 49:4
**description** 83:7
84:7
**designated** 12:18
15:4
**designation** 4:12
13:15 14:9
**designations** 13:17
**designee** 11:21
12:16,17,19 13:1
15:5,8
**designees** 15:4,7
**details** 33:2
**detection** 19:11
**determination**
129:10 153:3
159:8
**determine** 158:19
159:12
**determined** 61:14
115:13
**determining** 32:12
32:12
**develop** 32:6

**developing** 32:11
**devote** 17:13
**dialogue** 47:3
**died** 73:3
**different** 6:17 25:6
38:7 62:1 159:4
**difficult** 7:7
**diligence** 123:21
124:1
**direct** 70:19
112:18 150:8
**directed** 100:1
130:21 133:7
**direction** 121:21
**directly** 40:21
56:17 91:8
**directors** 116:13
**disclosure** 69:5
**discourse** 39:20
**discovered** 87:10
**discovery** 26:5
27:14 48:19
113:21
**discuss** 45:4 152:1
152:2,7
**discussion** 32:21
63:1,6,7 65:10
69:19 90:13 92:10
154:2
**discussions** 97:2
**disposition** 98:2
**dispute** 47:9 50:17
**disruptive** 10:16
45:7
**dissatisfaction**
41:19
**district** 1:3,4
**dive** 33:1
**divide** 34:16
**division** 1:5 23:7
23:12

CONFIDENTIAL

**[document - examined]**                                                Page 8

document   12:3
    47:12 72:3 93:9
    111:3 118:14
    124:11 131:3
    140:12,14 143:21
    148:13
documentation
    48:17
documents   88:11
    93:7,8 94:2 143:2
doing   7:6 10:15
    25:8 27:11 30:5
    34:13,14 35:21
    60:1 103:9,9
    109:13 110:10,14
    115:17,19 121:18
    124:17 130:6
dollar   156:9
door   146:7
dor   105:10 116:14
doubt   76:14 78:5,9
    86:12
doug   126:20
downs   46:7
dr   85:10,15,16
drawings   58:3
drill   52:13 72:12
    122:17
drilled   19:16 32:9
drilleries   71:17
drillery   72:17
drive   1:18 9:9
driving   148:1
drove   59:17
due   63:3 76:11
    85:21 106:12
    123:21 124:1
duly   6:5 164:7
duration   17:4
dwayne   135:20

**e**

e   2:10,20 3:11,20
    4:13,14,15,16,18
    5:5,8 10:19 12:8
    43:16,16,17 44:1
    44:15 46:5 47:18
    47:18,18,19 48:2,3
    48:14 49:3,10
    51:21 53:15 54:19
    56:8,20,21 65:20
    69:16 70:15,20
    71:9 73:15 77:13
    77:15 79:16,17,21
    80:3,5,6,17 81:7
    83:4 85:8 105:6
    112:17 113:5,9,17
    114:9,12,16 118:2
    121:6 122:12
    127:3 134:4
    142:15 143:3
    148:17 149:1,2,12
    151:21 152:4
earlier   12:15
    13:10 22:15 43:1
    63:21 133:13
    137:15 145:3
    151:20
early   45:17 133:19
earth   71:16 72:11
    72:12,16
easier   7:17
eat   105:18
eating   105:16
    106:11
ed   42:13
edition   112:21
educate   118:5
effect   149:21
effective   111:6
    118:16 134:12
    135:13

efficiency   19:18
effort   49:7,8 136:9
ego   58:7
either   38:1 54:18
    93:4 114:2
electronic   161:1
electronically   8:4
elite   95:6,7,10,20
    96:8,12,15 97:9
emotional   46:5
employ   31:9
    133:12
employed   95:7
    98:12 138:7
employee   18:1
    133:19
empty   8:9
enclosed   75:17
ended   56:12 98:1
endorsement
    120:2,7
endurance   69:4
endure   59:8
energy   111:5
    118:15 138:3
engage   19:8
engaged   29:15
    81:2
engineer   85:16
    91:7
engineering
    158:10
ensure   155:9
entire   36:6 91:3
    98:11 112:8
    155:20
entrepreneur
    17:14 137:16
entry   18:15
epidemic   46:21

equally   66:16
equipment   21:4
    31:11 86:2
equity   16:13,17
    18:4,6
eroded   51:7
errata   162:9,19
    163:1
especially   116:7
    156:9
esquire   2:3,13 3:4
    3:14
essence   88:19
    140:21 141:5
essentially   43:6
    53:3,4
estate   24:4,5,6
    138:8
estimating   21:1
estimator   42:13
et   21:1
evaluate   105:9
evaluating   20:21
    56:14
event   72:21
everybody's
    105:17
evoked   130:13
evolved   86:18
    130:10 146:12
exact   12:10 28:3
    30:12 60:14 91:1
exactly   48:8 54:5
    97:3 102:8 109:13
    151:4 152:14
examination   4:5
    6:8 94:6 139:19
    154:3 156:12
    164:9
examined   6:7
    162:4 164:8

CONFIDENTIAL

**[example - fire]**                                                                Page 9

example  45:16
  49:5 90:3
exchange  48:14
  49:5
exclamation  8:8
excluded  104:13
exclusion  120:7
  158:12
exclusions  104:10
  117:12,13,16
  123:7 155:5
  158:14
excuse  13:14 99:9
  99:10
executed  145:21
executing  33:12
  37:3
execution  23:17
  42:1 145:12,12
executive  67:20
  68:8 79:3,6
exemption  67:20
exhaustive  28:10
  28:13 108:10
exhibit  4:10,11,12
  4:13,14,15,16,17
  4:18,19,20,21 5:4
  5:5,6,7,8,9 8:4,5,7
  11:13,15,19 12:12
  14:20 43:8,9,15
  44:1 47:13 65:11
  65:15,18 66:10,18
  67:4,5 68:5,11
  70:4,6,9,12,14
  74:16,16,17 75:6,9
  79:10,13,21 80:1,2
  80:4 82:16,19
  83:2,3,3 84:15,16
  84:17,19 99:3,21
  100:18,18,19
  101:18 103:12

108:3 110:19,20
  110:20 112:4,14
  114:19 117:7,9,12
  117:20 118:11,13
  121:4 127:12
  130:15,15,16
  132:21,21 133:2
  136:20 139:13,15
  139:20 140:2
  143:1,9,15,15
  147:3,11 148:9,12
  150:9 151:20,20
  153:2,5,6
exhibits  8:3,9
  11:10 93:3 98:10
  114:18 127:10
  140:9 142:15
  143:3
exist  158:14
existing  121:16
  159:6
expect  124:3
expected  55:8
expedited  161:3
experience  18:11
  23:19 24:1 126:3
experienced  57:15
expires  164:20
explain  45:14
explained  91:17
explicit  54:21
explicitly  40:5
  46:13 53:9 59:16
  86:6 155:9
express  41:18 60:9
  62:6 124:14
extend  7:14
extended  87:6
extending  86:21

**f**

fabricated  64:16
face  62:13,20
  71:15,15,20 72:10
  72:12
fact  115:15 116:19
facts  51:5,6
fail  150:17,21
failed  151:4,5
failing  149:20
fair  25:8 28:16
  29:20 35:11 55:19
  55:21 87:10 131:2
  131:4 132:2,3
fallen  72:17 78:3
falling  124:9
falls  29:18
familial  81:18
  82:8
familiar  7:1
fantastic  34:6
far  29:6 103:3,3
  104:14 108:20
  109:12 111:18
  124:12 126:15
  129:1 133:21
  135:8,12 137:14
farris  42:13
fashion  18:1
fast  92:7
favor  62:9
february  24:17
  43:17 45:21 56:21
  70:16 73:4 99:8
  100:9 108:9
  112:18 113:17
  121:7 130:20
  132:12
federal  2:5
feedback  101:2,5
  105:3 128:14

feel  8:18 58:8
  61:16 76:20
  140:14 162:8
fell  78:1
felt  25:18 33:10,11
  58:12 60:2 87:14
  124:6
fi  44:19
field  9:4 92:3 95:6
  95:8,10,20
fields  104:2 120:1
figure  20:2
figured  150:5,6
file  55:11 108:4
  139:18
filed  85:20 87:4
  97:9 143:16
filings  85:12,18,20
fill  60:10,14,20
  61:21 120:2,12
  153:12,14
final  136:6 141:10
  141:13
finalized  145:15
financial  23:10
financing  76:21
find  14:4 40:15
  66:8 75:17 98:10
  125:21
fine  10:17 51:2
  93:18 97:18
  105:17 133:16
  161:2
finish  7:12,15
finished  72:2
  79:11 89:17,20
  160:16
finishes  72:4
finishing  25:19
fire  1:10 2:12 3:3
  119:18

**[firepower - going]**

**firepower**  59:8
**first**  6:5 16:18
  18:15 22:9 39:10
  40:4 41:6 44:1
  45:4 59:19,19
  61:7 62:7,10
  65:19 66:9 76:19
  80:4 84:19 90:21
  100:2 103:16
  107:3 113:9 114:8
  115:4 127:6,20
  128:2,5 142:16
  154:7
**fitzgibbon**  2:13
  4:6 6:8,12 13:18
  14:3,7 43:7 47:10
  50:13,19 51:11
  63:9,12,16,20 65:4
  65:13 70:2 74:15
  93:1,11,21 98:18
  105:20 106:12
  107:3,9,16,20
  139:1,4,8,13,17,19
  146:5 147:2,7,9,15
  148:3,5 153:19
  160:15
**five**  6:21 13:11
  48:19 61:3 94:13
**fix**  58:14 61:9 62:2
**flag**  62:17
**flare**  46:6,7
**flaw**  61:12
**flip**  142:14 143:8
**focus**  21:5 36:17
**focused**  33:12
**focusing**  25:12
**focussed**  17:15
  33:9
**folder**  8:9 130:15
  132:21

**folks**  37:18 45:15
  130:6
**follow**  156:13
**followed**  58:1
**following**  147:12
**follows**  6:7 113:13
**food**  29:10
**forbid**  73:1
**foregoing**  162:4
**forget**  27:6 133:10
**form**  66:21 67:13
  67:16 112:20,21
  113:4,6,12,16
  114:6,13 120:2
  122:12 131:21
**formal**  82:3,5
  128:2
**formally**  17:9
  133:18
**formerly**  95:7
**forms**  15:21 136:2
**forward**  109:6
  114:14 123:9
**forwarded**  113:16
**forwarding**  76:16
  80:8
**found**  116:8
**foundation**  19:17
**founded**  24:16,18
**four**  120:1
**fourth**  76:5 104:7
  119:21
**freaking**  63:2
**free**  8:18 16:11
  140:14
**friday**  1:16 65:8
  148:18
**friend**  22:7 34:6
**front**  134:7 146:6
**fronts**  80:19 81:4
  81:10 128:8

**frozen**  81:15
**full**  74:13 106:8
**further**  36:21 49:5
  60:21 61:13
  123:21 153:20
  160:15 164:9,12
**future**  21:1

**g**

**gantt**  90:3
**gap**  116:7 127:17
**garrett**  42:12,12
  44:2,7,16,18 47:5
  48:12
**gas**  18:13 25:7,8
  25:15 26:2 38:15
  53:10 96:8
**gear**  52:13
**geared**  136:5
**general**  4:19 30:10
  31:1 39:15 60:15
  61:12 62:15 75:18
  78:6 103:21 113:5
  119:6,16 122:14
**generally**  20:11
  42:6 46:2,3
**gentleman**  102:12
**getting**  11:11 32:1
  34:18,18 41:10
  42:3,18,19 73:8
  77:2 101:1,4
  115:11 116:10
  127:6 147:16
**give**  33:17 53:5
  70:3 97:17 102:20
  109:15 118:7
  131:14
**given**  15:20 36:6
  36:21 103:6
  116:19 155:18
  162:5

**gives**  136:11
**giving**  78:20 83:18
**global**  58:19 59:1
  60:17 61:12
**go**  13:15,18 14:14
  28:11 31:6 32:7
  32:21 33:2 39:19
  42:18 46:18 49:6
  50:6 56:19 57:4
  71:20 82:7 84:16
  97:20 108:20
  110:20 112:14
  117:11 120:6
  121:4 123:12
  127:11 136:13
  139:5,5,11 140:20
  141:8 149:9 151:2
**goal**  16:12 49:12
**god**  27:4 73:1
**going**  6:16 8:19
  10:2 11:11 14:17
  25:18,20 27:13
  32:5 33:5 34:18
  39:18 40:16 42:3
  43:7,12,12 44:16
  47:8,10 50:15
  51:4 52:2 53:6
  54:5 55:1 56:12
  57:1,21 58:14
  59:4,5,8,11 60:6
  62:1,2 70:2 71:13
  74:15 87:14 91:16
  91:20,21 93:2
  98:3,16 100:18
  105:16 106:4,17
  107:7 108:2 109:6
  111:18 114:8
  115:7,18 123:9
  128:10 135:10
  139:1,6 146:16
  153:2

CONFIDENTIAL

**good** 6:9,10 8:2 9:1 10:20 12:20 13:3 17:19 23:4 23:14 25:13 33:7 36:8,9 40:7 42:9 42:18 46:9,14 57:20 60:2 63:10 93:10,19 102:18 105:21 109:11 118:8 122:8 139:2 140:4
**gotten** 11:14 105:3 113:15,19 115:1
**grant** 111:8,9
**great** 34:6 63:11
**greene** 96:5 97:1
**greg** 39:14 41:11 43:18 45:6 46:4 46:21 48:17 49:14 59:6 124:18
**group** 2:4
**grout** 31:13
**grouted** 19:12 32:9
**guess** 74:9 91:18 136:5 159:3,19
**guy** 23:8,10 33:3 42:18 47:7 71:18 100:15 102:4,7
**guys** 31:12 46:10 49:1 59:7 103:3 107:5 114:1 123:15 160:17

**h**

**hadjs** 39:14 41:2,7 43:18 47:19 48:4 91:5 124:18
**half** 106:13
**halting** 62:9
**hammered** 93:20

**hand** 129:21 164:15
**handle** 29:13
**hands** 77:11
**hang** 98:9 117:5 146:5
**happen** 57:11
**happened** 58:16 59:16 72:1,8 98:4 123:6
**happy** 102:17
**hard** 40:10 45:13 92:6 106:18,20
**hats** 38:7
**hauling** 19:6
**head** 43:3
**heading** 143:2 150:9
**headquarters** 20:16 21:6,14,17 21:19,21
**hear** 51:12 94:10 133:13
**heard** 52:14 122:9
**hearing** 101:5 107:4
**heath** 3:21 15:6 18:17 20:19 22:3 23:17 25:11 29:9 31:19,21 33:3 40:6,8 41:15 45:12 52:9 57:17 58:10 61:15 62:15 63:2 90:16 91:16 135:18 153:16
**heath's** 25:9
**heavy** 18:13 25:10
**hectic** 38:20
**held** 1:16 65:10 154:2

**help** 7:18 8:1 11:9 145:2,5
**helped** 29:16
**helpful** 128:14
**helping** 16:10,15
**hey** 57:18 123:6 146:14
**high** 19:18
**highlighted** 60:12
**highly** 32:18 151:18
**hill** 1:19,21 21:12 21:13,15,20 22:1 72:12 73:1 164:3 164:19
**hire** 112:13 158:15
**hired** 85:17
**historical** 16:8 51:21 109:5 115:16 117:1
**historically** 27:12 88:5 102:16 115:8 123:7 138:13
**history** 121:17
**hit** 11:12 71:17,18 72:12,13,17 122:17
**hold** 18:6
**holder** 69:4
**holiday** 65:8
**home** 38:10,12
**honest** 58:10 146:21 152:15
**honestly** 41:21 58:5,7 62:11 76:18 90:10,12,12 150:2
**hopeful** 37:11
**hotel** 97:1
**hour** 10:14 63:13 106:13

**house** 152:20
**huge** 124:11
**huh** 9:1 10:1 15:1 19:1,3 22:2 24:14 64:3 68:21 70:18 70:21 75:12,20 94:16 112:16 114:11,15 120:5 120:10 121:5 138:18 159:10
**hunch** 50:2
**hungry** 93:16
**huntington** 3:9
**hurt** 46:11 73:2

**i**

**idea** 33:17
**identification** 11:16 14:21 43:10 47:14 65:12 70:7 74:18 79:14 80:2 82:20 99:4 100:20 117:10 130:17 133:3 140:3 148:10
**identified** 85:10
**identify** 87:16
**identifying** 117:7
**imagine** 31:20 64:9
**immediately** 59:20 67:1 90:18 150:13
**impact** 155:6
**impacted** 61:10
**important** 123:3
**impossible** 64:8
**incept** 73:6
**incident** 46:17
**inclination** 59:19
**include** 143:4
**included** 154:13

**including** 75:17
92:17 125:18
**inconsistent** 50:21
51:8
**inconvenient**
147:20
**incorporate** 90:8
**incorporated**
144:20 145:4
146:1
**incorrectly** 58:1
87:7
**increase** 45:20
**increased** 146:15
**incredibly** 20:1
**indemnification**
125:17,18 130:5
**indemnify** 85:9
**index** 4:1 5:2
**indicates** 44:16
**indicating** 151:21
**indication** 46:17
**individual** 9:18
31:5 48:3
**inflection** 59:2
**information** 84:6
90:19 109:14
126:9,12 136:3
150:21
**initial** 86:13
123:17,20 130:9
130:11 140:16
151:6
**initially** 41:21
**initiated** 6:14
**input** 151:16
**inputs** 31:20
**inside** 71:16 72:11
**install** 57:21 61:5
**installed** 150:16

**instance** 54:12
**instructions**
108:19
**insurance** 1:10,11
2:12 3:3,12 4:21
6:13,15 23:10,19
24:2 29:14,17,18
29:21 53:5 54:8
55:5,6,12,17,18
56:1,5,15,17 64:20
66:4 69:14,17,20
75:14 76:3 77:19
78:13,14 80:16
81:8,9,19 82:9,11
84:8 94:8,19
95:11,13,15,18
96:11 97:4,6,9
98:5,13 101:12
102:2,13 103:2
104:19,21 105:9
105:10 108:7,12
108:14,21 109:6
109:19 111:4,5,12
111:19 112:5,7,13
114:2,6,10,19
115:1,2,9,12,20
116:1,2,4,14 117:2
117:13 118:15,15
119:16,18 121:8
121:12,13,14
122:1,3,8,19,20
123:4,16 124:12
124:15,16,19,20
124:21 125:1,4,14
126:12 127:20
128:20 129:2,7,9
129:18 130:21
132:6,11 133:7
134:10 135:5,9,13
136:3,16 137:10
137:13 138:10,11

151:10 152:2,6,15
152:18 154:8,10
154:12,14,18
155:4,12,15 156:1
156:3,9,16,18
157:2,4,5,7,10,15
157:21 158:8,13
158:15,16,18,18
158:19 159:1,2,6
159:10,11,21
160:8,9
**insured** 108:8
115:19 156:7
**insurers** 78:13
**interested** 16:10
164:13
**international** 1:7
11:4,8,21 13:7
101:12 111:6
112:5
**internet** 7:20
**interpret** 54:13
**interrupt** 96:4
**introduce** 8:3,4
47:11 50:18,20
70:3
**introduced** 42:21
**involved** 17:21
18:2 28:18 32:18
37:17 98:13 110:6
110:6 125:12
132:16 133:18,20
137:17 138:2
150:10 152:13,19
160:7
**involvement** 37:16
**involving** 16:3
94:19
**irate** 153:17
**isolated** 60:6

**issue** 30:9 61:15
76:2 95:19 139:9
145:10
**issued** 78:15
**issues** 6:17 11:2
77:19 82:1 85:10
126:3,5,10
**it'll** 7:16 14:3
**item** 107:10
142:16 158:20
**items** 104:12

j

**jacks** 2:3,4 4:8
13:14 14:1 50:7
50:14 51:2 52:5
52:17 93:16 96:3
96:19 97:5,13,17
106:2,7 107:5,11
125:16 139:6
147:4,8,20 153:21
154:3,4 156:10
160:13,20 161:1
**jackslegal.com**
2:10
**jeff** 44:2,12,13
135:17
**jf** 39:15 40:17 41:3
41:19 42:2,10
45:14,18 46:19
48:9 49:6,6 57:2
80:9 85:21 87:13
88:4,8,14 89:13
90:1,7,9 91:7,8
92:11 125:8,19
140:17 146:14
**jfa** 59:2 85:8 87:2
87:5 89:14 92:15
135:3
**jim** 105:8
**jimmy** 132:16
135:20

CONFIDENTIAL

**job** 16:12,15 25:21
27:3,5,6 28:8,15
29:17 32:1,4,12,13
32:16 33:1 37:12
37:14 41:12 42:9
42:18 55:1 74:3
109:16 115:7,8,12
146:11,15 156:9
**jobs** 19:21 20:1,6
20:8 21:1 25:18
26:2 27:2,20 28:2
28:3 37:10 39:19
42:2,4
**jog** 51:10
**jogging** 145:13
**jogs** 93:10
**johnson** 99:9
**johnston** 65:20
66:8 75:11,13
79:18
**johnston's** 75:16
**join** 16:5,7
**joined** 16:12,18,20
18:10 22:4,8 25:2
25:7
**joining** 22:14,17
**jumped** 153:7
**june** 75:10 76:16
77:17 148:18
164:16,21

**k**

**kathy** 38:18
**kay** 79:17
**keep** 58:15
**keeping** 45:10
**kefover** 3:21 15:6
18:18 22:4,6 23:6
24:15 28:14 30:3
34:5,9 35:6 41:18
44:2 45:2,4 52:7
52:20 54:2 59:14

79:6 90:21 151:16
**kefover's** 44:15
**kelly** 65:20 75:11
75:13 99:9
**kentucky** 26:7,15
**killed** 72:18
**kind** 16:13 18:14
19:12,17 20:18,19
24:5 25:9,9,12,14
31:21 32:3 33:3,8
33:9,12 34:15,16
36:1,5,16 37:7,9
38:6 40:1 42:1,3,5
42:6,18,21,21 43:2
45:8,14 46:3,4,5,6
46:6,20 47:4,4
48:18 49:10,13,21
50:1 53:1,13,18
54:9,21 55:2,8
57:18 58:13,15,19
58:20 59:1,3 60:2
60:6,16,21 61:7,12
62:4 73:19,20
74:4 87:12 91:12
91:16 92:3 98:8
106:9 109:14
110:9 116:9
123:11,20 124:1,4
130:12 131:14
132:18 134:6
136:17 145:10,16
146:11 147:12
**kinesiology** 54:7
54:11
**kinsale** 30:18
73:10,13 104:3,6,8
104:16 116:5
117:1 121:16
122:5 149:10,14
149:17,20,21
150:4 151:1,11,14

153:4 154:9 155:6
157:13,19
**knew** 22:11 61:16
103:8,9 123:15
**know** 11:6 12:7
16:10,13 17:13,15
17:18,19,20,21
18:1,15 19:13
20:1,5,7,7,9,10,11
20:11,21 22:6,17
22:18 23:1,18
25:9,13,14,17 26:2
27:11,21 30:15
31:4,5,11,12,13,19
31:21 32:1,2,3,4,7
32:8,10,14,18,19
32:20,20,21 33:3,4
33:7,8,8,10,11,11
33:12,19,20 34:1
34:11,12,15,16,17
35:20,21 36:1,4,6
36:7,14,17,17,19
36:21,21 37:1,2,3
37:4,7,8,9 38:6,8
38:14,17 39:1,3,18
40:1,5,6,9,12,14
40:15 41:9,12,12
41:13,14,21 42:3,4
42:8,9,15,17,18,19
42:19,20,21 43:1,2
43:3 45:6,8,9,11
45:13 46:2,3,4,7,8
46:10,11,12,13,21
47:3,4,5,6,7,7,8,9
47:11 48:19,20
49:1,2,12,14,17,18
50:1,3 51:5,8,8,9
52:12 53:3,7,9,10
53:10,12,12,13,15
53:17 54:6,14,15
54:15,20,21 55:1,1

55:3,4,5,7,8,9 57:6
57:8,8,10,11,12,13
57:14,15,17,19,20
57:21 58:1,2,7,7,8
58:9,10,11,13,14
58:15,15,17,18
59:4,6,17,21 60:2
60:3,5,15,17,18
61:1,3,3,4,5,8,9,14
61:16,18,19,19,20
62:11,13,13,15,16
62:18,19,21 63:1,2
64:13,17 71:13
72:20 73:1,3 74:2
74:7,19,21,21 75:6
75:13 76:3 77:2,8
77:9,9,15 79:11
81:6,12,18 82:2,17
86:6,15,18 87:3,5
89:15 90:1,2,3,4
91:5,11,12,13,14
91:18,20 92:5,7
93:11,12,17 98:20
102:10 103:6
105:4,4,4,5,6,15
106:7,11 108:19
109:7 110:1,5
111:9 114:7 115:7
116:3,4,7,8,12,16
116:17,19,21
117:4 121:1,20
122:7,8,9,11 123:6
123:10,10,12,13
123:13,20 124:5,5
124:6,8,9,11 125:7
125:9 126:6,6
127:5 128:18,19
129:2,4,9 130:8,9
130:11,11 131:8
132:15,17,19
133:20 134:5,7,16

135:18,20 136:1,2
136:14,14,15,16
137:5,14 138:13
139:21 143:18
144:10 145:11,11
145:16,17 146:11
146:11,13,14,20
147:5 149:6,8
150:3,4 151:2,3
152:12,14,20,21
153:9
**knowledge** 64:14
86:20 125:13
**known** 115:18
122:8 134:17
**knows** 52:15

**l**

**l** 3:4
**label** 66:21
**labeled** 69:3
143:21
**labor** 23:7,12
**lack** 124:15
125:18 128:11
**lady** 152:20
**laid** 146:16
**landfill** 19:6
**landslides** 69:21
**language** 116:20
**large** 20:1 25:20
**larger** 139:18
**largest** 40:11
**lasota** 126:20
127:4
**late** 106:13 133:19
**law** 164:8
**lawsuit** 6:13
**lawyer** 55:8 80:14
**lawyers** 131:16
152:12 153:9

**lay** 153:16
**learned** 54:6
**leatherman** 48:3,4
48:7,10
**leave** 17:7
**leaving** 155:21
**left** 17:8,10 19:4
30:14 48:9 60:3
92:3 133:11
**legal** 2:4
**lengthy** 140:12
**letter** 4:17 75:10
75:16 76:15,19
77:2,3,4,8,16
83:17 84:2,4
85:11 126:20
127:4,18 130:9
149:10 151:8,13
151:17
**letterhead** 130:20
133:7
**letters** 84:5
**level** 58:12 73:20
**liability** 4:19
30:10 31:1 75:18
78:6 96:7 103:21
113:5 119:6,7,16
158:8,9
**liberty** 1:10 2:11
3:2 6:12,14 30:8
30:14,15 55:11
56:3,3,12 73:5
74:12 76:1,7,11
78:7 83:11 87:20
100:4,8 102:14
103:15,20,20
104:3,11,15,18
111:4 113:3
114:10 116:11,15
118:14 119:16,18
120:16 121:9,19

122:1,7,12 129:17
129:19 130:4,20
132:7,13 133:7
136:17 137:2,6
141:15 150:5
151:11 154:16,18
155:5 157:13,19
**lien** 85:11,18,20
**liens** 85:20
**life** 7:16 38:20
111:10
**limited** 18:1 19:10
**limits** 119:7
**line** 36:19 52:17
66:3,11 68:3,11
100:2 121:12
163:4
**lines** 31:6 82:2
108:8,21 110:16
110:17 138:1
**list** 28:13
**listed** 142:16
**litigation** 15:14,21
16:3 35:1 80:19
81:2,10 85:4
94:18 98:3,7
125:10 128:7
130:5 131:18
134:15 156:21
157:14
**litigator** 85:1
**litigious** 39:18
**little** 7:20 10:15
43:3 52:10 76:20
112:10 119:20
159:3
**lived** 35:13
**llc** 3:15 83:11
101:12 141:16
**llp** 2:15 3:6

**load** 13:15 98:21
117:6
**loaded** 100:21
140:11
**loading** 98:15 99:1
100:17 108:3
117:8 140:7
**located** 24:8 26:2
**lock** 60:19 61:16
**long** 22:8 93:6
139:7
**longer** 18:2 133:19
**look** 10:10 56:10
70:9 79:10 92:20
103:19 109:5
118:12 119:20
127:3 131:10
144:13 147:13
152:11
**looked** 12:10 53:8
56:20 59:18 112:1
134:6 144:7,19
**looking** 23:15 56:7
67:3,3 69:15 72:3
102:17 108:17
111:1 115:11,12
121:1 136:19
142:2 145:8
**looks** 69:15 73:7
80:7 84:11 99:15
99:18,19 101:14
104:6 108:10,18
126:19 128:1
**lost** 117:5
**lot** 17:19 20:12
25:18 38:15,15
41:15 84:4 101:2
101:4 105:11
152:12
**loved** 17:19

**lower**  113:10
**lunch**  8:14 93:5,15
  93:15 94:1 140:4
  140:5

**m**

**machinery**  64:7
**mail**  2:10,20 3:11
  3:20 4:16 5:5,8
  10:19 43:16,16,17
  44:1,15 46:5
  47:18,18,18,19
  48:2,3,14 49:3,10
  53:15 54:19 56:8
  56:20,21 65:20
  70:15,20 71:9
  73:15 77:13 79:16
  79:17,21 80:6,17
  81:7 85:8 112:17
  113:9,17 114:9,12
  114:16 118:2
  121:6 122:12
  127:3 134:4
  148:17 149:1,2,12
  151:21 152:4
**mailed**  75:8 77:4
  77:15
**mailing**  21:7,20
**mails**  4:13,14,15
  4:18 12:8 51:21
  69:16 80:5 105:6
  113:5
**main**  20:9 90:8
  121:1
**mainstream**  83:11
**maintain**  109:1
**maintained**  108:8
**major**  42:1,6 57:7
  60:1
**making**  90:2
**malvern**  9:5

**manage**  16:16
  33:20 58:6
**management**
  23:18 29:19 87:13
**manager**  41:3
  42:10 44:9,10
  47:5
**managers**  44:14
  48:11
**managing**  18:15
  37:2
**manifest**  54:8
**manifestation**
  50:4
**manifested**  54:12
**march**  35:8 47:20
  56:21 57:2 86:4,9
  86:13 87:1 88:15
  89:9,17 90:14
  117:21 126:2,11
  144:14 146:3
**mark**  11:12 14:17
  43:7 74:15 83:11
  85:10 87:3,8,11,16
  87:18,20 88:4,14
  89:12 90:9 91:4
  92:14 141:15
  142:18 147:3,15
  153:11
**marked**  4:10 5:4
  8:8,9 11:15,19
  13:19 14:20 43:9
  43:15 47:13,17
  57:3 65:11,15
  66:18 70:6,9,12
  74:17 75:5,9 79:9
  79:13 82:19 98:16
  99:3 100:19 112:4
  117:9 127:10
  130:14,15,16
  132:21 133:2

  140:2,8 148:9,12
**market**  1:12 3:13
  6:15 53:5 55:12
  55:17 69:20 75:15
  81:8,19 82:9 84:8
  100:5 105:11
  114:3,6 115:2,19
  116:1,2,14 117:13
  122:19 124:20
  126:12 127:20
  129:9,18 132:6,11
  136:16 138:11
  152:2,6,15,18
  154:8,18 155:4,12
  156:1,6 158:18
  159:11
**marketing**  101:18
**markets**  100:4
**marking**  82:16
  99:21
**married**  138:5
**maryland**  27:8,9
  27:12 164:1,4
**massie**  3:4
**master**  32:1
**master's**  54:7,11
**material**  60:10,18
  64:7 72:18 86:1
  146:20 153:18
**materials**  35:21
**matter**  17:20 35:1
  44:3 80:19 93:10
  128:8 129:16
  147:20 149:10,11
**matters**  15:20
  94:14
**maxwell**  3:16
**mean**  12:6,7 29:16
  31:10 32:18 34:10
  35:15 36:10 41:9
  53:6 54:13 62:12

  64:9,10 71:15
  72:14 77:2 93:17
  96:12 99:15 106:2
  106:10,17 109:10
  109:14 110:16
  112:12 114:7
  120:21 121:1
  125:18 128:10
  131:7,15 132:15
  152:12
**means**  32:6 61:12
  71:19
**meant**  54:14
**mediation**  97:2
**meet**  22:9,13
**meeting**  87:15
  107:2 137:9,12
**meets**  93:5
**memory**  51:7,10
  91:2 93:10 145:14
**men**  86:2
**mentioned**  13:10
  26:1 28:5 29:1,1,6
  31:8 33:15 44:8
**messed**  53:20
**met**  22:3
**method**  61:12
**methods**  32:6
  71:19
**michael**  2:3 154:4
**micropile**  110:7
**micropiles**  19:16
**mid**  37:8 102:2,13
  103:2 104:20
  105:12,13,14
  108:12,20 109:12
  109:15,19 111:12
  111:19,21 112:7
  114:2,20 117:18
  121:15 123:15

**middle**  40:12 59:18 80:5 85:7
**midstream**  87:20 141:15
**mike**  2:10 50:6 52:1,3,4 93:12 96:14 97:3,11 106:1 107:4 134:5 139:4
**mike's**  156:14
**million**  156:9
**mind**  10:13 32:15
**mine**  74:4 139:6
**mini**  44:17
**minute**  14:4 56:19 97:17 106:14 107:13 139:18,21 144:7
**minutes**  10:9,15 52:16 60:5 63:17 106:3 107:8 139:9
**missed**  126:21 127:2,18
**mitch**  100:14,15 105:13,14
**mitigation**  49:13
**mobile**  44:17
**mobley**  34:19,20 35:2,5,19 36:12 37:12,16,17 39:11 44:3 56:2,20 64:5 64:15,20 69:21 71:3 81:3 87:17 87:19 88:1 109:19 110:2 116:18,19 124:13 125:11 126:4,16 130:7 131:18 134:15 141:14,17 142:9 143:21 149:16 154:11,20 155:1,2

155:6,7,11,16,20 156:3,20 157:13
**mode**  50:1
**moment**  39:13 46:2 98:9 117:5
**moments**  127:17
**monday**  65:21 79:18
**monetary**  92:1
**money**  146:17
**months**  22:11 77:1
**morgantown**  2:8
**morning**  6:9 8:13 52:11,12 54:1 63:21
**mouth**  129:21
**move**  21:13,14 60:7 62:2 104:8 127:9
**moved**  21:21 45:5 86:19
**moving**  25:14 44:17 45:3 58:15
**mullins**  2:14 3:5
**multiple**  28:16 30:21 37:5 38:7 65:19 80:19 81:3 81:10 83:13 84:10 87:4,4 116:21 124:10 128:8
**mutual**  1:10 2:11 3:2 6:13,14 22:7 30:8,14,15 55:12 56:3 73:5 74:12 76:1,7 78:7 100:5 100:8 102:14 103:20 104:11 111:4 114:10 116:11,15 118:14 119:16,18 120:16 121:9 129:19

130:4,21 132:7,13 133:7 137:6 154:16,19 155:5 157:13,19

**n**

**name**  6:11 25:4 27:7 42:11 94:7 100:12 102:5 120:2,7 149:7 163:3
**named**  48:3 164:5
**nature**  134:14
**near**  74:6
**necessary**  156:2 162:9
**need**  8:12,14 10:18 19:11 50:17,20,20 59:4 61:9 63:14 88:12 93:3,3,7 107:13 140:15 161:2
**needed**  45:8,11,12 49:17 55:18 72:20 162:19
**needing**  52:13
**needs**  82:11
**negotiation**  91:4 116:15
**nelson**  2:14 3:5
**nelsonmullins.c...**  2:20 3:11
**never**  49:14 90:4 96:15 97:3,4 111:10 122:9 125:8,9
**new**  19:13 20:8 26:7,16,17 48:10 110:16,17 115:7,8 115:12,14 116:7 116:16 117:12,13 117:19 154:21

**night**  40:9 53:8 62:13,21 90:18
**nightmare**  58:19 59:1
**non**  85:21 145:9
**nonpayment**  86:1
**nontreed**  91:14
**normally**  9:12
**north**  27:15
**northern**  1:4
**northgate**  1:18 9:9
**northwest**  2:16
**notarial**  164:15
**notary**  1:19 164:3 164:19
**note**  40:10 66:7 113:2
**noted**  104:12
**notes**  40:7 43:4
**notice**  4:11,19 11:20 78:13,20 81:9,12,13 82:3,6 126:15 127:7,20 128:2
**november**  83:17 84:1 126:19 127:4
**number**  30:13 61:10,21 68:5 70:13 75:18,21 76:1,4 78:6,7 110:20 118:17,18 118:19 120:2 139:13
**numbers**  80:2 83:3 148:13
**numerous**  124:7

**o**

**o'clock**  107:1,2
**oath**  53:21 54:4
**obfuscate**  159:20

[objection - pages]                                                                                          Page 17

**objection**  105:19
105:20 106:2
**objections**  124:15
125:4
**obscure**  92:4
**obtain**  30:10
**obtained**  30:15
**obtaining**  56:4
**obviously**  32:2,5
37:5 41:13 60:8
60:12 115:15,21
123:18 139:10
145:18 152:12
**occasion**  52:6
111:20
**occasions**  116:21
124:7,11
**occur**  116:17
**occurred**  59:20
71:15 73:1,2
115:21 122:16
123:21 133:19
**occurrence**  78:14
83:7 84:7
**occurring**  56:14
**october**  35:7 133:6
**odds**  19:21
**offered**  104:20
**office**  9:3,11,13,15
9:17,18 20:9
37:21 39:2 44:4
77:8,9
**officer**  67:20 79:3
79:6
**officer's**  68:8
**offices**  9:4
**offsite**  153:12
**oh**  28:17 34:10
41:5 77:20 99:14
117:5 148:21

**ohio**  26:3,8,15,18
26:19
**oil**  18:13 25:6,8,15
26:1 38:15 95:6,8
95:10,20
**okay**  7:1 8:3,10,21
9:7,15,20 10:10,17
10:20 12:11,15,21
13:2,10 15:12,18
16:5 19:4 20:3
22:3 24:11 26:1
27:13 28:4 30:20
31:7 35:3 41:5
43:13 44:15 45:20
51:2 52:20 54:19
59:10 61:9 63:9
64:18 65:2,18
67:19 69:12,19
70:2,12 72:6
73:16 76:14 79:9
79:15 80:17 82:12
83:1,6 84:14 85:7
88:10 93:21 94:7
95:4 97:8 98:9,15
98:19 99:6 100:17
100:21 101:3,10
101:16 102:6,10
104:14 107:11
108:11,19 109:18
110:1,17 111:16
111:18 112:11,14
112:17 114:4
115:21 117:20
118:8,10,20 119:2
119:5,11,14 121:4
121:20 122:4,6,11
125:3 127:11,16
128:3 130:14
132:9 133:5 135:1
135:12,21 136:19
137:14 138:16,19

140:8,20 141:9
142:4,14 143:8
147:2,15 148:16
153:10,19 160:3
**once**  43:1 58:21
75:2 93:6
**one's**  156:21 157:5
157:14
**oneeka**  1:19,21
139:14 147:9
164:3,19
**ones**  19:13 29:5
**ongoing**  80:18
81:18 82:8,10,12
128:7
**open**  71:3 72:15
75:7 133:4
**opened**  12:9 82:17
134:6 149:3
**operates**  158:13
**operating**  111:13
**operation**  21:14
45:7 50:1 88:1
**operational**  20:20
**operations**  10:12
30:1 90:4 103:4
109:7
**opinion**  129:5
**opportunity**  92:16
**opposed**  104:11
**options**  122:3
**order**  109:15
147:5
**ordering**  160:21
**orders**  146:14,19
**ordinary**  90:2
**original**  86:3
87:13 88:3,13
151:3
**originally**  86:16

**outcome**  164:14
**outlined**  124:7
**outside**  32:16
72:10
**outsourced**  158:10
**overall**  32:11
46:20 49:11,12
54:8 62:14 136:18
142:2
**overload**  36:18
**owned**  24:6
**owner**  40:21 87:21
**ownership**  24:4
**oxidizer**  19:17

**p**

**p.m.**  160:19
**p.o.**  3:8
**page**  2:21 4:5 5:1
12:12 14:18 44:1
65:16 66:9,10,11
66:17 67:12,15,19
68:4,4,7,11,18
69:3 70:14 80:4
83:3 84:19 99:20
101:17,18 103:12
103:12 110:19
113:9 114:8
118:13,13,17,19
118:20,20 119:1,3
119:4,10,12,13,14
119:21 121:1
128:5 140:13,20
141:8 142:6,10,14
143:1,8,14,18,20
148:13 149:4
150:9 162:20
163:4
**pages**  14:18 64:19
65:19 66:3 68:10
68:17 69:13,14
140:15

**paid** 91:21
**paper** 48:20 161:2
  162:21
**paperwork** 45:10
**paragraph** 55:15
  70:20 76:6 85:7
  141:16 142:8
  150:14
**part** 32:17 41:8,10
  46:20 47:9 51:13
  61:20,21 91:4
  92:4 97:2,4 135:3
  135:19 145:19,19
**particular** 30:5
  81:20 95:1 102:7
  102:15 104:10,20
  108:9 109:16
  110:10 118:2
  134:10 138:20
  157:8,14,16
  158:20
**particularly** 7:6
**parties** 7:5 150:10
  164:13
**partners** 34:15
  105:7
**partnerships** 24:7
**party** 32:16 40:17
  85:16
**pass** 93:6,21 94:4
  139:1
**passed** 87:8,11
  146:19
**paving** 48:11
**pay** 53:10
**payment** 76:10
  77:21 85:21 91:8
  91:14 141:10
**pdf** 118:20 119:1,4
  119:12

**peace** 49:11
**pending** 125:11
**pennsylvania** 1:18
  9:4,10 21:12 24:9
  26:3,8,19 67:21
  76:17 96:6
**people** 9:19 10:11
  17:19 20:14 39:19
  42:5
**people's** 93:5
**percent** 18:9
**percentage** 91:21
**perfect** 49:9 50:3
  99:6 107:15
**perform** 85:17
**performance**
  83:12,19 84:2,9
  103:6
**performed** 27:12
  28:6 32:13 54:9
**performing** 26:7
  26:12,13 27:8
  110:7 123:3
  126:17
**period** 17:16 31:2
  35:17 36:11 37:20
  56:2,3 78:7 79:2
  111:6 137:2
  155:10 156:17
**periodically** 38:11
**periods** 134:12
  135:14
**person** 22:21
  72:13 77:18 78:11
  78:17,19 79:1
  89:4 135:15,17
**personally** 20:13
  132:8 164:5
**perspective** 23:16
  57:14 95:19

**pertaining** 16:1,2
  125:13 130:5
**pertains** 103:19
**phone** 9:20 10:6
  10:10 38:21 44:19
**phrase** 147:18
**piece** 162:20
**pinwheel** 108:4
  147:16
**pipe** 36:19
**pittsburgh** 1:18
  9:9
**place** 63:6,8 75:2
  121:10 153:18
  164:6
**placed** 72:11
**plaintiff** 1:8 2:2
  11:21 95:21
**plaintiff's** 4:12
  14:9
**player** 19:18
**pleadings** 125:19
**please** 8:18 9:8
  47:12 66:8 117:6
  127:12 129:21
  161:1
**pllc** 2:4
**pm** 42:9 48:10
**point** 18:3 35:13
  36:2,18 38:6,6,9
  42:4,8 53:7 58:13
  58:20 59:2 60:13
  60:17,20 73:4,9
  75:3 77:17 82:4
  93:4,14 94:2
  108:15 110:10
  122:18 126:6,8
  133:18 138:14,21
  151:3,19 152:13
  154:15 155:3,19
  158:6 159:13,18

**pointing** 46:16
**points** 150:14
**policies** 24:2 30:10
  31:1 75:17 76:6
  76:16 78:14 125:6
  128:16,18 155:5
**policy** 30:8 31:4,5
  56:4 69:4 73:5,9
  73:13 74:1,12,14
  74:21 75:2,18,21
  76:1,3 78:6,7
  100:8 103:21
  104:6,11,16,16,18
  109:5 115:16
  120:16 123:4,16
  124:4 128:15,16
  129:8,17 134:12
  135:13 136:17
  137:2 149:21
  151:1 154:9,14,16
  154:19 155:1
  156:6 157:11
  158:13,18,19
  159:6,11,18 160:8
**pollution** 96:7
**poor** 25:9
**poorly** 60:18
**popped** 99:5
**populated** 148:6
**portions** 92:17
  142:17 143:4
**position** 18:19
  59:3 132:6
**possible** 7:21 20:6
  53:18 71:2 77:12
**potential** 32:15
**potentially** 27:1
  64:9
**practical** 32:14
  123:5

practice 46:6
predated 115:10
predominantly
21:4 78:21
preface 50:15
prefer 93:20
premium 76:21
78:1 104:15,15
108:17
preparation 28:18
51:17,19
prepare 52:7
prepared 64:7
111:12,6,7
preparing 31:16
present 3:21
president 18:18,20
39:15 41:4,5
press 97:19
pretty 28:10 42:9
42:13 46:9,14
54:20,20 59:9
60:2 108:10 138:3
139:6,11 152:21
previous 18:11
previously 37:15
94:12 100:7
127:10
primary 41:16
62:18 78:17
prime 28:1 40:21
92:14 135:17
principally 29:21
30:3 37:21 38:1
prints 33:1
prior 30:16,18
50:11 51:1,14
52:7 56:11 81:6
81:12,13 84:11
85:1 94:17 100:8
145:12 157:11

pro 92:8
probably 6:21 7:1
22:10,10 23:13
34:1 36:15 37:11
37:11 38:3 39:4
39:13,15 40:4
46:9 52:3 55:13
60:4 61:10 78:16
79:1 80:15 84:3
97:12 101:15
107:7 109:4
116:20 122:15,18
130:9 132:14
138:14 150:6
152:10,10,11
153:8 159:17
problem 14:3
60:13 61:17
problems 39:11
60:10 65:7
procedures 58:2
proceed 93:12
102:13
proceedings 6:1
164:11
process 136:11,18
procuring 37:9
produce 126:1
produced 125:20
product 102:14
production 32:1
professional 40:10
120:12 158:8,9
profit 37:4
profitability 23:18
progressing 41:13
project 23:8,9
25:4,6 30:6 32:17
34:20,20 35:2,5
36:5,8,10 37:1,6,8
39:12 40:3 41:3

42:10,16 44:9,10
44:13 48:11 56:2
56:5 86:4,7,13
87:1 88:14 89:8
90:11,20 91:6
92:8 141:14 144:5
144:14 146:2
150:16 155:20
156:1
projects 25:1,7
29:14 31:7,18
36:7,13 37:3
proliferating 47:1
prompted 46:3
48:13 73:20 115:6
116:17
prompting 48:16
proper 86:17
125:14
property 85:21
87:21
proposal 4:21
101:11 108:7
111:5,19 112:4
114:17,17,19
118:16 121:14,21
142:5
proposals 28:15
28:19 31:17,20
56:15
propose 105:16
proposed 121:13
137:10
protection 72:21
74:1
protocol 73:19
provide 55:18
64:19 84:6 109:16
114:13,17 122:13
136:3 154:10,19
157:17 159:21

160:7
provided 26:6
54:15,15 83:17
86:16 94:18 104:7
104:19 109:3
110:2 111:11,15
114:6,19 115:9
119:8 121:14
123:16 124:18
125:1 131:11
134:13 135:12
159:1
provider 109:8
providers 86:2
provides 114:9
providing 78:12
95:17 111:14
123:11 135:8
136:6 137:1
provision 67:20
144:19 146:1
provisions 90:8
141:18,21 144:18
public 1:19 164:3
164:19
pump 31:13
pumps 31:13
purchase 135:6
156:19 157:6,7,16
158:2
purchased 24:1
154:17
purpose 80:12
124:16
purposes 11:16
14:21 43:10 47:14
65:12 70:7 74:18
79:14 80:1 82:20
99:4 100:20 102:3
117:10 130:17
133:3 140:3

**[purposes - redstone's]** Page 20

148:10
**pursuant** 104:21
104:21
**pusey** 148:17
**push** 49:19,19
**pushed** 11:17
**pushing** 47:15
**put** 81:8 98:8
127:20 128:2
136:16 151:12
**putting** 53:16
89:21 121:17

**q**

**qualified** 158:3,6
**quality** 32:17
158:11
**question** 7:13 8:17
8:20 50:7 109:9
111:17 117:15
125:3 135:4 136:5
140:16 144:12
145:21 154:7
157:4 159:3,5,19
**questions** 6:17 7:3
7:4,15 10:11 13:5
50:15 51:9 138:20
153:20 154:5
156:10,13,14,14
160:2,11
**quickly** 7:2 32:12
106:15 139:11
**quite** 38:19
**quote** 59:7 73:8
100:7 101:15
102:3,14,15,17
103:15,20 108:21
115:1,3 116:9
120:15 121:10
145:9
**quotes** 100:4
102:20 105:1

116:10 123:17
**quoting** 105:3

**r**

**rail** 74:6
**railroad** 74:1
**rapport** 58:11
**rarely** 31:11
**reaction** 73:21
**read** 51:5,14 112:8
112:9 158:19
162:3 163:4
**reading** 77:5
79:11 118:4
142:10
**reads** 100:2
**real** 24:4,5,6 87:21
93:16 138:8
**realized** 40:5
**really** 17:19,20
18:14 20:5,19
21:19 29:11 31:19
40:7 41:8,11 45:8
46:11,12 53:13,21
57:6 58:8 59:2
71:8,9 72:17
92:12,12 96:4
131:7 151:4
**reared** 43:3
**reason** 38:5 50:19
76:14 78:5,9
86:12 108:16
120:19 121:2
150:20 158:15
163:4
**reasonable** 42:14
90:17 111:14
**reasons** 57:12
**rebuilt** 52:14
**recall** 28:9 29:8
41:6 46:15,16
48:13 49:4 50:8

55:14 56:8 60:14
61:15 62:5 63:5,6
63:7 64:2,18 65:1
69:19 74:11 75:4
77:16 86:3,6 91:1
92:5,12,21 97:10
98:1 100:11 102:1
108:6,11 113:20
126:13,17 130:10
132:14 134:1,3
135:10 137:1,8
141:21 144:11
**received** 74:11,13
74:20 75:2 76:15
101:15 111:21
123:18 126:15,20
127:7 130:3 132:4
134:1
**receiving** 131:5
**recognize** 75:21
99:7,12,16 101:10
101:14 118:2
140:17
**recollect** 12:10
27:20 31:3,15
72:7 77:5 84:4
132:18 137:12
151:4
**recollection** 26:9
27:18 50:21 71:14
145:5
**recollections**
131:9
**record** 65:9,10
83:2 154:1,2
160:4 162:5
164:11
**recorded** 164:10
**red** 62:17
**redirect** 96:3

**redrill** 19:13
**redrilled** 32:10
**redstone** 1:7 6:14
8:8 11:3,7,21
12:18 13:6,8 15:5
16:3,5,7 17:5,7,8
18:10,17 19:4,9
20:4 21:10 22:4,8
23:20 24:11 26:5
26:12 28:6,7,15,19
29:2,5,7,15 30:1,5
30:11,20,21 31:8
31:17 34:4,8
36:12 37:18 40:18
42:5 45:18 49:6,7
49:8,20 55:11,16
55:18 59:5 62:8
64:1,4,16 73:10
77:19 78:11,15
81:1 84:6 85:3
88:8 89:1,5 98:12
98:13 100:4
101:12 108:8,14
110:6,10 111:5
112:5 114:5
115:10 117:14
118:16 124:16
125:11,13 126:3
126:15 131:17
132:10 133:12
134:11 135:5,15
140:17 142:11
143:16 149:15
150:16 153:10,11
154:4 155:13,14
155:21 156:2,19
157:6,16 158:7
159:6,7,7,9
**redstone's** 27:14
64:19 81:9 83:12
84:9 144:20

**reed**  85:1
**refer**  54:16 108:3
**reference**  54:10
  63:21 103:15
  112:19 114:13
  128:6 142:8 146:2
**referenced**  102:15
  113:12 120:8
  137:15 144:6
**referred**  85:19
  134:21
**referring**  50:9
  52:4 71:7 128:9
  128:17 134:19
**reflect**  23:11
**refresh**  11:12,17
  43:12 47:15 50:20
  145:5
**refreshing**  14:12
  65:16 148:11
**regarding**  69:20
  81:2 84:2,7 95:18
  127:18 130:13
  132:6 158:5
**regards**  129:3
**related**  7:5 10:11
  12:9 18:12 22:21
  24:2 25:8 32:15
  45:12 48:17 87:2
  90:13 92:11 94:14
  94:18 97:1 122:15
  151:6,10
**relates**  151:9
**relationship**  16:8
  33:8 34:4 45:17
  46:10 81:18 82:8
  82:13 102:18
**relationships**
  116:13 136:14
**relative**  123:10

**relatively**  28:13
  57:9
**relevant**  92:17
**reliant**  55:17
**relied**  121:2,3
  131:13 136:2
**remains**  18:19
**remember**  12:6
  27:2,20 28:3,12
  29:9 36:15 40:5
  46:12 48:8 51:4
  56:7,10 57:16
  59:15,15 62:12,16
  62:21 63:1 71:8
  71:10 73:20 74:10
  75:15 76:19 77:6
  82:4 90:13,15,15
  91:3,15 92:2,3,13
  96:21 97:11 99:18
  102:4,5,6,9,21
  116:4 131:5
  133:15,16 143:11
  145:7 146:10
  152:4,9,14,17
  153:16 159:15
**remit**  76:10
**remotely**  7:7
**remove**  129:21
**removed**  117:16
  117:19
**removing**  44:20
**renewal**  75:17
  100:4 114:5 117:3
  122:21 134:11
  137:2,10 156:17
**renewals**  98:13
**renewed**  156:17
**rental**  86:2
**rented**  31:10
**repair**  57:12 60:7

**repairs**  21:4
**repeat**  79:20
  142:20
**rephrase**  8:18
**replaced**  48:11
**reported**  1:21
**reporter**  7:3,10,17
  98:17 129:20
  147:11 160:20
**represent**  94:8
**representative**
  11:3,7 95:2,5,20
  155:14
**representatives**
  129:14
**represented**  96:12
  156:7
**representing**  85:3
  125:1 131:17
**requested**  125:2,8
  125:9 158:17
**require**  146:17
**required**  17:17
  48:20 49:19 117:1
  124:19 154:10,13
  154:19 155:2,15
  156:3,7
**requires**  50:5
**reschedule**  106:18
  106:19
**reservation**  98:6
**reserve**  93:13
**residence**  1:17 9:8
**resigned**  17:9,11
**resources**  36:5
  37:2 83:11 128:11
  141:16
**respect**  13:1 15:2
  15:5,7 29:14
  34:19 35:5 39:11
  64:20 77:21 81:9

**87:17 88:13
  106:12 149:16
**respective**  136:4
**respects**  83:13
  84:10
**response**  54:2
  132:12
**responses**  26:5
  27:14
**responsibilities**
  78:2
**responsibility**
  29:13 49:14 78:4
  124:9 159:20
**responsible**  29:21
  30:4 32:2 33:6
  77:18 78:12
**retaining**  35:2
  141:14,17 142:9
  144:1
**review**  47:12 75:7
  82:18 92:17
  103:19 111:20
  118:6 120:15
  125:6 137:10
  151:13 159:6
**reviewed**  51:21
  55:10 88:3,6,7
  112:3 131:21
  146:19 149:3
**reviewing**  99:13
**rich**  96:9 105:16
  106:7 118:1
  153:21 154:5
**richard**  1:15 4:2
  6:4 162:14
**right**  6:11 9:2,16
  9:21 14:8,17
  23:16 24:13,20
  26:10 30:19 34:11
  34:14,17,18 36:3

36:10 37:2 42:2
45:11,19 53:7
58:6,16,18 59:3,14
60:7 61:7,8 63:16
65:5 70:4,5 71:3
72:15 77:19 82:10
82:15 86:11 88:8
88:19 89:2,9,10
93:13,16 96:14
97:3 99:1 104:2,8
105:16 110:7
113:14 123:18,19
129:3 140:6 141:6
143:10 148:6
157:3
**rights** 98:6
**riley** 2:14 3:5
**rings** 149:7
**risk** 23:15,17
29:19 32:16 49:13
54:21 71:4 72:15
73:17 87:13
**risks** 124:5,7
**road** 20:12
**robert** 3:4
**roger** 54:6,15,16
54:17,19 65:21
70:15 79:17 81:20
99:9,17 100:1
105:4,8 112:19
113:16 116:8
118:1 121:8
122:13 123:18
132:16 136:15
137:9,13 148:20
152:21 154:7,17
155:3,12
**rogers** 66:7
**role** 31:16 41:2
**rolling** 42:19
108:4

**room** 148:2
**root** 62:3 126:7
151:5
**rules** 7:2
**run** 7:2 136:17
**running** 40:13
90:18
**rw** 11:12 14:18
43:8,15 47:11,16
47:17 57:3 65:4
65:15,15,18 70:9
70:13 74:16 75:6
75:9 79:10 82:17
140:8

**s**

**s** 1:19,21 164:3,19
**safe** 55:3
**safely** 37:4
**safety** 62:8,11,12
62:15,19 63:3
**saw** 84:3 131:21
**saying** 40:6 83:17
123:6,7 127:5
144:10 146:14
157:12
**says** 55:16 66:8
67:8 70:13 77:3
80:18 83:10 85:8
141:13 142:15
143:3 149:10
150:10,14
**scapegoat** 59:4
**scarborough** 2:14
3:5
**scenario** 28:12
39:18 116:17
123:5
**scenery** 21:11,13
21:15,20,21
**schedule** 87:15
90:1 91:9,12,14

92:8 141:17 142:9
144:5
**scheduled** 85:11
**scheduling** 92:4
**schmidt** 84:21
85:1,2
**scope** 86:17 103:4
**screened** 153:18
**screwing** 58:5
**scroll** 12:11 14:18
43:21 66:9 67:12
67:15 68:3,10,17
83:6 84:14,18
101:16 103:11
110:18 113:4
118:10 119:3
140:13,14 143:14
144:4 149:4
**seal** 164:15
**second** 48:2 62:7
65:2 66:10 70:3
79:16,21 81:14
84:18 99:20 114:9
118:7 121:6 128:4
146:6,7 149:4
150:9 154:1
**secretary** 20:10
38:19
**section** 140:20
141:4,10 142:10
142:15 143:3
144:4,6,13 150:13
**secure** 109:18
122:19 123:12
**securing** 102:13
**see** 8:7,7 11:10
12:1,5,13,14 13:16
14:2,10 15:2,10
43:19 44:1,5,21
47:4,21 48:5
49:10 66:1,5,12

67:1,7,10,21 68:5
68:13,20 69:4
70:11,17 71:5,6
75:11,19 76:5,8,12
79:19 80:10,20
82:21 83:7,14,15
83:20,21 85:13
89:12 101:20
103:13,14,16
104:4 105:5
112:21 113:7,11
113:13 119:9
120:4,9,13 125:21
141:11,19 142:12
142:13,19 143:6
143:20 144:2,8,16
147:14 148:15,17
149:11 150:11,18
159:17
**seek** 100:7 136:2
**seeking** 128:19
**seen** 12:3,8 71:9
83:1,5 84:1 149:1
**send** 80:15 153:11
153:14
**sending** 46:4 79:9
80:13 82:16
**senior** 47:5
**sent** 42:5 56:9
65:14 69:12 70:8
75:5 76:7 77:7
82:6 112:2 116:20
124:19,20,21
139:20 151:14
155:8
**sentence** 80:17
83:10,16 114:9
121:6 128:6,13
**september** 35:7
89:2 154:9 155:19

[sequence - spoken]                                                                                                                 Page 23

**sequence** 146:15
150:15
**series** 80:5 120:1
**serious** 35:14
**service** 25:15
109:8
**services** 19:8 26:7
26:12,13 27:9,12
27:15 28:6 95:6,8
95:11,21 120:12
**set** 164:6
**settled** 98:7
**settlement** 60:15
60:20 61:21
**seven** 143:2
**share** 8:5,5,7
11:13 147:12
**shared** 126:12
**shareholders** 16:9
135:20 153:9
**sharpton** 100:14
100:15 102:2,13
103:2 104:20
105:12,13,14
108:12,20 109:12
109:15,19 111:12
111:15,19,21
112:7 114:20
121:15 123:15
**sheer** 59:13 60:11
**sheering** 57:5
59:19 62:7,17
126:3,11
**sheet** 162:9,20
163:1
**sherry** 148:17
152:19
**shifted** 36:5
**shop** 20:15,16,18
21:2,3,11,13,14,16
52:15,15 64:1,4

**short** 63:10
**shortly** 8:10
**shortsighted** 117:1
**show** 88:11 93:3,4
93:7 108:2
**showed** 109:5
**side** 18:13 25:14
29:21 42:10 92:1
**sided** 33:14
**sideswiped** 29:11
**sideways** 46:18
49:6 57:1,4
**sign** 124:5
**signature** 64:19
66:3,11,12,14,16
66:19,20 67:2,6,7
67:13,16 68:3,7,11
68:15,18 69:1,7,10
69:12,13 143:10
164:18
**signatures** 67:9
**signed** 67:4,5
88:21 89:1,4,7,13
89:16 90:7 91:7
92:18 98:5 143:12
**signing** 88:6
**signor** 87:19
**silicone** 25:10
**silo** 45:11
**similar** 110:13
118:11
**simple** 53:18
**sir** 8:7 14:16 35:4
40:20 44:6 48:1,6
49:9 55:13 56:18
63:18 65:7 66:2,6
68:2,9 73:11
79:20 80:7,11
81:5 82:21 83:15
85:14 88:9 92:20
101:21 103:10

104:1,5 131:19
133:9 134:3
140:19,19 141:2,7
141:12 142:20
143:19 144:3
148:15 149:5
150:12 152:5
153:5
**site** 23:8 35:9
36:12 37:17 40:18
41:1,20 45:18
46:19 56:20 57:5
61:20 62:8 64:5
64:15,21 69:21
73:17 81:3 87:17
87:19 109:19
110:2 124:14
125:11 126:4,16
130:7 131:18
134:15 144:21
149:16 153:14
156:21 157:13
**sitting** 7:8 148:2
**situation** 72:19
129:5
**six** 6:21 13:11 20:1
22:10 94:13
**size** 36:6 146:15
**skip** 147:7
**skipped** 147:4
**slid** 72:12
**slide** 72:8 73:1
122:16
**slides** 71:3
**slip** 73:18
**slipped** 71:17
**slowly** 7:19
**small** 44:17
**smart** 47:7,7
152:21

**smartest** 22:21
**snapshot** 105:2
**sole** 11:7 12:16,21
15:5,8
**somebody** 72:18
73:2 137:6 146:6
149:14 157:20
**soon** 71:2
**sorry** 27:10 28:11
50:6 51:12 79:20
99:11,12,14 101:3
109:9 130:2 141:4
142:21 148:21
157:18
**sort** 23:7 39:12
45:16 91:18
**sought** 134:18
**sounds** 8:2 9:1
12:20 13:3 26:10
30:19 86:11,11
89:3 160:16
**sourcing** 35:20
**south** 27:15 28:1
**southpointe** 9:14
**speak** 7:18 8:15
10:18 87:2
**specific** 84:4 90:13
142:8
**specifically** 88:18
**specifics** 64:12
**specified** 88:15
**specifies** 144:14
**speculated** 158:4
**speculating** 30:17
149:13 151:8
**speculation** 48:15
**spend** 93:1
**spill** 96:6 97:2
**spoken** 132:16
152:17

CONFIDENTIAL

[spots - talked]                                                    Page 24

**spots** 33:13
**spread** 14:2
**stacked** 32:8
**stage** 64:7
**stalling** 133:15
**standard** 46:4,5
**standpoint** 18:14
    20:21 102:19
**stanley** 80:15
    84:20,21 134:5
**start** 7:13,16 37:14
    91:19 106:13
    120:1
**started** 22:16
    24:12 37:9 38:7
    39:13,14 40:1
    41:7,9,11,12,17
    43:1 90:17 150:17
    150:21
**starting** 46:18
    49:5 86:17
**starts** 101:18
    118:13
**state** 26:21 102:2
    102:13 103:2
    104:20 108:12,20
    109:12,15,19
    111:12,19,21
    112:7 114:2,20
    115:16 117:18
    121:15 123:15
    164:1,4
**stated** 26:6
**statement** 28:16
    55:19,21 83:9
    84:19
**states** 1:3 26:11
    28:4,6,21 29:4
    31:8 71:1 119:6
**stating** 84:8 87:5

**station** 27:6 88:2
**stay** 21:17
**steel** 58:18
**stenographically**
    164:10
**step** 49:13
**steven** 111:8,9
**stock** 60:19 61:16
**stop** 106:10,18,21
    157:3
**store** 153:12
**strategy** 87:13
    151:10
**street** 3:17
**strictly** 56:5
**strong** 58:11
**structurally**
    150:17
**stuff** 36:20 53:8
    116:5,16 117:18
    117:19 138:14
**sub** 20:1 42:6
    124:13 142:16
    143:4
**subcontract** 40:18
    88:7 89:1,5,16
    90:7 92:19 140:17
    140:21 141:6
    142:1,11,11 143:2
    143:10 144:7,20
    145:13 146:1,2
**subcontractors**
    31:9
**subcontracts**
    110:3
**subject** 35:1 44:3
    66:3 69:16 93:14
    126:16 134:15
    149:9,11 156:20
**submission** 100:5

**submit** 31:17
    153:3
**submitted** 28:15
    29:5 91:11 108:15
    115:2 129:11
    146:13 149:16
    150:1,4,5
**submitting** 149:19
**subpart** 113:3
**subsequent** 86:1
    157:12
**subsequently**
    145:18
**subsidence** 71:4
    72:15 73:12 74:4
    122:15,20 123:8
**substantively**
    33:17
**subsurface** 110:12
**suggested** 104:19
**suing** 95:11,15
**suit** 15:15 95:12
    95:14
**suite** 2:7,17 3:7,17
**summary** 101:19
    103:16 108:18
    154:5
**sunseri** 3:14 4:7
    94:5,6,8 97:7,18
    98:19 99:1 100:17
    101:3,6,9 106:1,4
    106:20 107:12,18
    108:1 130:14
    138:19 139:3,15
    147:13 156:12
    160:11 161:3
**super** 133:20
**support** 36:1
**supposed** 89:16
    124:1

**sure** 7:9 8:11 10:5
    12:7,9 28:8 30:12
    30:13 34:21 45:10
    46:8 59:20 70:3
    74:2 82:5 87:18
    87:18 90:6 99:19
    99:20 103:1,1,8
    113:21 117:15
    122:16 124:8,10
    125:15 132:15,20
    133:21 134:9
    137:8 138:12
    143:1 149:2,3
    152:19,21 159:13
**surprised** 90:5
    92:13
**suspenders** 55:2
**switched** 150:3
**sworn** 6:5 164:7
**synopsis** 131:14

t

**table** 7:8
**tag** 96:10
**tails** 49:2
**take** 8:13,13,15
    10:19 14:3 40:6
    43:4 45:12 49:13
    63:16 65:3 70:9
    79:10 93:4 103:18
    105:17 106:14
    107:13 136:17,21
    139:18,21 161:3
**taken** 63:19 94:13
    107:21 115:15
    118:12 132:6
    146:8
**taker** 40:10
**talk** 52:6 82:10
    109:6 160:4
**talked** 52:1,9,9,11
    52:11,16 53:1

59:14 60:4 82:9
111:10
**talking** 7:11 34:21
39:14 50:10,12,16
53:18 57:16,17
127:16
**tb2-641-444555...**
75:18
**team** 16:12 128:20
**technical** 110:12
**ted** 42:12,17 44:2
44:7 46:8,13 47:5
48:9
**telephone** 2:9,19
3:10,19
**tell** 6:6 38:20
40:15 45:2,3
46:14 51:4 52:20
54:5,16 58:5
105:15 114:1
152:6 153:11
154:8,18 155:4
157:20 158:16,21
**telling** 91:15
**tend** 36:9
**tender** 80:9
**tennessee** 20:7
25:5,21 26:8,15
100:16
**tension** 45:20 46:2
46:3
**tenure** 17:5 18:21
20:3 21:9 28:7,19
29:7,15 30:11,20
34:4 153:10
**term** 145:12
**termination**
128:11
**terms** 20:21 29:17
30:1 36:16 61:11
82:3 104:7,8,9

105:3 116:17
124:3 128:14
134:7 136:18
137:4
**terry** 13:19,20
15:3
**testified** 6:7 23:6
35:6 94:12
**testifying** 11:2
155:13
**testimony** 64:1
95:18 162:5
**testing** 62:14,19
62:20 71:14,19
73:19
**tfitzgibbons** 2:20
**thank** 9:11 10:20
13:3 63:18 94:7
130:1 138:21
139:3 160:17
**thanks** 14:1
**thermal** 19:17
**thing** 33:20 34:21
58:19 60:6 71:12
72:7 74:7,20 75:3
76:21 91:17 112:8
146:9
**things** 20:20 25:11
30:1 33:9 46:14
46:18 49:5 53:16
56:21 61:2,19
62:1 75:1 92:14
123:12
**think** 10:14 13:16
13:17 15:12 16:6
19:14,18,20,20,21
22:20 23:9,13,14
23:15 24:12,15
26:11,21 28:5,9,13
29:1,4,18 32:19
35:12,12,13 36:9

37:15 38:2,8 39:3
39:21 40:9 42:2
42:20 43:8 46:1,8
46:17 48:21,21
49:2,8,9 50:8,17
51:3 54:14 56:11
57:13,19,19,20
58:21 59:2,6,7,17
60:16,19,21 61:1,2
61:4 62:12,18
65:4 71:11,12
73:18 74:8,13,20
75:14 76:19 82:1
82:4,15 87:3,12,20
89:10,11,19 93:2
95:2 96:13 97:13
98:17 102:16,19
105:2 106:3
107:12 109:9
111:13 115:4,6,8
115:14 116:3,19
121:16 122:17
123:3,13 125:19
125:20,21 126:5
128:1,18 130:8
132:8 133:18
138:19 139:7,11
139:16 144:9
147:4,21 148:19
148:19,20 150:1,1
150:2,4 151:2,12
152:9,15 157:2
**thinking** 38:5 72:9
81:17 143:12
**third** 3:7 32:16
76:6 80:17 85:16
128:6
**thought** 32:3 36:7
54:20 98:18 122:9
151:12

**three** 39:4
**tim** 6:11 13:14
139:7 147:4 152:9
153:21 160:13
**time** 7:12 8:12,14
16:11,13 17:12,16
17:17 22:9 24:12
25:17,20 27:11
30:21 31:2 34:10
35:17 36:11 37:3
37:20 38:4,9,11,19
41:16 42:8 56:2,3
57:9 60:14,21
61:15 62:6 63:10
64:18 65:3 73:4
73:17 74:3 76:19
77:17 79:2 80:14
85:5 87:7,11
88:18,21 89:7,15
90:21 91:1 92:9
92:11 93:2 98:11
101:5 105:2,7
106:21 108:9
109:1 110:11
115:5,5 120:15
126:8 127:6 128:2
132:15 134:11
136:21 138:15,21
140:21 141:5
146:17 149:15
151:5,9 155:10
156:16 157:8,16
158:6 164:6
**times** 6:20 13:11
94:14
**timib483-484**
148:14
**timing** 27:2 32:4
37:1 82:2
**timothy** 2:13

CONFIDENTIAL

**titled** 111:4 118:14
**today** 6:17 7:6
  11:1 13:5
**told** 24:15 28:14
  43:4 53:1 54:19
  80:15 107:9 135:4
  135:11 154:12,21
  155:12 156:2,15
  156:21 157:1,5,15
**tone** 49:10
**top** 43:17 47:18
  68:18 70:13 78:6
  119:6,17 128:5
  148:16
**topic** 15:2
**topics** 12:12,18,19
  13:2,5 15:7,8
**trail** 43:16 47:18
  48:2,20
**trailer** 44:4,20
  45:5
**train** 27:6
**transcript** 160:21
  162:4 164:10
**transpired** 12:8
**trash** 19:6
**travelers** 96:11,16
  97:9
**treed** 91:14 145:9
  145:9
**trial** 97:20
**tried** 20:5 33:15
  53:17
**trucking** 96:7
  138:3
**true** 50:3 148:4
  162:5 164:11
**trust** 58:12
**truth** 6:6,6,7 54:1
**try** 7:12 8:10,13
  8:15 11:9,10

33:20 59:9 71:1
  96:3 106:14
  147:15
**trying** 19:14,18
  27:19 33:12 36:17
  38:2 40:11 49:11
  49:12 63:12 96:4
  98:10 103:14
  117:6 118:4 127:9
  133:15 136:10,13
  145:2
**turned** 58:20
**two** 23:8,12 39:6,8
  68:10,17 77:1,10
  83:3 114:18
  120:11 138:4,4
  148:13
**type** 122:20
  134:10 157:4
**typical** 34:7

**u**

**uh** 9:1 10:1 15:1
  19:1,3 22:2 24:14
  64:3 68:21 70:18
  70:21 75:12,20
  94:16 112:16
  114:11,15 120:5
  120:10 121:5
  138:18 159:10
**ultimate** 87:19
  126:7
**ultimately** 32:20
  34:14 47:8 77:11
  98:6 126:21 129:6
  129:15
**unable** 8:16
  153:12
**uncertain** 145:4
**underground** 74:4
**underlying** 13:12
  15:14,19 50:11

51:15 85:4 86:1
  89:12 96:5 98:7
  125:6 131:18
**undermine** 49:7,8
**understand** 6:18
  8:18 11:1 13:4
  49:16 53:4,14,19
  90:6 117:15 124:4
  129:13,15 136:10
  158:12,14
**understanding**
  61:18 71:11
  103:18 127:19
  134:8
**understood** 8:20
  13:9 35:4 49:15
  53:2 69:13 72:1
  89:8 129:1 159:4
**underwriter** 111:8
**unforeseen** 37:5
  72:21
**unfortunately**
  49:21 50:2 140:5
**uninvolved** 151:18
**union** 2:5
**uniontown** 20:9
  20:15,17,18 21:3,6
  21:8,18 37:21
  38:2,3,9 76:17
**united** 1:3 2:5
**university** 2:6
**unquote** 59:7
**upcoming** 154:18
**update** 114:17
**ups** 46:6
**use** 48:19 57:1
  81:3 162:20
**usually** 31:10

**v**

**vaguely** 56:8
**vain** 109:2
**values** 91:12
**variables** 37:5
  61:10
**various** 15:21
  17:14 29:14 31:7
  31:17,20 57:11
  136:2
**vast** 23:21
**venue** 96:2
**verbatim** 59:6
**vernon** 9:3,6,7
**versus** 97:9 137:6
  145:9 151:6
**viewed** 134:2
**virginia** 1:4 2:8
  3:9,18 24:10 26:4
  26:8,19 27:16
  28:2 29:9 35:3
**virtual** 1:15 2:3,13
  3:4,14 4:2 160:18
**virtue** 144:18
**voice** 101:5
**vs** 1:9

**w**

**w** 133:19
**waggett** 44:2,12
  44:13 135:17
**wailers** 64:15
**wait** 7:12,15
**waiting** 65:17
**walking** 132:19
**wall** 35:2 49:17
  62:13 71:16,16
  72:9,10 85:17
  141:14,18 142:9
  144:1 153:13

CONFIDENTIAL

**[walls - yep]**                                                           Page 27

**walls**  40:11
**walton**  1:15 4:2
  6:4,9 11:15 14:20
  43:9 47:13 51:12
  65:11,14 70:6,8
  74:17 79:13 82:19
  94:7 97:10,20
  98:11,15 99:3,6
  100:19 101:10
  108:2 117:7,9
  118:1 129:20
  130:3,16 132:20
  132:21 133:2
  136:19 138:5,19
  139:20 140:2
  148:8,9 160:16
  162:14
**walton's**  50:11
**want**  10:8 14:1
  34:21 54:17 88:10
  90:6 93:12,15
  106:9 115:3
  121:21 122:16
  123:13 125:21
  139:4,5,8 143:14
  147:5 158:16
  159:1 160:9
**wanted**  45:9 48:17
  50:14 52:3 55:2
  105:5,8 114:9
  116:8,11 122:15
  152:1,1,7
**wants**  93:17
**washington**  2:18
  97:13,16
**watching**  33:9
**water**  19:11 91:19
**waters**  54:11,17
  56:6 65:21 70:15
  79:17 80:8,13
  81:20 99:9,17

100:1 112:19
113:17 118:1
121:8 137:9 154:7
154:17 155:3,12
**way**  18:3 23:14
  40:15 49:9 62:4
  62:20 80:1 119:21
  164:13
**waynesboro**  38:14
**we've**  28:5,21 29:6
  82:15 114:18
  115:5 118:11
  144:18
**wearing**  38:7
**week**  39:3,9 65:8
  77:10 127:17
  147:19
**weeks**  39:6 127:1
  127:2
**wells**  19:11
**went**  14:11 32:20
  59:17,20 60:21
  62:4 116:6,9
  121:8
**west**  1:4 2:8 3:9,18
  24:9 26:3,8,19
  29:9 35:2 83:11
  85:10 87:3,9,12,16
  87:18,20 88:4,14
  89:12 90:9 91:4
  92:14 141:15
  142:18 153:11
**wheeling**  1:5 3:18
**white**  3:15
**wi**  44:19
**wide**  71:3 72:15
**wife**  138:7,9
**winding**  36:16
**winter**  40:12
**wit**  164:2

**witness**  6:5 51:3
  63:11,14,18 65:7
  74:19 93:9,19
  96:14,20 97:11,15
  98:20 101:1,4,7
  105:21 106:10,17
  107:1,15 130:2,18
  133:4 139:2,12
  146:9 147:18
  160:17 163:3
  164:5,15
**witnesses**  14:9
**word**  57:1 104:3
**words**  46:18 81:3
**work**  19:14,15
  20:4 25:8,16 29:6
  30:5 37:10 38:16
  49:18 86:18 89:16
  91:16 103:7 106:8
  109:13,20 110:7
  110:10,12,13
  115:17,19 121:9
  124:14,16 125:11
  126:17 130:6
  134:20 141:15,17
  142:8 144:5 155:6
  155:7,11
**workday**  34:7
**worked**  20:8 25:12
  27:21 38:10 75:14
  156:8
**workers**  62:8
  67:21
**working**  25:2,3
  34:4 36:12,13
  40:1,8 42:6,19
  46:9 49:1,1 62:13
  62:20 71:20 74:3
  74:6 87:5 91:2,6
**works**  8:11 34:11
  139:12 149:14

**worries**  97:19,19
**write**  151:7
**writing**  53:17
**written**  151:21
**wrong**  57:18 59:21
  60:1 61:6
**wrongfully**  146:18

**x**

**x**  116:4 121:18
  122:5,10

**y**

**yeah**  12:14 14:11
  16:15 17:12 19:10
  21:19 22:15 23:13
  23:21 24:10,17
  26:10,14,17 27:19
  27:19 28:17,17
  29:16 30:19 36:10
  38:3 40:4 41:16
  43:6 45:6 50:13
  51:3 63:11 66:13
  69:15 72:4 73:18
  73:18 76:9 77:20
  82:9,14,14,14
  94:11 95:16 96:20
  97:5 98:14 99:1
  99:15 101:1
  102:20 103:5
  105:14 106:4,10
  106:17 108:10
  110:15,16 112:12
  113:1,14 118:7
  119:15 133:17
  142:5 145:7,7
  147:14 149:18
  153:7
**year**  56:11,12,12
**years**  22:12 48:19
**yep**  14:13 43:14
  65:16 84:18

**[yep - zoom]**                                              Page 28

107:20 108:5
113:11 119:18
121:11 140:7
**yesterday**  53:2
**york**  20:8 26:7,16
26:17 115:7,8,14
116:7,16 117:12
117:13,19
**young**  44:8 47:7
**younger**  42:9

**z**

**zoom**  147:21

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.